**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| DARRYL R. WORMUTH<br>CAROLINA WORMUTH<br>ANTHONY J. BROOKE<br><br>PLAINTIFFS,<br>v.<br><br>PRINCE GEORGE'S COUNTY, MARYLAND<br>PRINCE GEORGE'S COUNTY POLICE DEPARTMENT<br>CLEO SAVOY<br>DAVID ROBINSON<br>JAMES McCREARY<br>MICHAEL ELSER<br>MALIK AZIZ<br>ANGELA ALSOBROOKS<br>DONNELL TURNER<br>AISHA BRAVEBOY<br>MUSA EUBANKS<br>JOEL PATTERSON<br>COREY TRUXON<br>JEFF ROSS<br><br>DEFENDANTS. | CIVIL ACTION No.: 8:23-CV-02905-TDC<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT**

NOW COMES the Plaintiffs, Darryl R. Wormuth, Carolina Wormuth, and Anthony J. Brooke, by and through their attorney, Ray M. Shepard and The Shepard Law Firm and pursuant to the First, Fourth, Fifth and Fourteenth Amendments of the United States Constitution, 42 U.S.C. §§ 1983 and 1988, Articles 24, 26, and 40 of the Maryland Declaration of Rights, and the common law of Maryland, does hereby sue the Defendants, Prince George's County, the Prince George's County Police Department, Cleo Savoy, David Robinson, James McCreary, Michael Elser, Malik Aziz, Angela Alsobrooks, Donnell Turner, Aisha Braveboy, Musa Eubanks, Joel Patterson, Corey Truxon, and Jeff Ross for violations of their rights guaranteed by the United States Constitution,

the Maryland Declaration of Rights, and the common law of Maryland. In support of their causes of action, Plaintiffs allege as follows:

**PARTIES**

1. Plaintiff Darryl R. Wormuth ("Darryl or D. Wormuth") is a citizen of the United States residing in Kingsley, Pennsylvania. Darryl Wormuth was at all relevant times a police officer in the Prince George's County Police Department employed by Prince Georges County, Maryland. He is the husband of Plaintiff Carolina Wormuth. Darryl Wormuth is white. Prior to the events alleged in this Complaint, Wormuth consistently received outstanding performance appraisals from his chain of command.

2. Plaintiff Carolina Wormuth is a citizen of the United States residing in Kingsley, Pennsylvania and is Plaintiff Darryl Wormuth's wife.

3. Plaintiff Anthony J. Brooke is a citizen of the United States residing in Anne Arundel County, Maryland. Anthony J. Brooke was at all relevant times a police officer in the Prince George's County Police Department employed by Prince Georges County, Maryland. Anthony Brooke is white. Before and after the events alleged in this Complaint, Brooke consistently received outstanding performance appraisals from his chain of command.

4. Defendant Prince George's County is a municipal corporation and body politic located in Prince George's County, Maryland. Pursuant to the Prince George's County Charter, § 101, Prince George's County has all rights and powers of local self-government and home rule. Prince George's County maintains and operates a police force, known as the Prince George's County Police Department. Police officers with the Prince George's County Police Department are employees of Prince George's County. Prince George's County has *respondeat superior* liability for Plaintiffs' State Constitutional claims.

5. Defendant Prince George's County Police Department (the "police department") is the police force maintained and operated by Prince George's County, Maryland.

6. Defendant Cleo Savoy was at all relevant times a police officer in the Prince George's County Police Department. Savoy served as an investigating officer with the Internal Affairs division of the police department. Savoy retired from the police department after the events alleged in this Complaint. Savoy is sued individually and in her official capacity as an officer within the police department. Cleo Savoy is black.

7. Defendant David Robinson was at all relevant times a police officer in the Prince George's County Police Department. Robinson served as the Assistant Commanding Officer within the Internal Affairs division of the police department. Robinson retired from the police department after the events alleged in this Complaint. Robinson is sued individually and in his official capacity as an officer within the police department.

8. Defendant James McCreary was at all relevant times a police officer in the Prince George's County Police Department. McCreary served as the Commanding Officer within the Internal Affairs division of the police department. McCreary has been promoted to Deputy Chief of Police. McCreary is sued individually and in his official capacity as an officer within the police department. James McCreary is black.

9. Defendant Michael Elser was at all relevant times a police officer in the Prince George's County Police Department. Elser is an investigating officer within the Internal Affairs division of the police department. Elser is sued individually and in his official capacity as an officer within the police department.

10. Defendant Malik Aziz is the Chief of Police in the Prince George's County Police Department. Aziz is the ultimate approval authority within the police department for disciplinary

actions initiated within the police department. Aziz is sued individually and in his official capacity as an officer within the police department. Malik Aziz is black.

11. Defendant Angela Alsobrooks is the Prince George's County Executive. Alsobrooks directed that the cases of officer discipline involving the Plaintiffs within the Prince George's County Police Department be approved by her and/or her office. Alsobrooks is sued individually and in her official capacity as the Prince George's County Executive.

12. Defendant Donnell Turner was at all relevant times the Inspector General for Prince George's County. Turner reported directly to Alsobrooks and her office for matters relating to the officer discipline cases involving the Plaintiffs. Turner is sued individually and in his official capacity as Inspector General for Prince George's County.

13. Defendant Aisha Braveboy is the State's Attorney for Prince Georges County, Maryland. With respect to all federal constitutional claims alleged herein pursuant to 42 U.S.C. § 1983, Braveboy is sued only in her individual capacity and is not sued in her official capacity as the State's Attorney for Prince George's County. Aisha Braveboy is black.

14. Defendant Musa Eubanks was at all relevant times an Assistant State's Attorney for Prince Georges County, Maryland. With respect to all federal constitutional claims alleged herein pursuant to 42 U.S.C. § 1983, Eubanks is sued only in his individual capacity and is not sued in his official capacity as an Assistant State's Attorney for Prince George's County. Musa Eubanks is black.

15. Defendant Joel Patterson was at all relevant times an Assistant State's Attorney for Prince Georges County, Maryland. With respect to all federal constitutional claims alleged herein pursuant to 42 U.S.C. § 1983, Patterson is sued only in his individual capacity and is not sued in his official capacity as an Assistant State's Attorney for Prince George's County.

16. Defendant Corey Truxon was at all relevant times a police officer in the Prince George's County Police Department. Truxon is the Commanding Officer within the Internal Affairs division of the police department. Truxon is sued individually and in his official capacity as an officer within the police department.

17. Defendant Jeff Ross was at all relevant times a police officer in the Prince George's County Police Department. Ross serves as the Assistant Commanding Officer within the Internal Affairs division of the police department. Ross is sued individually and in his official capacity as an officer within the police department.

## JURISDICTION AND VENUE

18. This Court has subject matter jurisdiction over Plaintiff's Federal Constitutional claims pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1983, and mandamus jurisdiction under 28 U.S.C. § 1361.

19. This Court has supplemental jurisdiction over Plaintiff's State Constitutional and common law claims pursuant to 28 U.S.C. § 1367(a).

20. Venue is proper in the District of Maryland pursuant to 28 U.S.C. § 1391(b) because multiple Defendants reside in the district and a substantial part of the events or omissions giving rise to the claims occurred in this district.

## STATEMENT OF FACTS

21. In or about December 2018, the Hispanic National Law Enforcement Association NCR and the United Black Police Officers Association, together with individual hispanic and black police officers, sued Prince George's County, the former Chief of Police of the Prince George's County Police Department and others in the United States District Court for the District

of Maryland alleging systemic discrimination against hispanic and black police officers within the police department. The case was styled *Hispanic Nat'l Law Enforcement Assoc. NCR et al. v. Prince George's County, et al.,* Case No.: 8:18-cv-03821 (D. Md. 2018)(the "HNLEA Lawsuit").

22. As part of the HNLEA Lawsuit, the plaintiffs in that case filed a comprehensive analysis of police department operations down to individual officer-level detail authored by Michael E. Graham (the "Graham Report") to demonstrate systemic racism and perceived biased disciplinary policies within the police department. The Graham Report was filed in the HNLEA Lawsuit on February 22, 2021 (8:18-cv-03821 ECF Doc. #445-13).

23. Plaintiffs in this case were among the individual white officers identified within the Graham Report. Specifically, Plaintiffs were identified as 2 of 61 Prince George's Couty Police Officers having 20 or more use of force incidents over a four-year period. Of the 61 officers, 17 were black, 3 were Hispanic, 2 were Asian, and the remaining 39 were white. *See id.* at Exhibit C.

24. On or about July 20, 2021, the parties in the HNLEA Lawsuit entered a Settlement Agreement filed in the action on July 30, 2021. (8:18-cv-03821 ECF Doc. #566-1). Pursuant to the Settlement Agreement, the defendants agreed to pay the plaintiffs and their attorneys $5,290,000 and to revise the police department's promotion and internal disciplinary policies, and to implement new General Orders within the police department.

25. During the HNLEA Lawsuit, Defendant Angela Alsobrooks directed her Inspector General, Defendant Donnell Turner, to assume oversight and control of all disciplinary investigations and proceedings within the police department. In compliance with Alsobrooks' directive, Turner became intimately involved in the police department's investigations and disciplinary actions, and informed the police department that all disciplinary actions would need approval from the office of the County Executive prior to implementation.

26. On February 10, 2020, another lawsuit was filed against Prince George's County in the matter of *Kara McMurray v. Prince George's County, et al.,* Case No. CAL 20-05415, in the Circuit Court for Prince Geroge's County. The case was removed to the United States District Court for the District of Maryland on April 8, 2020, and styled *McMurray v. Tallant, et al.,* 8:20-cv-00919 (D. Md. 2020)(the "McMurray Lawsuit"). The McMurray Lawsuit alleges gender discrimination, sexual assault and other misconduct involving a former Prince George's County police officer, Richard Tallant.

27. While the HNLEA and McMurray Lawsuits were progressing, Plaintiff D. Wormuth participated in the arrest of a black juvenile in Prince George's County on October 20, 2020.

28. In accordance with police department policies regarding the use of force during arrests, Plaintiff D. Wormuth photographed the arrestee immediately upon reaching the district station for booking. Because of the outdated cameras issued to officers for this purpose, it is common for police officers to use their personal cell phones to capture these photographs. D. Wormuth used his personal cell phone to photograph the arrestee, who was uninjured and who displayed no marks indicating any injury.

29. Subsequently, Plaintiff D. Wormuth was accused of using unreasonable force during the arrest of the black juvenile on October 20, 2020. The juvenile was alleged to have been grabbed by the neck for a few seconds but did not require any medical attention at the time of his arrest.

30. During the investigation by Internal Affairs, Defendant Savoy learned that D. Wormuth used his personal cell phone to photograph the black juvenile after the arrest and applied for a search and seizure warrant to obtain possession of D. Wormuth's personal cell phone.

31. Savoy obtained a warrant to seize D. Wormuth's cell phone on December 9, 2020; however, the warrant expired without being served.

32. On the morning of February 25, 2021, the American Civil Liberties and Union of Maryland ("ACLU") demanded that Defendant Alsobrooks terminate top police department officials, as well as Officers mentioned in the Graham Report and the HNLEA lawsuit. The ACLU also called for widespread reform to the disciplinary procedures of the police department. *See* ACLU of Maryland demands top PGPD officers resign amid racism allegations (dbknews.com) (Last accessed 10/22/23.) That afternoon, Savoy applied for and obtained a second warrant for the seizure of D. Wormuth's personal cell phone on February 25, 2021. Pursuant to this warrant, Savoy obtained D. Wormuth's personal cell phone on March 2, 2021.

33. The police department had never prior to this applied for nor obtained a warrant for the seizure of an officer's personal cell phone in relation to allegations of excessive force resulting in no or only minor injuries.

34. The February 25, 2021 warrant authorized only seizure of D. Wormuth's personal cell phone; it did not authorize any search of the contents of the phone. For this reason, Defendant Savoy applied for a third search and seizure warrant, which was granted on March 10, 2021.

35. For each of the forgoing search warrant applications, Defendant Musa Eubanks was assisting Defendant Savoy and specifically reviewed and approved each application prior to its submission to a judge for consideration.

36. When Defendant Savoy obtained the cell phone, she said, "Just so you know this didn't come from anyone in Internal Affairs, up to include the Chief, this has been going on since December." D. Wormuth declined consent to any search of the contents of his cell phone and did not provide Defendant Savoy with the four-digit passcode needed to unlock his cell phone.

37. On that same day, March 2, 2021, Mr. Bonsib contacted Assistant State's Attorney Musa Eubanks via email, who as explained was assisting Defendant Savoy in her applications for search and seizure warrants and warned that any search warrant to search the contents of D. Wormuth's personal cell phone should be narrowly tailored to protect D Wormuth's constitutional rights. Mr. Bonsib's email is reproduced below:

**Subject:** Re Darryl Wormuth
**Date:** Tuesday, March 2, 2021 at 1:20:26 PM Eastern Standard Time
**From:** Robert C. Bonsib
**To:** Musa Eubanks

Musa – after our tel call I learned that Det Savoy only had a search warrant for the seizure of the phone and not for the inspection of the phone. Mr. Wormuth did not consent to the search of the phone and I wanted to make clear that we are concerned that any search warrant for the contents of the cellphone must protect against the inspection any attorney client communications. My phone numbers and email are noted below and communications would occur over those numbers and email.

Also, I would expect that any search warrant would be limited in scope to matters that occurred at the time of or shortly after the incident that occurred on Oct 20, 2020 and nothing before that time and nothing after the time frame surrounding the incident. As you might expect the cellphone contains personal message, photographs and content that are deserving of constitutional protection.

Please contact me if you have any questions regarding our position regarding this issue

Bob

38. Although the factual basis for the search warrant application discussed only the events of October 20, 2020 (the arrest of the black juvenile) and despite Mr. Bonsib's email to Defendant Eubanks, the March 10, 2021 warrant application sought authorization to search and seize without limitation "all stored data to include but not limited to: photographs, emails, text messages, video clips, contacts, and call details" on Plaintiff D. Wormuth's personal cell phone. The resulting warrant was plainly an unconstitutional general warrant.

39. Obtaining a search and seizure warrant of Plaintiff D. Wormuth's cell phone for the entire contents was excessively intrusive and excessive in scope for the incident Defendant Savoy and Internal Affairs were investigating. Defendants Robinson and McCreary failed to intervene

during Savoy's blatant, overzealous intrusion into private messages and photographs contained in Defendant D. Wormuth's phone. Individuals do not lose their Fourth Amendment rights merely because they work for the Government instead of a private employer. *See City of Ontario, California v. Quon*, 560 U.S. 746, 756 (2010). Defendant Savoy already had access to the photograph of the black juvenile prior to her search warrant application because Plaintiff Wormuth had already provided the sole picture he took of the juvenile to the supervisor conducting the use of force review. Additionally, Defendant Savoy's colleague in Internal Affairs, Detective Amir Canela, captured three photographs of the juvenile less than two hours after Plaintiff D. Wormuth took his picture. Moreover, per police department policy regarding use of force incidents and internal affairs investigations, Defendant Savoy could have also simply ordered Plaintiff D. Wormuth to turn over the photograph he captured, and he would have had a duty to comply with her order or be subject to administrative discipline.

40. Nor was a broad search warrant needed to obtain call information regarding the alleged unreasonable use of force incident. Upon subpoena, Plaintiff D. Wormuth's service provider, Sprint, would have provided communication logs and data for the exact times he was observed communicating with others after the incident. This less intrusive method would, however, have hindered Savoy's clandestine goal of using a prohibited general warrant to conduct a fishing expedition to find unrelated administrative charges against the Plaintiffs under the guise of the use of force incident she was investigating. *See Richardson v State,* 481 Md. 423, 450 (2022).

41. Defendant Savoy made materially false statements and misrepresentations in her applications for the search and seizure warrants. In her applications for the February 25, 2021 and the March 10, 2021 search and seizure warrants, her probable cause sections were devoid of any statements or evidence that Plaintiff D. Wormuth sent text messages to other officers about the

alleged assault. In her stated probable cause for the warrants, Defendant Savoy represented that she would "recover photographs of the Victim's *injuries*." This was a false statement by Defendant Savoy, who already knew the juvenile was uninjured not only from Detective Canela's photographs, but also from the photograph provided by Plaintiff D. Wormuth to his supervisor for the use of force report. The lack of injuries to the arrested juvenile was confirmed publicly in an April 28, 2021 press conference, when then Chief of Police Hector Velez stated, "it is my understanding there were no injuries."

42. Defendant Savoy misled the Court in her application for the March 10, 2021 search and seizure warrant for the contents of the cell phone. In the "description of the items to be seized" section of the warrant, Defendant Savoy sought "to capture all stored data to include but not limited to: photographs, emails, **text messages**…" even though her probable cause section lacked any evidence of text communications about the arrest. Furthermore, in her "justification" section, she further misled the court by stating, "Your affiant knows that when crimes are committed by one or more than one person, the individuals committing the crime often communicate **in advance to plan the crime.**" This statement cannot possibly apply to Plaintiff D. Wormuth's use of force incident because Plaintiff D. Wormuth would have had no way of knowing in advance that the incident would occur.

43. These misrepresentations by Defendant Savoy clearly show an intentional, calculated plan to use general search and seizure warrants to conduct a "fishing expedition" to find evidence of unrelated "misconduct" due to her bias towards the Plaintiffs and the Special Assignment Team ("SAT").

44. Defendant Savoy was so eager to conduct her fishing expedition that between March 2, 2021 and March 10, 2021, Defendant Savoy searched the entire contents of D.

Wormuth's personal cell phone **without a warrant** and before she received the general warrant on March 10, 2021.

45. Forensic analysis of the FBI cell phone extraction shows that D. Wormuth's cell phone remained locked from March 2, 2021 at 12:11 PM until March 9, 2021 at 1:28 PM, at which time it was unlocked without a warrant. *See* **Exhibit 1** pg. 5.

46. It is standard operating procedure for both the Prince George's County Police Department and the FBI to place a smartphone device in "airplane mode" after seizure and for the device to remain in airplane mode until data extraction is initiated. When the device is in airplane mode, it prevents all wireless communications with the device. This protects and preserves the contents of the cell phone, prevents remote alteration or destruction of the data on the device, and preserves the privacy rights of the owner of the device until a warrant has been issued.

47. Although she was an experienced former homicide detective intimately familiar with this standard protocol within the police department, Defendant Savoy did not follow this procedure with respect to Plaintiff D. Wormuth's personal cell phone. In addition to unlocking D. Wormuth's cell phone on March 9, 2021 without a warrant, the FBI extraction also demonstrates that the display screen of the phone turned on and off repeatedly between March 2, 2021 and March 10, 2021. This allowed Defendant Savoy to view alerts appearing in the lock screen which displayed incoming messages, emails, calls, contacts, and other application notices as they were received in real-time. Accessing such data, even while the smartphone remains "locked," constitutes a search within the meaning of the Fourth Amendment. *See United States v. Sam,* Case No. 2:19-cr-00115 (W.D. Wash. May 18, 2020)(citing *Riley v. California,* 573 U.S. 373, 381-85 (2014)).

48. During Defendant Savoy's warrantless search of D. Wormuth's cell phone, Defendant Savoy took photographs of D. Wormuth's cell phone contents using her own personal cell phone, including various text message conversations. Defendant Savoy's fingers, kitchen countertop and bed sheets are visible in these photographs, as are the edges of D. Wormuth's cell phone and phone case, indicating the photographs were not part of the FBI's analysis of D. Wormuth's cell phone.

49. On March 11, 2021, the day after receiving the search warrant for the contents of D. Wormuth's cell phone, Defendant Savoy delivered custody of the cell phone to the FBI for the purpose of conducting a forensic search and seizure of the phone's contents. On the Receipt of Property document signed by Defendant Savoy and FBI Special Agent Mark Zimmerman, the description of the phone delivered by Savoy includes the phone's four-digit passcode needed to unlock the phone: "passcode = 3342." *See* **Exhibit 2.**

50. Number 3342 is not only the correct passcode needed to unlock the cell phone, but also it is Plaintiff D. Wormuth's police badge identification number. Defendant Savoy's notation of the phone's four-digit passcode on the Receipt of Property document demonstrates Defendant Savoy had associated Plaintiff's badge number with the passcode for his cell phone prior to turning the phone over to the FBI for analysis. *See* **Exhibit 2.**

51. Just five days later and long before the FBI's analysis of the cell phone was completed, Defendant Savoy caused the suspension of Lt. Edward Finn and Capt. Jeremy Bull on March 16, 2021, using text messages she obtained from D. Wormuth's personal cell phone during her unlawful warrantless search. Defendant Savoy did not receive the results of the FBI "phone dump" nor any forensic analysis from the FBI containing text messages until March 20, 2021. *See* **Exhibit 3.** These suspensions were approved by Defendants Robinson, McCreary, and Aziz.

Defendants Robinson, McCreary, and Aziz knew or should have known at this point that an unlawful warrantless search of the cell phone had occurred and each were complacent in the unlawful activities of Defendant Savoy.

52. FBI Special Agent Zimmerman recorded in his FBI 302 report that he "provided a 1 TB [terra byte] hard drive containing a copy of the data and accompanying reports related to 1B1 [D. Wormuth's personal cell phone] to Det. Savoy" on March 19, 2021. *See* **Exhibit 3.**

53. On that same day, March 19, 2021, Defendant Savoy informed FBI Special Agent Zimmerman that the extraction provided to her earlier that day "appeared to be missing text communications." *See* **Exhibit 3.**

54. FBI Special Agent Zimmerman then performed a second extraction of only "MMS and SMS messages" [text messages] from D. Wormuth's personal cell phone and placed the data files and associated reports on an additional 1 TB hard drive. *See* **Exhibit 3.**

55. The FBI's search of the cell phone included its entire contents. Included amongst the contents searched and seized (copied) were intimate photographs of Plaintiff Carolina Wormuth that she shared privately with her husband. Such private photographs could bear no reasonable relation to any legitimate search of the cell phone.

56. On March 20, 2021, Defendant Savoy received back from the FBI both D. Wormuth's personal cell phone and the second hard drive containing the text messages from the cell phone. *See* **Exhibit 3** and **Exhibit 4.**

57. The timing of these events demonstrates Defendant Savoy had access to and, in fact, searched for, seized (photographed), and used text messages from D. Wormuth's personal cell phone prior to receiving any forensic data from the FBI and prior to receiving a search warrant for the contents of the cell phone.

58. In Defendant Savoy's Report of Investigation, reviewed and approved by Defendant Robinson, Savoy made the following false statement: "During this investigation on Respondent Wormuth #3342 (SI2020-066), investigators obtained a search and seizure warrant for his cell phone and data. *Upon reviewing the [FBI] data download from the search warrant, investigators discovered text messages between the Respondents*," referring to Plaintiffs D. Wormuth and Brooke, and retired police officers Jeremy Bull and Edward Finn. *See* **Exhibit 7** pg. 6 (false statement emphasized).

59. Throughout her investigation, Defendant Savoy consistently and methodically made it appear as if she used only the FBI download of the cell phone to locate text messages. That false narrative was vital to concealing her illegal warrantless search and to defending her reasoning for the overbroad search of Plaintiff D. Wormuth's cell phone that she would later testify to. Once the FBI search was completed and she received the results on March 20, 2021, Defendant Savoy used the photographs she previously had taken using her own personal cell phone to search through the FBI "phone dump" using keywords captured in her earlier photographs. Significantly, to conceal her prior unlawful warrantless search of the cell phone, none of the photographs Defendant Savoy took using her own cell phone were provided to the Plaintiffs during discovery. Instead, they received only documents printed from the FBI phone dump. Plaintiffs D. Wormuth and Brooke only became aware of these photographs when they were presented to the Court by Defendant Patterson over two years later at D. Wormuth's sentencing hearing. *See* **Exhibit 14.**

60. The forensic tool the FBI used to extract data from the cell phone was version 7.43 of software called "Cellebrite." Once a cell phone's contents are downloaded using Cellebrite, the investigator can use queries to specifically locate text messages, call records, and pictures based on date and time parameters set by the investigator using the software. Cellebrite describes this

functionality on its website: "This version of Cellebrite Physical Analyzer introduces significant updates that help to make data review faster and more efficient. These updates also provide the flexibility needed to access specified data that is in line with data privacy regulations. The Selective Decoding capability complies with warrants that limit access to mobile device data, by allowing examiners to only decode content of an application that is in question. This not only speeds up time to review, but ensures that data-privacy regulations are maintained." *See* *https://cellebrite.com/en/productupdates/review-data-faster-and-more-efficiently-with-cellebrite-physical-analyzer-7-43/*. (last accessed 10/5/2023).

61. FBI special agents and analysts, Cellebrite employees, and Defendant Savoy were all aware of the query tools and the format of a cellular download. Nevertheless, Defendant Savoy would later commit perjury on the record about the ability to query date ranges using Cellebrite and how the download is able to be viewed to justify her overbroad search, which she recognized as unlawful, involving the entirety of Plaintiff D. Wormuth's cell phone contents.

62. On April 15, 2021, the police department amended Chief's Special Order #21-003 to include the following new prohibition: "All employees are prohibited from using culturally insensitive language. This applies to all communications, both internal and external." Prior to this Order change, no policy of the police department purported to regulate private speech, whether through private text messages or otherwise.

63. On April 23, 2021, Plaintiff Brooke was suspended by Defendant Savoy for alleged violations of the updated special order based upon private text messages she obtained from D. Wormuth's personal cell phone. The updated Special Order #21-003 was cited *ex post facto* as the basis for suspension as all the private text messages were dated before the updated policy.

64. On April 28, 2021, Plaintiff D. Wormuth was indicted by Defendant Braveboy's office in connection with the October 20, 2020 arrest of the black juvenile.

65. On May 5, 2021, after meeting with Defendants McCreary and Robinson, Captain Chad Schmick sent an email to officers under his command that stated: "I have asked if there has been consideration regarding what is public and what is private communication; especially on a personal phone. The guidance I have been given is that if any negative comments made become part of an investigation, it is incumbent on the department to act."

66. On May 7, 2021, Defendant Aisha Braveboy notified George Nichols, Deputy Chief of the police department, that she had placed Plaintiffs D. Wormuth and Brooke on her "do not call" list or "*Brady* list" because she received text messages from the police department that she perceived to be "offensive" and "violently racist." In the letter, Braveboy wrote: "I am imploring you to ensure that these officers are no longer positioned to have contact with the residents of Prince George's County."

67. Ironically, just days earlier, Defendant Braveboy fired a State's Attorney's Office Investigator, retired Captain Meredith Bingley, for reporting to Braveboy her discovery of Defendant Savoy's criminal history, that included a conviction for second degree assault for breaking a glass storm door, pointing her loaded police-issued handgun at her then husband and his friend, and then fleeing the scene before other officers arrived. This information clearly should have been disclosed in accordance with the State's *Brady/Giglio* obligations in all of Savoy's cases and the failure to have done so taints all of Savoy's prior cases, many of which were homicide cases.

68. For years, Defendant Savoy remained silent and failed to inform prosecutors of her criminal history. Upon information and belief, Defendant Savoy is the only police officer ever to

have been assigned to Internal Affairs with a criminal record. This likely occurred because her conviction happened under her maiden name, Cleo M. Johnson. *See* **Exhibits 16** and **17.**

69. Rather than place Defendant Savoy on her "do not call" list or otherwise act to rectify the failure to disclose Savoy's criminal history over many years in her cases, which include homicide prosecutions, Defendant Braveboy approved expungement of Savoy's criminal records upon her petition filed on May 4, 2021. *See* **Exhibit 18.** When Savoy retired on December 31, 2021, Braveboy attended her retirement party and gave her an award. *See* **Exhibit 19**.

70. During this same period, Defendants Robinson, McCreary, Aziz, Turner, and Alsobrooks were also made aware of Savoy's criminal history. Rather than remove Savoy from Internal Affairs, they ignored her misconduct and allowed her to continue in her position knowing that if Savoy's investigation of the Plaintiffs were compromised it would be detrimental in their ongoing HNLEA and McMurray Litigation matters.

71. On May 26, 2021, Defendant Alsobrooks officially announced she would not be running for Governor in the 2022 election despite raising the most money of any likely candidate at the time. Upon information and belief, the on-going HNLEA Lawsuit litigation was a focal reason why Defendant Alsobrooks chose not to run for Governor in 2022. Defendant Alsobrooks first used the police department's Internal Affairs division as a direct political component during her first effort to run for Governor in the 2022 election and also in her current campaign for the United States Senate. As pressure mounted against her and her bid for Governor due to the HNLEA Lawsuit, she directed her subordinates and the Internal Affairs division to become even more reckless and desperate in the targeting of the Plaintiffs.

72. More specifically, Defendant McCreary assigned Lt. Robert Black, a supervisor in the Internal Affairs division, to aide in the litigation of the HNLEA Lawsuit despite Black being

specifically mentioned by name in the HNLEA Lawsuit for alleged harassment of Lt. Sonya Lancaster. Furthermore, in 2020, Defendant Black was removed from case work in Internal Affairs by Defendant McCreary due to his attempted actions towards another Internal Affairs Lieutenant, who was attempting to confirm exculpatory evidence in the McMurray criminal case. Defendant Black was obsessed with disciplining the Lieutenant. Defendant Black wanted this exculpatory evidence which he was also aware of, to remain buried and hidden. That exculpatory evidence would later be used to successfully overturn the conviction against Lt. Tallant in the McMurray criminal case. Instead of removing Defendant Black from Internal Affairs once more, Defendant McCreary, assigned him to specifically identify investigations and cases that could benefit and aid Defendant Alsobrooks in litigation of the HNLEA Lawsuit. These actions further show just how much of a political component the Internal Affairs division was to Defendant Alsobrooks' office during this time.

73. On June 22, 2021, Plaintiffs Brooke and D. Wormuth were formally recommended for disciplinary action by Defendant Aziz based upon the reports prepared by Defendant Savoy relating to the text messages Savoy obtained unlawfully from D. Wormuth's cell phone. *See* **Exhibits 5** and **6.** Although Savoy was purportedly investigating the single incident involving the black juvenile's arrest on October 20, 2020, she identified text messages dating back to six years prior to the arrest in question. Defendant Savoy must have recognized that text messages from long before the arrest in question could have nothing to do with the arrest she was purportedly investigating.

74. On June 28, 2021, the Washington Post published a very widely viewed article relating to Defendant Alsobrooks spending approximately $17.6 million dollars litigating the HNLEA lawsuit.

75. The actions of Defendant Savoy were approved by Defendant David Robinson and Defendant James McCreary. Robinson and McCreary were responsible for the supervision of Savoy's investigation, and Robinson signed off on Savoy's investigative reports. Robinson and McCreary both concurred in and approved the formal disciplinary actions recommended by Defendant Aziz on June 22, 2021.

76. Specifically, Defendant McCreary presented Savoy's investigation to Defendant Turner for the purpose of initiating the disciplinary proceedings against D. Wormuth and Brooke with approval from Defendant Alsobrooks.

77. In or about September 2021, Plaintiffs Brooke and D. Wormuth initiated show cause proceedings in the Circuit Court for Prince George's County pursuant to the Law Enforcement Officer's Bill of Rights to challenge the legality of their proposed terminations.

78. While the show cause hearing was pending, Captain Rogers Massey sent the following email in September 2021 to select officers at the direction of Defendant McCreary:

> **Release of "Do Not call" List**
> Good Afternoon.
> The Internal Affairs Division has received notification that ASA Braveboy intends to release the names of officers currently placed on the "Do Not Call" to the public. The release is tentatively scheduled for October 1, 2021. The ASA's Office has elected to allow effected officers to submit impact statements, explaining why they should not be on the '"Do Not Call" list. These statements should be emailed to me (Captain Massey #2693) by close of business on September 27, 2021 and I will then forward them to the ASA's Office for review. The Internal Affairs Division has no determination in the outcome of the review. Officers wishing to submit impact statements will be cc'd when the statements are forwarded to the ASA's Office

79. Captain Massey's September 2021 email was sent to every officer included in the "do not call" list with only two exceptions. Both Plaintiff D. Wormuth and Plaintiff Brooke were excluded from the email and did not receive the email in September 2021. Accordingly, neither Wormuth nor Brooke received notice that they were to be included in the do not call list and neither

had any opportunity to submit impact statements as described by Captain Massey prior to release of the list to the public.

80. On September 29, 2021, Defendant Savoy lost her departmentally issued laptop in the parking lot of the Maryland Live Casino. Upon information and belief, Defendant Savoy regularly played the slot machines at local casinos during her work shifts while concurrently being compensated by Prince George's County. A citizen found the laptop in the parking lot on September 30, 2021, and brought it to District III station to turn in. The police officer assigned to the front desk took custody of the laptop and notified the Internal Affairs division. In a desperate attempt to cover for herself, Defendant Savoy then crafted a "lost property" report so she could backdate when she "lost" her laptop to have occurred on her last scheduled day off and not while working (RMS #21-0044719). Following this logic, it would have taken her three full "work" shifts to realize that her only departmentally issued laptop was missing. This intentionally false report was yet another example in an elongated, continuous pattern of misrepresentations and untruthfulness throughout Defendant Savoy's career that went unchecked by her supervisors, Defendants McCreary and Robinson.

81. On October 29, 2021, Defendant Braveboy released her "do not call" list to the public and appeared on television. During televised news coverage, Defendant Braveboy described those officers on the list as "those who have lied" or are "racist, homophobic and sexist."

82. On November 8, 2021, a show cause hearing was held in the Circuit Court for Prince George's County in the action filed by Plaintiff Brooke. During the hearing, Defendant Savoy was called as a witness and provided the following false testimony:

> Q Okay. Now, as to the phone itself, you then obtained a second search warrant from Judge Woodard dated March 10, 2021; am I correct about that?
> A That's correct.

> Q Okay. So, it was sometime after March 10, 2021, that you first had access to the other officer's cell phone, correct?
> A *That is correct*.

**Exhibit 8** (11/8/2021 Transcript of Proceedings at 36:14-22).

> Q. So, Detective Savoy, in your search warrant where the actual items that you were supposed to seize, is it true that the search warrant is stating that you're to capture all -- data to include, but not limited to photographs, emails, text messages, video clips, contacts, and call details?
> A That is correct.
> Q Okay. And is there any specified date that this search warrant limits that you are supposed to receive data for a specific date?
> A I'm sorry. No, it does not.
> Q So it was for all data in the phone?
> A That's correct.
> Q Okay. And I just want to ask you a question about the process of when you download the cell phone. So, once you received the cell phone from Corporal Warmith [sic], how is it that you actually receive the data? Is it organized by date or do you just have your packet of information that you have to sift through?
> A You get an entire packet of everything that's included in the phone. So, you have messages. You have pictures. You have emails, whatever is in the phone. *It's not compiled just date by date, sort of. This is one specific board. Text messages or this is another specific for pictures. It's just a whole group of messages that comes on a download*.
> Q Okay. And is that what is called a phone dump?
> A Yes
> *  *  *
> Q Now, once you the received the phone dump, did you particularly have to go through every single item in that phone dump to find what you were looking for?
> A *Yes*.
> Q Okay. And can you explain to the Court how it was that you came across the messages involving Corporal Brooke?
> A So, when you get the download, you can actually type in like key words on the dump on the phone download. So in going through the phone, I knew that it was a -- the chances of him talking to someone on his squad was higher just based on the conversation. So, I went through each individual squad mate first. And in doing that, certain messages populated. *And they were not in specific order or like dates or times. It just will give you a whole feed of text messages for each individual or whatever key word that you -- that you put in*. So, even for the victim -- well, the -- one of the -- I'm sorry, not the victim, but one of the complainants on the criminal aspect for Corporal Warmith [sic], and I won't disclose his name because I don't think that's public yet.
> *  *  *

> So, when you type in like key words and then any conversation that has those key words in that conversation will pop up. *So, you would have to literally go through each and every message and, like I said before, there's no specific date that it's listed, but once you pull it up, you can see what date that this conversation took place on*.
> Q So, the text messages that -- the text exchange where you discovered the text messages charged here with Corporal Brooke, is that how those text messages came to your knowledge?
> A *Yes*

**Exhibit 8** (11/8/2021 Transcript of Proceedings at 49:23-53:07)(false testimony *italicized*).

83. Not only was Defendant Savoy's testimony regarding when she first had access to the contents of D. Wormuth's cell phone false, but also her description of Cellebrite as providing limited review functionality and how she identified the text messages involving Plaintiff Brooke was false. Defendant Savoy perfidiously crafted her false testimony to manufacture an explanation for why she was *required* to conduct such a broad search of the cell phone, when in fact the Cellebrite software permitted much more targeted searches over specified time frames, and to conceal the fact that she had already searched the entire cell phone's contents prior to her receipt of the "phone dump" from the FBI and before she had obtained any search warrant. Defendant Savoy's false testimony was also intended by her to cover up and conceal her warrantless search by providing fictitious details about her use of the FBI's "phone dump" to find the messages later used to administratively charge the Plaintiffs with misconduct for their private communications.

84. The text messages selected by Defendant Savoy and included in the recommendations for termination of Plaintiff Wormuth's and Plaintiff Brooke's employment with the police department (**Exhibits 5** and **6**) all relate to matters of public concern expressed privately between the officers involved using exclusively their personally owned cell phones. As such, they had no adverse effect on the police department.

85. On January 21, 2022, in connection with the McMurray Litigation, the plaintiff in that case, Kara McMurray, filed a motion to compel the production of text messages from D. Wormuth's cell phone to support her argument relating to alleged retaliation against her from the Special Assignment Team (SAT) to which Plaintiffs D. Wormuth and Brooke were assigned. The motion was ultimately granted on March 17, 2022. Defendants Alsobrooks and Turner therefore knew from these events that Kara McMurray would likely use the text messages from Wormuth's cell phone against the County, further incentivizing them to continue their maniacal targeting of everyone associated with those text messages, including the Plaintiffs.

86. On April 28, 2022, a motions hearing was conducted in the Circuit Court for Prince George's County in Plaintiff D. Wormuth's criminal prosecution to consider, among other issues, D. Wormuth's motion to suppress all evidence obtained from his personal cell phone. In connection with that motion, Assistant State's Attorney Nicholas Leonardi informed Mr. Bonsib that the State would not use any of the contents of the cell phone. Mr. Bonsib relayed this information to the Court on the record and Leonardi confirmed that "[t]he State does not intend to use any of the contents of that phone." *See* **Exhibit 9.**

87. In addition to confirming the State's intention not to use any contents of the cell phone, Leonardi also promised the Court to follow-up with federal law enforcement to have the cell phone returned to Plaintiff D. Wormuth. *See* **Exhibit 9.** These representations by Leonardi to the Court and Mr. Bonsib tacitly acknowledged that the suppression motion would have been successful. Based upon these representations by Leonardi, it should have been clear to all concerned that the cell phone's contents were unlawfully obtained and should not be used.

88. FBI custody records indicate Defendant Savoy returned the cell phone to the FBI on March 29, 2021. *See* **Exhibits 3** and **10.** Despite Leonardi's promise to follow-up with federal

law enforcement to have the cell phone returned to Plaintiff D. Wormuth and despite Wormuth's repeated requests, the government refuses to return Plaintiff's property to him.

89. The basis of D. Wormuth's motion to suppress was that the scope of the March 10, 2021 warrant created plainly a general warrant that failed to comply with the Fourth Amendment's requirement to describe with particularity "the place to be searched, and the persons or things to be seized." *See Richardson v. State,* 481 Md. 423, 282 A.3d 98 (2022); *Burns v. United States,* 235 A.3d 758 (D.C. App. 2020). Because none of Defendant Savoy's photographs of the cell phone were disclosed at that point, D. Wormuth did not then know that Defendant Savoy had searched his cell phone unlawfully prior to the March 10, 2021 warrant.

90. Defendant Savoy, an experienced former homicide detective with many years of investigative experience, and who admittedly was investigating an isolated specific arrest that occurred on October 20, 2020, intentionally requested a general warrant to justify her unlimited warrantless search of the cell phone's contents that spanned more than six years prior to the arrest in question. Defendant Savoy intentionally sought a search warrant that authorized an unlimited review of the contents of "all stored data" even though the warrant was supported by an affidavit that established probable cause for only a single date in time. The warrant was plainly overbroad and so lacking in probable cause and particularity that the warrant judge should not have issued it. The warrant's deficiencies were so extreme and apparent that any reasonably well-trained police officer, such as Defendant Savoy, and any State's attorney reviewing the warrant application, such as Defendant Eubanks, with reasonable knowledge of what the law prohibits, must have known the warrant was invalid notwithstanding its approval by a judge. Qualified immunity cannot apply to Savoy's warrantless search and even if she had awaited the receipt of the general warrant on March 10, 2021, qualified immunity still would not apply to such obvious "fishing expeditions."

*See e.g., Burns v. United States,* 235 A.3d 758 (D.C. App. 2020)(holding the good faith exception inapplicable to a facially deficient warrant very similar to that obtained by Savoy in this case).

91. On August 29, 2022, the Maryland Supreme Court decided the case of *Richardson v. State,* 481 Md. 423, 282 A.3d 98 (2022). At issue in *Richardson* was the constitutionality of a Prince George's County Police search warrant for the contents of a cell phone containing identical language to the March 10, 2021 search warrant obtained by Defendant Savoy in this case. The Court unanimously found the search warrant constituted a general warrant "that allowed police to engage in the type of exploratory rummaging that led the Founders to adopt the protections of the Fourth Amendment."

92. After *Richardson* was decided, no reasonable prosecutor or police officer could have believed it was constitutionally permissible to continue to use the contents of Plaintiff D. Wormuth's cell phone. This was especially true for prosecutors and officers in Prince George's County. Not only did *Richardson* analyze a search warrant obtained by a Prince George's County Police Officer containing identical boilerplate language widely used within the police department and contained in the March 10, 2021 warrant, but also the Prince George's County State's Attorney's Office had been providing training to Prince George's County Police Officers consistent with *Richardson's* ruling a full year before the Maryland Supreme Court Decided *Richardson. See* **Exhibit 11.** The training was prompted by the *Burns v. United States,* 235 A.3d 758 (D.C. App. 2020) decision.

93. The *Richardson* and *Burns* decisions were well known throughout the police department and the *Richardson* decision caused the department to suspend all searches of seized cell phones and to change its policies for cell phone search warrants. Officer Andrew Batavick sent an email to all Prince George's County police officers on December 13, 2022 discussing the

status of cell phone searches and search warrants within the police department "[d]ue to the Richardson Decision."

94. Notwithstanding the *Richardson* decision in August 2022, ASA Leonardi's representations to the Court in April 2022 that the contents of D. Wormuth's cell phone would not be used by the State, and the on-point training offered by the State's Attorney's Office regarding "strengthening cell phone warrants," Defendant Michael Elser, acting at the direction of Defendant Joel Patterson, who was prosecuting an unrelated criminal case against 14 Prince George's County Police Officers who were all members of SAT; *State v. Brooke, et al.,* Case No. CT221115F, (P.G. County Cir. Ct.)(the "SAT Case"), which included Plaintiff Brooke, conducted a new search of the entire contents of D. Wormuth's cell phone without obtaining a new search warrant in January 2023. This new, warrantless search, which was nearly two years after the general search warrant was issued for the contents of the cell phone and nearly nine months after the April 2022 motion hearing, was approved by Elser's supervisors in Internal Affairs, Defendants Corey Truxon and Jeff Ross.

95. At a motions hearing held in that case on January 19, 2023, Defendant Patterson stated the following to the Court:

> Defense counsel raised issues indicating that there was another witness who would be testifying who could testify about the timekeeping procedures and Officer Wormuth's name came up. I was advised to look into Officer Wormuth. Officer Wormuth had been initially investigated as being a part of this because he was in the SAT and he did work for Finn.
>
> Our records indicated from what we could see from the ExakTime and from PGPD timekeeping that there was no double dipping on the part of Officer Wormuth. He was not indicted as a result of this case. In a completely unrelated incident, Officer Wormuth has been charged.
>
> And again, Your Honor, the State doesn't have direct contact with a witness who has been charged because they do have Fifth Amendment privileges.

> With respect to Officer Wormuth's other investigation as a part of that other completely unrelated case, his cellphone was seized.
>
> His cellphone was downloaded, and as one might assume from a cellphone that somebody has used for years, there's a lot of text conversations in there. Now the investigation that reviewed that cellphone initially was not concerned with this investigation. When those files were reviewed, they were not reviewing them with an eye to the timekeeping procedures at Prince George's County Police Department. They were reviewed with an eye of a completely different subject matter, a completely different crime.
>
> As a result of the conversations that the State has had with Defense counsel as a result of the motions that Defense counsel raised in this case that we are asking for time to argue, the State asked its detective to go back through those voluminous messages and see if there is any directly probative information coming from one of the defense witnesses speaking about this specific issue, and there was. There is.
>
> That detective has been reading through these text messages and he has so far provided, and I forget the exact number, but it's somewhere in the realm of 4,800 pages of messages. And for each of them he provided specific sites where you can look within those messages to find some of the relevant information.
>
> We provided those conversations to Defense counsel and we provided the specific emails from the detective saying, hey, pay attention to these specific areas of the conversation within these greater files. The State has not yet finished reviewing that document. This all came about due to Defense's motion in this case in early January.

*See* **Exhibit 12** (Hearing Transcript 1/19/2023 at 42:13—44:24).

96. From Defendant Patterson's admissions to the Court, it is evident that Defendant Elser's new search of D. Wormuth's cell phone contents in January 2023 constitutes another warrantless search of the cell phone's contents in violation of D. Wormuth's constitutional rights. *See United States v. Ganias,* 755 F.3d 125 (2d Cir. 2014)(holding the Fourth Amendment does not permit officials executing a search warrant for the seizure of particular data on a computer to seize and indefinitely retain every file on that computer for use in future criminal investigations).

97. The egregiousness of this behavior is compounded by the fact that, once again, Plaintiff Carolina Wormuth's intimate photographs intended for her husband's eyes only were available to investigators without limitation.

98. The SAT Case was dismissed by Defendant Patterson on January 24, 2023. Immediately thereafter, Defendants Patterson, Braveboy, Truxon, and Aziz reopened an administrative investigation (IA 2022-029) of six officers, including Plaintiff Brooke, who were involved in a February 2021 use of force incident that had been closed on December 20, 2022 without any adverse actions. Although the police department's use of force expert never issued any written review and none of the officers involved were ever interviewed, the Defendants caused an indictment to issue solely against Plaintiff Brooke charging him with misdemeanor misconduct in office. Not only was Plaintiff Brooke singled out in this way but also the case was dismissed in July 2023 by the Circuit Court for Prince George's County.

99. At Braveboy's direction, Defendant Patterson noted an appeal of the dismissal. Upon information and belief, Braveboy's office has never before appealed from dismissal of a misdemeanor charge in Prince George's County. These unrelenting actions to get Plaintiff Brooke at any costs further demonstrate the Defendants' malice towards and targeting of Plaintiff Brooke.

100. Notwithstanding the *Richardson* decision in August 2022 and ASA Leonardi's representations to the Court in April 2022 that the contents of D. Wormuth's cell phone would not be used by the State, at D. Wormuth's sentencing hearing conducted on May 26, 2023, Defendant Patterson, who had taken over the case from ASA Leonardi, stated the following to the Court:

> Your Honor, it's not limited in scope, search warrant, the search warrant says all text messages, SMS messages, instant messages contained within the phone, and that's what the Judge signed off on. Further, as you pointed out earlier this is sentencing. We are not offering any of this information to prove guilt. We are just offering it as character evidence and Your Honor is permitted to consider all evidence at sentencing when determining the

> appropriate sentence and part of that is determining the character of the individual who is being sentenced.
>
> We do submit that this information was absolutely obtained through a valid search warrant and legally reviewed by law enforcement officers. I can say that prior to trial there was some conversation between the original counsel who handled this case and Mr. Bonsib about how much of the text messages would be used during trial.
>
> It was never agreed upon that we would not use any of the text messages during trial. What was agreed upon is that we would limit ourselves to a very narrow range of those text messages during trial.

*See* **Exhibit 13** (Sentencing Hearing Transcript 5/26/2023 at 13:22—14:18).

101. Defendant Patterson's misrepresentations to the Court were intentional. Not only had ASA Leonardi expressly promised the judge hearing D. Wormuth's suppression motion (not the sentencing judge) on the record that "[t]he State does not intend to use any of the contents of that phone," *see* **Exhibit 9,** but also the evidence Defendant Patterson presented to the Court consisted largely of Defendant Savoy's photographs of D. Wormuth's cell phone, complete with her fingers, kitchen countertop, and bed sheets visible in the photographs—plainly not the product of the FBI phone dump as explained earlier. Nor were the text messages presented by Defendant Patterson at the sentencing hearing limited "to a very narrow range of those text messages" as they spanned from July of 2017 to months after the October 20, 2020 arrest. *See* **Exhibit 14.**

102. Throughout the investigations, adverse employment actions, and criminal prosecutions described above, the Defendants have displayed an extraordinary bias against Plaintiffs D. Wormuth and Brooke on the basis of their race clearly in an effort to defend themselves against the ongoing HNLEA and McMurray Lawsuits, specifically targeting the Plaintiffs while simultaneously ignoring the same type of behavior from black officers and disproportionately seeking more severe punishments when retaliating against the Plaintiffs for their speech as compared to others similarly situated.

103. More Specifically, Defendant Savoy was further motivated to target the Plaintiffs because they were white officers who were members of the District III SAT. In or about late 2019, while Savoy was assigned to the Homicide Division, and just prior to being transferred to Internal Affairs, her son was stopped by a white member of SAT and complained that he had been mistreated. Savoy not only caused her son to make a frivolous complaint against the white officer involved, but also she threatened Captain Jeremy Bull (who she would later suspend on March 16, 2021) with search and seizure of his personal cell phone, and further stated, "I know how you SAT boys do." In addition to suspending Captain Bull on March 16, 2021, she also suspended Lt. Edward Finn, who was the Commander of District III SAT.

104. Defendant Savoy's investigation was demonstratively biased against white officers. For example, Defendant Savoy took a photograph of D. Wormuth's cell phone depicting a group text that included Sergeant Jesse Spence, a black supervisor within the police department, who referred to Officer Thomas Lester (who is black and one of D. Wormuth's accusers) as a "snitch boy." *See* **Exhibit 14**. While Defendant Savoy charged Plaintiffs D. Wormuth and Brooke with use of language warranting termination for calling Officer Lester a "snitch," *See* **Exibits 5** and **6**, Sergeant Spence was not suspended, investigated, or charged despite using the same language and referring to a fellow black officer as a "snitch boy."

105. Defendant Savoy meticulously and intentionally ignored a great number of text messages that contained racist, homophobic, and sexist comments made by black officers. One such officer, Sergeant David Chandler, was assigned to Internal Affairs as an investigator with Savoy. Another black officer in these text messages, Sergeant Lamar Robinson, is a spokesperson for the police department in the media relations division. The group text strings in which these black officers participated are indistinguishable from the text strings used to discipline and target

the Plaintiffs. *See* **Exhibit 15.** Neither Sergeant David Chandler nor Sergeant Lamar Robinson were placed on the "do not call list."

106. In or about June 2023, Sergeant Thomas Hilligoss (who is an openly homosexual male officer assigned to Internal Affairs and a part of the police department's LGBQT outreach team) became aware of text messages involving Chandler and Robinson that contained racist, homophobic, and sexist comments. Defendants Aziz, Truxon, and Ross, and the County Office of Law were also made aware of these same text messages. Hilligoss, who was mentioned in the derogatory text messages in the group texts, became frustrated at the fact that Defendants Savoy, Robinson, and McCreary ignored these messages when they were discovered by Savoy and that Defendants Aziz, Truxon, and Ross were continuing to refuse to initiate any investigation or to discipline the black officers involved. In fact, despite his degrading and culturally insensitive remarks, Sergeant Chandler was rewarded with a permanent daytime position in the Executive Command office working under Defendant McCreary.

107. Defendants Aziz, McCreary, Truxon, and Ross will not initiate an investigation into the text messages or discipline Chandler despite his biased and culturally insensitive comments because they know it will taint their administrative case against the Plaintiffs and expose their pattern of targeting and retaliation. Despite Defendants McCreary and Robinson's conversation with Captain Schmick on May 5, 2021 regarding the police department's duty to act on "negative comments," all of the Defendants have defended Chandler and the other black officers involved by saying the messages are too "old." On the contrary, some messages that the Defendants are attempting to discipline the Plaintiffs for were sent prior to Chandler's messages. Moreover, during the HNLEA lawsuit litigation in 2021, the Defendants terminated Corporal Simon VanLeuven, a white officer, for a public social media post that pre-dated the messages in the Chandler text string.

Not being investigated or disciplined for offensive text messages that are too "old" apparently applies only to black employees who are not being targeted by the Defendants.

108. In addition to ignoring the same type of language used by black officers, Defendants Savoy, Truxon, Ross, Robinson, McCreary, Aziz, Braveboy, Turner, and Alsobrooks knowingly recommended and approved termination for the language used by Plaintiffs D. Wormuth and Brooke while other officers found to have used similar language received only minor punishments.

109. For example, in Case IA2023-017, Officer Demarco Garcia told a citizen to "get the fuck on the ground before I shoot you, nigger" and "get the fuck on the ground before I blow your fucking head off, nigger." Garcia's violently racist statements were captured on body camera and several charges of using discriminatory language were sustained; however, his punishment consisted only of a short suspension without pay. Garcia was not added to the "Do Not Call" list.

110. In another case, IA2023-013, Corporal Jeremy Allen texted a squad mate in reference to a homicide victim, "why did you kill that lady?" and "Curtis Drive has one less resident now." Accompanying these texts, Allen sent a cartoon depicting a book entitled "How to Kill." Charges of unbecoming conduct were sustained; however, Allen received only a short suspension without pay. In contrast, during their administrative case, Plaintiffs D. Wormuth and Brooke were charged with unbecoming conduct for making private comments about homicides but were recommended the maximum punishment of termination. Allen was not added to the "Do Not Call" list.

111. In addition to these examples, the Yearly Disciplinary Closure Reports published by the police department include many additional examples of officers receiving only minor

punishments for language and conduct like that used to recommend termination against the Plaintiff Officers. None of these officers were added to the "Do Not Call" list.

112. In August of 2020, Defendant James McCreary removed Lieutenant Robert Black, who is white, from investigating cases in Internal Affairs. At the time, Black was a commanding officer in Internal Affairs which meant he supervised investigators beneath him. In response to being removed from Internal Affairs casework, Black publicly stated "I wouldn't piss on James if he was on fire." This violently racist comment was made in the presence of multiple Internal Affairs personnel. Black was never investigated or disciplined for his disturbing public speech. He was allowed to continue to supervise investigators in Internal Affairs and even served Plaintiff Brooke with his administrative charges. Lt. Black was not added to the "Do Not Call" list.

113. On September 22, 2022, the Assistant Chief of Police, Vernon Hale, who is black, referred to black citizens of Prince George's County as "monkeys" during a crime meeting. This comment was made in the presence of numerous high-ranking officers, including Defendants Aziz and McCreary, as well as Internal Affairs command staff. Two black officers at the meeting, Captain Calvin Tyson and Major Katina Gomez, were offended by this comment and voiced their concerns after the meeting. Subsequently, Assistant Chief Hale circulated an email to the commanders at the meeting offering his "sincere apology" to those offended by his language. *See* **Exhibit 21.** Notwithstanding the April 15, 2021 updated language policy in Chief's Special Order #21-003 prohibiting the use of "culturally insensitive language," Hale was never suspended, investigated, reprimanded, nor administratively charged with this plainly culturally insensitive language. By contrast, Defendants Aziz and McCreary recommended termination of Plaintiffs when they, in private and off duty, referred to criminals as "animals." Assistant Chief Hale was not added to the "Do Not Call" list.

114. No officer or person was ever offended or made any complaint about the text messages between Plaintiffs because they were completely private and not made in their official capacity. Defendant Aziz and McCreary's willingness to ignore Hale's admitted use of culturally insensitive language while attempting to inflict maximum punishment on Plaintiffs D. Wormuth and Brooke for their less offensive private communications shows complete targeting and retaliation towards them by the Defendants.

115. In January 2023, in connection with the McMurray Litigation, attorneys for the County filed pleadings in which they used the disciplinary proceedings against Plaintiffs D. Wormuth and Brooke to mitigate the County's liability in that case. So much so that the attorneys stated that the County had "terminated [Wormuth] from the Department" even though this was false.

116. In July 2023, Plaintiffs obtained group text messages in which Sadia Noah-Hope and Tiffani Shannon were members of the group. Both Noah-Hope and Shannon are attorneys employed in the Prince George's County Office of Law. In that position, Noah-Hope is the attorney representing Prince George's County in the administrative disciplinary actions against the Plaintiffs for inappropriate use of language. The group text messages not only reveal shockingly racist statements against white people, but also that Noah-Hope has shared the text messages from Plaintiff D. Wormuth's cell phone with her colleagues in the Prince George's County Office of Law. In one text, attorney Shannon states: "I know who and what your husband is. Yup. I knew early on but we actually have County proof of it…evidence and shit so…yeah your 'perspective' isn't the least bit surprising. YOU MARRIED A RACIST. Good riddens! Got your ass fired and you still capin for than man! Have a great life. And be thankful you're no longer a nigger lover!" Shannon was referring to a retired Prince George's County Police Sergeant who was involved in

Plaintiff D. Wormuth's text messages and was also made a respondent by Defendant Savoy in the administrative case against Plaintiffs. It's ironic that the attorney seeking to terminate the Plaintiffs' employment for their supposed use of language would tolerate blatantly racist language from her colleagues. *See* **Exhibit 20.**

117. In or about August 2023, Defendant Braveboy contacted Tracee Wilkins, a News 4 investigative reporter, and provided her with text messages from D. Wormuth's cell phone that had not previously been referenced in his criminal case and asked Wilkins to run a story on Plaintiffs D. Wormuth and Brooke, which aired on August 8, 2023.

118. Defendant Braveboy was interviewed as part of the story and referred to Plaintiffs D. Wormuth and Brooke as "racist individuals on our department that were putting our citizens at risk."

119. On August 4, 2023, Plaintiff D. Wormuth was served with three additional administrative charges related to his criminal case. The recommended discipline by Defendant Aziz was termination for all three charges. Defendant Truxon, at the direction of Defendant Alsobrooks and Defendant Aziz, ensured Plaintiff D. Wormuth was served with an administrative hearing board date of August 29, 2023. In an email to Defendants Truxon and Ross, dated August 22, 2023, Shaun Owens, Esq., who has been representing police officers in Prince George's County for over a decade, expressed concerns about the seemingly expedited timeline for Plaintiff D. Wormuth's administrative hearing board and requested a change of venue due to Plaintiff D. Wormuth's notice of claim against the Defendants on January 19, 2023. Mr. Owens' email to Defendants Truxon and Ross is reproduced below:

**From:** Shaun Owens <sowens@sbwdlaw.com>
**Sent:** Tuesday, August 22, 2023 4:53 PM
**To:** Truxon, Corey E. <cetruxon@co.pg.md.us>; Ross, Jeff L. <JLRoss@co.pg.md.us>; Chandler, David A. <dachandler@co.pg.md.us>; Noah-Hope, Sadia I. <SINHope@co.pg.md.us>
**Subject:** Wormuth AHB

Dear all,

Please be advised that I am writing in reference to Cpl. Darryl Wormuth's upcoming trial board, currently scheduled for Tuesday, August 29, 2023.

I have proposed a resolution to this matter that would result in Cpl. Wormuth resigning prior to the scheduled hearing. I have been informed that this offer has been rejected.

Cpl. Wormuth has requested that the pending hearing be postponed for purposes of further preparation. As we are all aware, this case marks the first time--at least in my tenure as FOP counsel--where a hearing has been scheduled within roughly one month of service of the charging document.

Additionally, Cpl. Wormuth has informed me that the department was placed on notice of his intent to pursue a tort action against Prince George's County. In prior situations where a respondent was a litigant in a civil action against the County, the department has determined that an outside board is the appropriate remedy. I am therefore asking that Cpl. Wormuth be provided with the same consideration.

120. Defendant Truxon denied Mr. Owens' requests for postponement and for an outside panel board hearing.

121. The denial of Plaintiff D. Wormuth's requests through his counsel is another example of the disparate treatment and pattern of targeting directed against Plaintiffs. While the HNLEA Lawsuit was being litigated, both Captain Joe Perez and Officer Patrick McClam were afforded a change of venue for administrative hearing board proceedings because of their involvement in civil claims against Prince George's County and the police department stemming from the HNLEA Lawsuit.

122. Federal statutory law permits the Plaintiffs to bring this private cause of action to redress violations of their rights guaranteed by the Bill of Rights in the United States Constitution, including all the rights protected by the First, Fourth, Fifth and Fourteenth Amendments as described above. Specifically, 42 U.S.C. § 1983 provides in pertinent part that, "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State, . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and

laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, . . .”

123. The Local Government Tort Claims Act (“LGTCA”) provides that a local government entity “shall be liable for any judgment against its employee for damages resulting from tortious acts or omissions committed by the employee within the scope of employment with the local government.” Md. Courts & Jud. Proc. Code § 5-303(b).

145. A local government’s liability is limited under the LGTCA to a maximum of $400,000 per individual claim, and $800,000 per total claims that arise from the same occurrence for damages resulting from tortious acts or omissions. Md. Courts & Jud. Proc. Code § 5-303(a).

146. Subject to the aforesaid damage caps, “a local government may indemnify an employee for a judgment for punitive damages entered against the employee,” however, the local government itself may not be liable for punitive damages. Md. Courts & Jud. Proc. Code § 5-303(c). The local government entity may not assert governmental or sovereign immunity to avoid its duty to defend or indemnify an employee. Md. Courts & Jud. Proc. Code § 5-303(b)(2).

147. On January 19, 2023, all Plaintiffs provided notice of their claims alleged herein to the Honorable Rhonda L. Weaver, Prince George’s County Attorney, pursuant to Md. Courts & Jud. Proc. Code § 5-304(b). *See* **Exhibit 22**.

148. In the Maryland Tort Claim Act, Md. State Gov’t Code § 12-101 *et seq.* (“MTCA”), the State of Maryland has waived its sovereign immunity for tort actions against the State or any of its instrumentalities to the extent provided in Md. State Gov’t Code § 12-104.

149. Under the MTCA, the State’s liability may not exceed $400,000 to a single claimant for injuries arising from a single incident or occurrence, except that “[i]f liability . . . arises from intentional tortuous acts or omissions or a violation of a constitutional right committed by a law

enforcement officer," then liability for any "combined award for both economic and noneconomic damages may not exceed a total of $890,000 for all claims arising out of the same incident or occurrence, . . ." *See* Md. State Gov't Code § 12-104(a)(2).

150. On January 19, 2023, all Plaintiffs provided notice of their claims alleged herein to the Maryland State Treasurer, the Honorable Dereck E. Davis, pursuant to Md. State Gov't Code § 12-106(b). *See* **Exhibit 23**.

COUNT I
FIRST AMENDMENT
UNLAWFUL RETALIATION
(Anthony Brooke and Darryl Wormuth v. Cleo Savoy, David Robinson, James McCreary, Malik Aziz, Angela Alsobrooks, and Donnell Turner)

151. Plaintiffs incorporate the previous allegations in paragraphs 1 through 150 as if restated herein verbatim.

152. Defendants Cleo Savoy, David Robinson, James McCreary, Malik Aziz, Angela Alsobrooks, and Donnell Turner each acted intentionally and without just cause, as described herein, to retaliate against Plaintiffs for their private speech regarding matters of public concern in violation of Plaintiffs' rights guaranteed by the First Amendment of the United States Constitution.

153. All of the speech contained in the text messages that relate to the adverse employment actions against the Plaintiffs in this case related to matters of public concern, including but not limited to: (1) Plaintiff Wormuth's criminal assault prosecution that was in the news; (2) the federal indictment of six officers, including three Prince George's County Officers for insurance and financial institution fraud in July 2021 (unsealed on August 18, 2021), a matter in the news and described in a press release issued by the Department of Justice; (3) several homicide cases reported in the news; (4) NFL protests (taking a knee during the National Anthem) widely reported in the news; (5) the HNLEA Lawsuit involving 12 plaintiff police officers reported

in the news; (6) the indictment of two Prince George's County Police officers in September 2020, one for second degree assault and a second for theft offenses, both of which were reported in the news, and (7) generally crimes happening in Prince George's County, which are clearly matters of public concern.

154. Specifically, each of the defendants initiated and/or approved of the institution of adverse employment actions against Plaintiffs in whole or in part because of their protected speech.

155. Such adverse employment actions included, among other things: (1) the initiation on or about June 22, 2021 of administrative discharge proceedings seeking to terminate Plaintiffs' employment with the police department because of their private speech; (2) the placement of Plaintiffs on a restricted duty status that removed Plaintiffs' ability to work as a police officer, to work overtime, to seek advancement, or to have any interactions with the public while at work; and (3) the recommendation that Plaintiffs be placed on the State's Attorney's "do not call list" which was publicly released on or about October 29, 2021.

156. Each of the defendants identified in this Count acted intentionally and maliciously to initiate, recommend and/or approve of the adverse employment actions herein described against Plaintiffs because of their private speech.

157. Each of the defendants acted with malicious intent to retaliate against Plaintiffs and to punish Plaintiffs for their use of language they found offensive or unwanted, and with reckless or callous indifference to Plaintiffs' rights and to thereby harm the Plaintiffs.

COUNT II
FIRST AND FOURTH AMENDMENT
*MONELL* CLAIMS
(Darryl Wormuth, Carolina Wormuth and Anthony Brooke v.
Prince George's County and the Prince George's County Police Department)

158. Plaintiffs incorporate the previous allegations in paragraphs 1 through 150 as if restated herein verbatim.

159. In the seminal case of *Monell v. Dep't of Social Services of the City of New York,* 436 U.S. 658 (1978), the Supreme Court determined that a local governmental body may also qualify as a person liable under § 1983 based on the unconstitutional actions of individual defendants, but only where those defendants were executing an official policy or custom of the local government, resulting in a violation of the plaintiff's rights. *Monell,* 436 U.S. at 690-91.

160. "A plaintiff may demonstrate the existence of an official policy in three ways: (1) a written ordinance or regulation; (2) certain affirmative decisions of policymaking officials; or (3) in certain omissions made by policymaking officials that 'manifest deliberate indifference to the rights of citizens.'" *Johnson v. Balt. Police Dept.,* 2022 U.S. Dist. LEXIS 189576, *179, 2022 WL 9976525 (D. Md. Oct. 14, 2022)(citing *Carter v. Morris,* 164 F.3d 215, 218 (4th Cir. 1999)).

161. In *Pembaur v. City of Cincinnati,* 475 U.S. 469 (1986), the Supreme Court made clear "that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." *Id.* at 480.

162. In this case, Plaintiffs' First Amendment retaliation claims more particularly set forth in Count I are related to the municipal policy created under Chief's Special Order #21-003.

163. The application of this policy to the Plaintiffs was also the product of decisions made by municipal policymakers, namely Defendant Aziz, who was the Chief of Police and the

author of the policy in question, as well as Defendant Alsobrooks, who unquestionably is a municipal policymaker as the Chief Executive for Prince George's County.

164. Because the acts of retaliation for the exercise of protected speech as alleged herein arise directly from the written policy created under Chief's Special Order #21-003 and was initiated and approved by the municipal policymakers capable of acting in their official capacities to effect and/or create the policies of the Prince George's County Police Department and Prince George's County, namely Defendants Aziz and Alsobrooks, the Prince George's County Police Department and Prince George's County itself have direct liability for the acts of retaliation in violation of Plaintiffs' rights secured by the First Amendment of the United States Constitution.

165. The police department also developed and maintained a common policy of using applications for general warrants to search "all contents" of cell phones obtained by officers in the Prince George's County Police Department. The March 10, 2021 search warrant described herein was a product of that policy, as was the warrant at issue in *Robinson.* Police officers in Prince George's County commonly used the same boilerplate language in all of their search warrant applications seeking to examine the contents of cellular phones. That language was designed to produce and did produce general search warrants in all or nearly all cases involving search warrants for cellular phones.

166. Even before the *Robinson* decision in 2022, the policy and practice of seeking general warrants by the police department for cell phone searches was clearly wrongful, especially after the U.S. Supreme Court decided *Riley* and courts in neighboring D.C., *see Burns v. United States,* 235 A.3d 758, 773-74 (D.C. 2020), applied *Riley* to strike down general warrants like those being sought routinely in Prince George's County. In fact, as described above, the D.C. decision

in *Burns* triggered training by the Prince George's County State's Attorney's Office to strengthen cell phone search warrants.

167. Despite the availability of that training, the department continued in its policy and practice of seeking general warrants when cell phones were to be searched. The failure of Chief Aziz and other high-ranking officials within the police department to curtail the use of applications seeking general warrants for cell phones despite these developments demonstrates the type of omissions made by policymaking officials that "manifest deliberate indifference to the rights of citizens."

COUNT III
FIFTH & FOURTEENTH AMENDMENTS
STIGMA PLUS CLAIMS
(Darryl Wormuth and Anthony Brooke v. Aisha Braveboy, Cleo Savoy, James McCreary, Malik Aziz, Angela Alsobrooks, and Donnell Turner)

168. Plaintiffs incorporate the previous allegations in paragraphs 1 through 150 as if restated herein verbatim.

169. The Fifth and Fourteenth Amendments to the United States Constitution prohibit the government from depriving Plaintiff of "life, liberty, or property" without due process of law.

170. "The Supreme Court has acknowledged a constitutional liberty interest in one's reputation." *Elhady v. Kable*, 993 F.3d 208, 225 (4th Cir. 2021)(citing *Kerry v. Din,* 576 U.S. 86, 91-92 (2015)).

171. A plaintiff claiming reputational injury "must show [(1)] a statement 'stigmatizing his good name' and damaging his standing in the community; (2) some type of dissemination or publication of the statement; and (3) some other government action that 'alter[s] or extinguishe[s] one of his legal rights." *Id.* (quoting *Paul v. Davis,* 424 U.S. 693, 706-711 (1976)).

172. In this case, Plaintiffs D. Wormuth and Brooke have suffered severe reputational injury arising from being recommended for and placed on the "do not call list" by the Defendants without prior notice and without any opportunity to be heard regarding their placement on the list, being labeled as officers "who have lied" and officers who are "racist, homophobic and sexist." Defendant Braveboy has publicly labeled the Plaintiffs as officers "who have lied" and officers who are "racist, homophobic and sexist" during multiple televised interviews. And, for their private speech deemed to be "racist," the Plaintiffs have been targeted by the Defendants for discipline, including administrative termination and other adverse employment actions.

173. On May 7, 2021, Defendant Aisha Braveboy notified George Nichols, Deputy Chief of the police department, that she had placed Plaintiffs D. Wormuth and Brooke on her "do not call" list or "*Brady* list" because she received text messages from the police department that she perceived to be "offensive" and "violently racist." In the letter, Defendant Braveboy plainly sought to influence the work assignments of the Plaintiffs, which are administrative personnel matters and not advocacy related to any criminal case, writing: "I am imploring you to ensure that these officers are no longer positioned to have contact with the residents of Prince George's County." After this letter, both Plaintiffs were relegated to positions involving no contact with any member of the public without prior notice and without any opportunity to be heard regarding their reassignment to such demeaning positions. Additionally, these reassignments harmed the Plaintiffs financially in several ways.

174. Because absolute immunity safeguards the process, not the person, it extends only to actions "intimately associated with the judicial phase of the criminal process." *Nero v. Mosby,* 890 F.3d 106, 117 (4th Cir. 2018)(quoting *Imbler v. Pachtman,* 424 U.S. 409, 430-31 (1976)). All

other actions are entitled only to qualified immunity. *Id.* (citing *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993)).

175. To determine whether a particular act is "intimately associated with the judicial phase," courts "employ a functional approach to examine 'the nature of the function performed,' without regard to 'the identity of the actor who performed it,' 'the harm that the conduct may have caused,' or even 'the question whether it was lawful.'" *Id.* (quoting *Buckley,* 509 U.S. at 269, 271). The Supreme Court has distinguished between advocative functions and investigative or administrative functions, holding that the former enjoy absolute immunity, but the latter do not. *Nero,* 890 F.3d at 118.

176. Defendant Braveboy's successful attempt to affect personnel decisions in the police department for the Plaintiffs, "imploring" the Deputy Chief of the police department to "ensure" that Plaintiffs were assigned to positions without any public contact, was not an act intimately associated with the judicial phase of any criminal process.

177. Defendants Savoy, McCreary, Aziz, Alsobrooks, and Turner all acted together to suspend Plaintiffs and to initiate and pursue their administrative discharges from the police department on the basis of their private protected speech, which the Defendants labeled *ex post facto* "culturally insensitive."

178. The Defendants, and Defendant Braveboy in particular, intentionally performed the acts alleged herein without legal justification or excuse, but with an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure the Plaintiffs.

179. As detailed in this Complaint, the Defendants—all of whom are black—intentionally and willfully have sought to punish the Plaintiffs—both of whom are white—for their private text messages obtained through unlawful means. At the same time, these Defendants have

ignored similar texts from black officers and have refused to treat black officers in the same manner as they have treated the Plaintiffs.

180. This disparate treatment demonstrates the Defendants actions were motivated by their own racist feelings, that is their own hatred and bias toward white people and white police officers. The defendants have gone out of their way to publicly humiliate the Plaintiffs and to label them in the community as dishonest white racist officers. For example, Defendant Braveboy contacted Tracee Wilkins, a News 4 investigative reporter, and provided her with text messages from D. Wormuth's cell phone that had not previously been referenced in any case, and which were not then publicly disclosed, and asked Wilkins to use the text messages to run a story on Plaintiffs D. Wormuth and Brooke, which aired on August 8, 2023. Defendant Braveboy was interviewed as part of the story and referred to Plaintiffs D. Wormuth and Brooke as "racist individuals on our department that were putting our citizens at risk." Braveboy's actions to publicize previously unreleased text messages were not in connection with any case she was prosecuting; instead, she acted out of malice and intentionally to harm the Plaintiffs.

181. To make matters worse, the text messages these Defendants used to label the Plaintiffs as racists and to punish them are taken completely out of context. They are quoted without including the context of the conversations in which they occurred, and they are misrepresented by the Defendants. By way of example, during the televised news report that aired on August 8, 2023, a text from Wormuth is quoted: "Black people in a white man's job." What was not reported is the context of this statement. In an earlier criminal prosecution of a black police officer, Corporal Adrian Crudup, for tipping off criminals of police investigations, Crudup offered race as the reason for his crime, testifying that he was targeted for prosecution because he was "a black man in a white man's job." In context, this statement is not racist at all, it is simply

a shorthand reference used when someone suggests race is to blame for their own misconduct. Context matters: taking a knee might be a sign of civil protest, but it could also be part of a marriage proposal. The Defendants made no effort to determine the context of the text messages used to punish the Plaintiffs, they just quote them without context and label the Plaintiffs racists.

COUNT IV
FOURTH AMENDMENT
UNLAWFUL SEARCH & SEIZURE
(Darryl Wormuth and Carolina Wormuth v. Cleo Savoy,
Musa Eubanks, Michael Elser, Corey Truxon, Jeff Ross and Joel Patterson)

182. Plaintiffs incorporate the previous allegations in paragraphs 1 through 150 as if restated herein verbatim.

183. By virtue of her marriage to D. Wormuth and because her husband's cellular phone constitutes marital property often used by her and shared with her husband (much like their shared home), Plaintiff Carolina Wormuth had, like her husband, a reasonable expectation of privacy in the contents of the personal cellular telephone that is the subject of this action.

184. Plaintiff Carolina Wormuth had a reasonable expectation that photographs of her taken/stored on the phone and her text communications with her husband would remain private on the cellular phone shared between them, especially those that attached photographs of her naked body intended for her husband's eyes only and unrelated to any relevant investigation.

185. As set forth herein, Defendant Cleo Savoy conducted one or more warrantless searches of Plaintiffs' personal cellular phone on and/or between March 2, 2021 and March 10, 2021 (prior to issuance of the March 10, 2021 warrant) and during such warrantless searches observed and seized unlawfully contents of the cellular phone, including text messages, photographs, and other private data in violation of Plaintiffs' rights guaranteed by the Fourth Amendment of the United States Constitution.

186. As set forth herein, the search warrant application made by Defendant Cleo Savoy and reviewed and approved by Defendant Musa Eubanks on or about March 10, 2021 clearly called for a general warrant prohibited by the particularity requirement of the Fourth Amendment to the United States Constitution.

187. The resultant warrant was so facially invalid that no reasonably well-trained police officer or prosecutor could have relied on the general warrant as sufficient to authorize the limitless searches that occurred after March 10, 2021.

188. Defendants Savoy and Eubanks acted knowingly, intentionally, and maliciously to obtain a general warrant they knew was invalid to conduct an unlawful fishing expedition of the entire contents of the personal cellular phone belonging to Plaintiffs, and to cover up the warrantless searches already conducted.

189. At the time of these events, the Prince George's County Prosecutor's Office was already training Prince George's County police officers to avoid general warrants for cellular phones in the wake of the D.C. Court of Appeals' decision in *Burns v. United States,* 235 A.3d 758 (D.C. App. 2020)(holding the good faith exception inapplicable to a facially deficient warrant very similar to that obtained by Savoy in this case).

190. In approving Savoy's general warrant application for submission to a judge, Defendant Eubanks was not performing an advocacy function as an officer of the court, but was instead performing an investigative function for which there is no absolute immunity.

191. Knowing that the warrant was overbroad and unconstitutional, the Defendants nevertheless caused the FBI on or about March 19, 2021 to extract the entire contents of the cell phone as described herein, and then searched the entire contents under the guise of a valid warrant, when they then well knew the general warrant was invalid and unlawful.

192. Notwithstanding the *Richardson* decision in August 2022, ASA Leonardi's representations to the Court in April 2022 that the contents of the Wormuths' cell phone would not be used by the State, and the on-point training offered by the State's Attorney's Office regarding "strengthening cell phone warrants" following the *Burns v. United States,* 235 A.3d 758 (D.C. App. 2020) decision in 2020, Defendant Michael Elser, acting at the direction of Defendant Joel Patterson, who was prosecuting an unrelated criminal case against 14 Prince George's County Police Officers who were all members of SAT; *State v. Brooke, et al.,* Case No. CT221115F, (P.G. County Cir. Ct.)(the "SAT Case"), conducted a new search of the entire contents of the Wormuths' cell phone without obtaining a new search warrant in January 2023.

193. In directing Defendant Elser to conduct a new warrantless search of the Plaintiffs' personal cell phone, Defendant Patterson was not performing an advocacy function as an officer of the court in the SAT case but was instead performing an investigative function for which there is no absolute immunity.

194. This new, warrantless search, which was nearly two years after the general search warrant was issued on March 10, 2021 and nearly nine months after the April 2022 motion hearing described above, was approved by Elser's supervisors in Internal Affairs, Defendants Corey Truxon and Jeff Ross.

195. At the time of this new warrantless search in January 2023, no reasonably well-trained police officer or prosecutor could have believed the search was lawful.

196. The defendants acted with malicious intent to deprive Plaintiffs of their rights or with reckless or callous indifference to Plaintiffs' rights secured by the Fourth Amendment to the United States Constitution and to thereby harm the Plaintiffs.

197. As a direct and proximate result of Defendants' unlawful searches of the Plaintiffs' personal cell phone and the unlawful seizure of their personal data, the Plaintiffs have suffered significant harm, including but not limited to adverse employment actions as described herein, defamation of character both publicly and in connection with criminal sentencing proceedings against D. Wormuth, shame, emotional distress, humiliation, and invasion of their personal privacy.

COUNT V
ARTICLE 40 OF THE MARYLAND DECLARATION OF RIGHTS
UNLAWFUL RETALIATION
(Anthony Brooke and Darryl Wormuth v. Cleo Savoy, David Robinson, James McCreary, Malik Aziz, Angela Alsobrooks, and Donnell Turner, Prince George's County and the Prince George's County Police Department)

198. Plaintiffs incorporate the previous allegations in paragraphs 1 through 150 and 152 through 157 as if restated herein verbatim.

199. Article 40 of the Maryland Declaration of Rights provides that "the liberty of the press ought to be inviolably preserved; that every citizen of the State ought to be allowed to speak, write and publish his sentiments on all subjects, being responsible for the abuse of that privilege." Importantly, Article 40 is capable of a different interpretation than the First Amendment. *Clear Channel Outdoor v. Dep't of Fin.,* 472 Md. 444, 457 (2021); *State v. Brookings,* 380 Md. 345, 350 n.2 (2004)(the Maryland Supreme Court has "emphasized that, simply because a Maryland constitutional provision is *in pari materia* with the federal one . . . does not mean that the provision will always be interpreted or applied in the same manner as its federal counterpart.")(citing *Dua v. Comcast Cable,* 370 Md. 604, 621, 805 A.2d 1061, 1071 (2002) and *DiPino v. Davis,* 354 Md. 18, 43, 729 A.2d 354, 367 (1999)("In certain contexts the contours of the State Constitutional rights are not precisely those of the Federal.").

200. The First Amendment has been interpreted to protect the speech of government employees only when their speech is a matter of "public concern" and the government lacks an adequate justification for treating the employee differently from the public at large. The language of Article 40 "that *every citizen* of the State ought to be allowed to speak, write and publish his sentiments *on all subjects*," suggests broader application in which one's employment status is irrelevant, and protections apply not only to matters of public concern, but also to matters of private concern, *i.e.,* "*on all subjects*." Article 40 (emphasis added).

201. Defendants Cleo Savoy, David Robinson, James McCreary, Malik Aziz, Angela Alsobrooks, and Donnell Turner each acted intentionally and without just cause, as described herein, to retaliate against Plaintiffs for their private speech in violation of Plaintiffs' rights guaranteed by Article 40 of the Maryland Declaration of Rights.

202. Specifically, each of the defendants initiated and/or approved of the institution of adverse employment actions against Plaintiffs in whole or in part because of their protected speech.

203. Such adverse employment actions included, among other things: (1) the initiation on or about June 22, 2021 of administrative discharge proceedings seeking to terminate Plaintiffs' employment with the police department because of their private speech; (2) the placement of Plaintiffs on a restricted duty status that removed Plaintiffs' ability to work as police officers, to work overtime, to seek advancement, or to have any interactions with the public while at work; and (3) the recommendation that Plaintiffs be placed on the State's Attorney's "do not call list" which was publicly released on or about October 29, 2021.

204. Each of the defendants identified in this Count acted intentionally and maliciously to initiate, recommend and/or approve of the adverse employment actions herein described against Plaintiffs because of their private speech.

205. Each of the defendants acted with malicious intent to retaliate against Plaintiffs and to punish Plaintiffs for their use of language they found offensive or unwanted, and with reckless or callous indifference to Plaintiffs' rights and to thereby harm the Plaintiffs.

206. Prince George's County and the Prince George's County Police Department are vicariously liable for the acts of their employees in violation of Plaintiffs' State constitutional rights.

COUNT VI
ARTICLE 24 OF THE MARYLAND DECLARATION OF RIGHTS
STIGMA PLUS CLAIMS
(Darryl Wormuth and Anthony Brooke v. Aisha Braveboy, Cleo Savoy, James McCreary, Malik Aziz, Angela Alsobrooks, Donnell Turner, Prince George's County and the Prince George's County Police Department)

207. Plaintiffs incorporate the previous allegations in paragraphs 1 through 150 and 169 through 181 as if restated herein verbatim.

208. Similar to the Fifth and Fourteenth Amendments to the United States Constitution, Article 24 of the Maryland Declaration of Rights provides that, "no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land."

209. Article 24 of the Maryland Declaration of Rights is generally interpreted as providing rights coextensive with the Fifth and Fourteenth Amendments to the United States Constitution. "The Supreme Court has acknowledged a constitutional liberty interest in one's reputation" arising under the Fifth and Fourteenth Amendments to the United States Constitution. *Elhady v. Kable*, 993 F.3d 208, 225 (4th Cir. 2021)(citing *Kerry v. Din,* 576 U.S. 86, 91-92 (2015)). The Plaintiffs also have a property interest in their employment as police officers in Prince George's County.

210. Article 24 of the Maryland Declaration of Rights arguably speaks more directly to one's constitutional right to protect his or her reputation, by providing that "no man ought to be . . . *in any manner*, *destroyed, or* deprived of his life, liberty or property, . . ."

COUNT VII
ARTICLE 26 OF THE MARYLAND DECLARATION OF RIGHTS
UNLAWFUL SEARCH & SEIZURE
(Darryl Wormuth and Carolina Wormuth v. Cleo Savoy, Musa Eubanks, Michael Elser, Corey Truxon, Jeff Ross, Joel Patterson, Prince George's County, and the Prince George's County Police Department)

211. Plaintiff incorporates the previous allegations in paragraphs 1 through 150 and 183 through 197 as if restated herein verbatim.

212. Article 26 of the Maryland Declaration of Rights provides State Constitutional protections coextensive with the Fourth Amendment to the United States Constitution to be free from unreasonable searches and seizures. *King v. State,* 434 Md. 472, 482, 76 A.3d 1035, 1041 (2013)(collecting cases). Likewise, Article 24 of the Maryland Declaration of Rights is the Maryland counterpart to the due process clauses found in the Fifth and Fourteenth Amendments to the United States Constitution and are in *pari materia* with its federal counterparts. *Allmond v. Dep't of Health & Mental Hygiene,* 448 Md. 592, 609 (2016).

213. As a direct and proximate result of Defendants' unlawful searches of the Plaintiffs' personal cell phone and the unlawful seizure of their personal data, the Plaintiffs have suffered significant harm, including but not limited to adverse employment actions as described herein, defamation of character both publicly and in connection with criminal sentencing proceedings against D. Wormuth, shame, emotional distress, humiliation, and invasion of their personal privacy.

COUNT VIII
DEFAMATION *PER SE*
(Darryl Wormuth and Anthony Brooke v. Aisha Braveboy)

214. Plaintiff incorporates the previous allegations in paragraphs 1 through 150 as if set forth herein verbatim.

215. In or about August 2023, Defendant Braveboy contacted Tracee Wilkins, a News 4 investigative reporter, and provided her with text messages from D. Wormuth's cell phone that had not previously been referenced publicly in his criminal case and asked Wilkins to run a story on Plaintiffs D. Wormuth and Brooke, which aired on August 8, 2023.

216. Defendant Braveboy was interviewed as part of the story and referred to Plaintiffs D. Wormuth and Brooke as "racist individuals on our department that were putting our citizens at risk." Labeling Plaintiffs as violent racists who pose a threat to the community constitutes defamation *per se.*

217. These comments only served to reinforce prior televised interviews of Braveboy in which she referred to Plaintiffs as officers "who have lied" or are "racist, homophobic and sexist."

218. Plaintiff D. Wormuth's criminal trial for assault of the black juvenile concluded on May 26, 2023 with sentencing. No appeals were filed. Likewise, the resurrected case against Plaintiff Brooke was dismissed by the Court in July 2023. Accordingly, when Defendant Braveboy arranged for and appeared on the news program on August 8, 2023, her comments cannot fairly be characterized as comments intimately associated with the judicial phase of any criminal process. Accordingly, she is not entitled to immunity for her intentional and malicious defamatory statements.

219. Defendant Braveboy acted intentionally and with actual malice when she sought the news coverage and then used the opportunity to intentionally defame the Plaintiffs. Defendant

Braveboy intentionally performed the acts alleged herein without legal justification or excuse, but with an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure the Plaintiffs. Braveboy's malice is demonstrated by her disparate treatment of the Plaintiffs who are white as compared to black officers who used similar language.

220. Furthermore, Braveboy acted with reckless disregard of the Plaintiffs' rights by labeling the Plaintiffs as violent racists who pose a threat to the community without affording any opportunity for the officers to explain the context in which messages were sent, or any opportunity to be heard. She simply identifies texts that sound bad when read in isolation, or without important context, and jumps to the accusation that Plaintiffs are violent racists who pose a threat to the community. In other words, Braveboy's characterization of the Plaintiffs is not accurate and portrays the Plaintiffs in a false light.

COUNT IX
INVASION OF PRIVACY – FALSE LIGHT
(Darryl Wormuth and Anthony Brooke v. Defendants Cleo Savoy,
David Robinson, James McCreary, Malik Aziz,
Aisha Braveboy, Angela Alsobrooks and Donnell Turner)

221. Plaintiff incorporates the previous allegations in paragraphs 1 through 150 as if set forth herein verbatim.

222. As set forth in this Complaint, Defendant Savoy, motivated to target white officers assigned to the SAT, engaged in a pattern of unlawful behavior which included false statements in her official reports and false testimony under oath intended to cover up her unlawful search of the Wormuths' cell phone and attempt to explain the need for her general search of all contents of the phone.

223. Defendant Savoy intentionally selected text messages taken out of context to portray the Plaintiffs in a negative and false light.

224. Defendant Savoy's actions were condoned and supported by Defendants David Robinson, James McCreary, Malik Aziz, Aisha Braveboy, Angela Alsobrooks and Donnell Turner. In recommending the Plaintiffs for administrative discharge, the Defendants painted the Plaintiffs as violent racists, which was and is a false characterization of the Plaintiffs. These efforts were publicized in multiple news reports that characterized the Plaintiffs as something they are not—violent racists who pose a threat to the citizens of Prince George's County.

225. Consistent with the efforts of the aforesaid Defendants, in or about August 2023, Defendant Braveboy contacted Tracee Wilkins, a News 4 investigative reporter, and provided her with text messages from D. Wormuth's cell phone that had not previously been referenced publicly in his criminal case and asked Wilkins to run a story on Plaintiffs D. Wormuth and Brooke, which aired on August 8, 2023.

226. Defendant Braveboy was interviewed as part of the story and referred to Plaintiffs D. Wormuth and Brooke as "racist individuals on our department that were putting our citizens at risk." Labeling Plaintiffs as violent racists who pose a threat to the community constitutes defamation *per se.*

227. These comments only served to reinforce prior televised interviews of Braveboy in which she referred to Plaintiffs as officers "who have lied" or are "racist, homophobic and sexist."

228. Plaintiff D. Wormuth's criminal trial for assault of the black juvenile concluded on May 26, 2023 with sentencing. No appeals were filed. Likewise, the resurrected case against Plaintiff Brooke was dismissed by the Court in July 2023. Accordingly, when Defendant Braveboy arranged for and appeared on the news program on August 8, 2023, her comments cannot fairly be characterized as comments intimately associated with the judicial phase of any criminal process.

Accordingly, she is not entitled to immunity for her intentional and malicious defamatory statements.

229. Defendant Braveboy acted intentionally and with actual malice when she sought the news coverage and then used the opportunity to defame the Plaintiffs. Defendant Braveboy intentionally performed the acts alleged herein without legal justification or excuse, but with an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure the Plaintiffs. Braveboy's malice is demonstrated by her disparate treatment of the Plaintiffs who are white as compared to black officers who used similar language.

230. Furthermore, Braveboy acted with reckless disregard of the Plaintiffs' rights by labeling the Plaintiffs as violent racists who pose a threat to the community without affording any opportunity for the officers to explain the context in which messages were sent, or any opportunity to be heard. She simply identifies texts that sound bad when read in isolation, or without important context, and jumps to the accusation that Plaintiffs are violent racists who pose a threat to the community. In other words, Braveboy's characterization of the Plaintiffs is not accurate and portrays the Plaintiffs in a false light.

## COUNT X
## COMMON LAW CONSPIRACY
(Darryl Wormuth and Anthony Brooke v.
Defendants Cleo Savoy, David Robinson, James McCreary, Malik Aziz, Corey Truxon,
Jeff Ross, Aisha Braveboy, Musa Eubanks, Donnell Turner, and Angela Alsobrooks)

231. Plaintiff incorporates the previous allegations in paragraphs 1 through 150 as if set forth herein verbatim.

232. Defendants Cleo Savoy, David Robinson, James McCreary, Malik Aziz, Corey Truxon, Jeff Ross, Aisha Braveboy, Musa Eubanks, Donnell Turner, and Angela Alsobrooks, acting with each other and through other Prince George's County Police Officers, had an

agreement or understanding to engage in unlawful discrimination and retaliation against the Plaintiffs to intentionally interfere with Plaintiffs' employment within and outside the police department.

233. In furtherance of the conspiracy, and as more specifically described herein, Defendants engaged in unlawful acts of discrimination and/or retaliation by *inter alia* (i) making false statements and providing false testimony to conceal illegal search activities; (ii) intentionally seeking an illegal general warrant for the purpose of conducting an excessively broad search in hopes of obtaining evidence against the Plaintiffs and for the purpose of concealing unlawful warrantless searches of Plaintiff Wormuth's property, (iii) commencing investigations of the Plaintiffs while refusing to investigate others similarly situated, (iv) disciplining Plaintiffs in a disproportionate and discriminatory manner, (v) causing Plaintiffs to be involuntarily transferred to less desirable positions, (vi) causing Plaintiffs requests to be transferred to more desirable positions to be denied, (vii) causing harm to Plaintiffs' reputation and employment, and (viii) reopening stale administrative matters to target Plaintiff Brooke for successive criminal prosecutions (all of which ultimately failed and were dismissed).

234. As a direct and proximate result of the Defendants' agreement and acts, Plaintiffs suffered actual damages and loss.

COUNT XI
MANDAMUS--RETURN OF PROPERTY
28 U.S.C. § 1361
(Darryl Wormuth and Carolina Wormuth v. all Defendants)

235. Plaintiffs incorporate the previous allegations in paragraphs 1 through 150 as if set forth herein verbatim.

236. Despite repeated demands by the Plaintiffs for the return of their property, the government continues to retain possession of their personal cellular telephone and as demonstrated

by the allegations in this Complaint, continues to make use of private information and data obtained illegally from the phone.

237. D. Wormuth's criminal case in which his cell phone was seized as described herein is fully concluded and no further proceedings are possible. No appeals are pending, nor were any filed. At this stage, "the person from whom the property is seized is presumed to have a right to its return, and the government has the burden of demonstrating that it has a legitimate reason to not return the property." *See e.g., In re Grand Jury Subpoena Duces Tecum (Roe & Roe, Inc.),* 49 F. Supp. 451, 453 (D. Md. 1999).

238. Furthermore, "in such a case, the legality of the search and seizure is no longer an issue; even if the seizure was lawful the government must justify its continued possession of the property by demonstrating that it is contraband or subject to forfeiture." *Id.* Even if the Government has a continuing evidentiary interest in the property, it may not "hold property for an 'unreasonable time' without taking some action with regard to the property." *United States v. Carter,* 859 F. Supp. 202, 205 (E.D. Va. 1994), *aff'd*, 139 F.2d 424 (4th Cir. 1998).

239. This Court has sufficient ancillary jurisdiction to require the government to return to Plaintiff his personal property. *United States v. Totaro,* 468 F.Supp. 1045, 1047-48 (D. Md. 1979)(court has jurisdiction to enforce government's duty to return seized property once its need for the property terminates regardless of the validity of the search and seizure). This is especially so here, where the phone retains evidentiary value *in this case* because it will contain data confirming it was accessed without a warrant between March 2, 2021 and March 10, 2021, as indicated by the FBI forensic reports.

**DEMAND FOR JURY**

240. Plaintiffs respectfully demand trial by jury of all issues in this action that are so triable.

**PRAYER FOR RELIEF**

241. Plaintiffs respectfully pray that this Court grant the following relief:

a. Issue a writ of mandamus requiring the government to forthwith return to Plaintiff Wormuth his personal property, namely his personal cellular phone seized on March 2, 2021 by Defendant Savoy; and

b. Enter judgment against the defendants, independently, and jointly and severally when permitted by law, and in favor of plaintiffs for recovery of compensatory damages in an amount or amounts to be determined at trial; and

c. Enter judgment against the defendants, independently, and jointly and severally when permitted by law, and in favor of plaintiffs for recovery of punitive damages in an amount or amounts to be determined at trial; and

d. Include in any judgment an award of attorney's fees, expert fees, and costs pursuant to 42 U.S.C. § 1988 and Fed. R. Civ. P. 54; and such other relief that this Honorable Court deems to be just and proper.

December 11, 2023

Respectfully Submitted,

/s/Ray M. Shepard
Ray M. Shepard, Bar No. 09473
The Shepard Law Firm, LLC
122 Riviera Drive
Pasadena, Maryland 21122
Phone: 410-255-0700
Facsimile: 443-773-1922
Email: Ray@Shepard.Law

*Counsel for Plaintiffs Darryl and Carolina Wormuth and Anthony Brooke*