## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

DARRYL R. WORMUTH, *et al.*,

      Plaintiffs,

v.                                                   Case No. 23-cv-2905-ABA

PRINCE GEORGE'S COUNTY,
MARYLAND, *et al.*,

      Defendants

## MEMORANDUM OPINION

In 2021, Plaintiffs Darryl R. Wormuth ("Wormuth") and Anthony J. Brooke ("Brooke") were formally disciplined by the Prince George's County Police Department. Plaintiffs Wormuth, Brooke, and Carolina Wormuth (Wormuth's wife) believe they were unfairly targeted and retaliated against by the Police Department, the State's Attorney's Office for Prince George's County, and members of those offices, and have brought this lawsuit alleging violations of their constitutional rights. The County Defendants[1] have moved for a judgment on the pleadings, and the State's Attorney Defendants[2] have moved to dismiss the claims. For the reasons stated below, the Court will partially grant and partially deny both motions.

---

[1] The County Defendants are Prince George's County, former County Executive (and now U.S. Senator) Angela Alsobrooks, Inspector General Donnell Turner, and the Prince George County Police Department along with Chief of Police Malik Aziz and officers James McCreary, David Robinson, Jeff Ross, Cleo Savoy and Corey Truxon.

[2] The State's Attorney Defendants are State's Attorney Aisha Braveboy along with Assistant State's Attorneys Michael Elser, Musa Eubanks, Joel Patterson.

## I.    BACKGROUND

At this stage, the Court "must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff[s]." *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016). Plaintiffs allege as follows.

On October 20, 2020, Wormuth arrested a black minor in Prince George's County. *Id.* ¶ 27. Wormuth, using his personal cell phone, "photographed the arrestee immediately upon reaching the district station for booking." *Id.* ¶ 28. The arrestee later alleged that Wormuth grabbed him by the neck, and Wormuth was subsequently accused of using unreasonable force during the arrest. *Id.* ¶ 29. Wormuth provided the photograph of the arrestee to his supervisor during the review of the arrest. *Id.* ¶ 39.

During the Internal Affairs investigation, Defendant Cleo Savoy ("Savoy"), an "investigating officer with the Internal Affairs division of the police department," learned that Wormuth had used his personal cell phone to take the picture of the arrestee. *Id.* ¶¶ 6, 30. Savoy "applied for a search and seizure warrant to obtain possession" of Wormuth's cell phone. *Id.* ¶ 30. During the course of applying for those warrants, Assistant State's Attorney Eubanks assisted Savoy and "specifically reviewed and approved each application prior to its submission to a judge for consideration." *Id.* ¶¶ 14, 35. On December 9, 2020, Savoy obtained a warrant for Wormuth's cell phone, but the warrant expired without being executed. *Id.* ¶ 31.

On February 25, 2021, Savoy "applied for and obtained a second warrant for the seizure of [Wormuth's] personal cell phone." *Id.* The second warrant only authorized seizure of the phone; "it did not authorize any search of the contents." *Id.* ¶ 34. On March 2, 2021, pursuant to the second warrant, Savoy obtained Wormuth's cell phone.

*Id.* ¶ 32. Also on March 2, 2021, Wormuth's counsel emailed Eubanks relaying the expectation that "any search warrant would be limited in scope to matters that occurred at the time of or shortly after the incident that occurred on Oct 20, 2020, and nothing before that time and nothing after the time frame surrounding the incident." *Id.* ¶ 37.

On March 10, 2021, Savoy obtained a third warrant, this one authorizing a search of the contents of Wormuth's personal cell phone. *Id.* ¶ 34. The March 10, 2021 search warrant application sought to search "all stored data to include but not limited to: photographs, emails, text messages, video clips, contacts, and call details" in Wormuth's personal cell phone. *Id.* ¶ 38. Plaintiffs allege that, sometime between March 2, 2021 and March 10, 2021, Savoy conducted a warrantless search of Wormuth's personal cell phone (after the December 9, 2020 search warrant had expired but before receiving the March 10, 2021 search warrant). *Id.* ¶¶ 44-45. They allege that, during that search, Savoy took photographs of the contents of Wormuth's cell phone using her own personal cell phone. *Id.* ¶ 48.

On March 11, 2021, after receiving the March 10 warrant, Savoy "delivered custody of the cell phone to the FBI for the purpose of conducting a forensic search and seizure of the phone's contents." *Id.* ¶ 49. "On the Receipt of Property document signed by [Savoy] and FBI Special Agent Mark Zimmerman, the description of the phone delivered by Savoy include[d] the phone's four-digit passcode needed to unlock the phone." *Id.*

On March 16, 2021, while the FBI's analysis of the cell phone was pending, Savoy suspended Lt. Edward Finn and Capt. Jeremy Bull, allegedly based on "text messages she obtained from [Wormuth's] personal cell phone during her" search. *Id.* ¶ 51. These suspensions were approved by Defendants David Robinson ("Robinson"), James

McCreary ("McCreary"), and Malik Aziz ("Aziz"), all members of Prince George's County Police Department. *Id.* ¶¶ 7, 8, 10, 51.

On March 19, 2021, Special Agent Zimmerman reported that he "provided a 1 TB [ ] hard drive containing a copy of the data and accompanying reports related to" Wormuth's personal cell phone to Savoy. *Id.* ¶ 52. Later that day, Savoy informed Zimmerman that the hard drive "appeared to be missing text communications." *Id.* ¶ 53. Zimmerman then performed a second extraction of the text messages from Wormuth's cell phone and added that data to the hard drive. *Id.* ¶ 54. The FBI's search of the cell phone's contents included "intimate photographs of Plaintiff Carolina Wormuth that she [had] shared privately" with Wormuth. *Id.* ¶ 55.

On April 15, 2021, the Prince George's Police Department amended a preexisting policy, Chief's Special Order #21-003, to expressly prohibit all employees "from using culturally insensitive language." *Id.* ¶ 62. This prohibition "applie[d] to all communications, both internal and external." *Id.*

On April 23, 2021, Savoy suspended Plaintiff Brooke, a police officer in the department, for alleged violations of the updated Special Order based on text messages obtained from Wormuth's personal cell phone. *Id.* ¶ 63. As explained below, Brooke later initiated "show cause proceedings in the Circuit Court for Prince George's County pursuant to the Law Enforcement Officer's Bill of Rights." *Id.* ¶ 77. As the Appellate Court of Maryland has laid out in a recent opinion from those proceedings, the text messages that prompted the suspension including the following "sixteen racist and demeaning messages":

> Text 1: "FBI did search warrants on two PGPD officers today
> out of D4 … guess what race they are …"

Text 2: "Yep," in response to W. saying "No doubt ... black people in a white man[']s job."

Text 3: "We get a paper [cut] and bleed out, these savages get shot in the head and still won't die."

Text 4: "3 Homicides in D4 last night. I LOVE IT."

Text 5: "Hearing about [homicides] like that and just imagining the whole block out there screaming and crying brings true warmth and happiness to my heart."

Text 6: "This one felt glorious last night." This text accompanied a picture of a Black man in a hospital bed with bandages over his forehead and his eye swollen shut.

Text 7: "Heard the call at [W]alker [M]ill, hope they got shot."

Text 8: "Everybody wants to be a social justice warrior. Fuck [']em."

Text 9: "We all deserve nice things. Fuck these animals!!"

Text 10: "Did you see that little fuck got transferred to MRD what a joke"

Text 11: "Yup all they do is bitch and moan about more more more. Want the most shit from doing the least amount of work. Bottom [line] ol whitey is just better at policing than them!"

Text 12: "I just love that it's constantly them getting caught for fraud, theft, all the shit and all they can do is still blame us."

Text 13: "So glad that dude got locked up on [R]ochell. He's such a bitch. Kenney and I [beat] the shit out of him last year when he ran with a gun on Atwood."

Text 14: "I know it doesn't mean much coming from me but I'm seriously not doing shit anymore, fuck this place. Savages ..."

> Text 15: "Can't wait to tell you about all the lazy turd #1s[1] in the class smh."
>
> Text 16: "Helping shift 4 with calls! Why don't they bring the little snitch back from MRD if they are so short! Oh wait they can't it's his reward!"

*Id.* at *1. These same text messages are at issue in Counts 1 and 5 in this case. *See* ECF No. 37-8. Others of the text messages at issue appear in the record at ECF No. 37-8: "No doubt . . . black people in a white mans job," "God forbid we make a black person look bad, or expose them here for what they are . . . fuckin animals," "Here we go again, another four years of poor fuckin blacks," "The lodge didn't endorse any candidate for president due to the gays and blacks!!!!"

On April 28, 2021, Wormuth was indicted by a grand jury of the Circuit Court for Prince George's County, based on his use of force during the October 20, 2020 arrest discussed above. *Id.* ¶ 64. On May 7, 2021, Braveboy notified George Nichols ("Nichols"), Deputy Chief of the Prince George's Police Department, that she had placed both Wormuth and Brooke on her "*Brady* list" or "Do Not Call" list because she had "received text messages from the police department that she perceived to be 'offensive' and 'violently racist.'" *Id.* ¶ 66. Braveboy wrote that she was imploring Nichols "to ensure that these officers are no longer positioned to have contact with the residents of Prince George's County." *Id.*

On June 22, 2021, Aziz "formally recommended . . . disciplinary action" against Brooke and Wormuth based on Savoy's reports relating to the text messages from Wormuth's cell phone, including text messages dating back to six years before the October 20, 2020 arrest. *Id.* ¶ 73. Specifically, the Police Department recommended that both Brooke and Wormuth's employment should be terminated. *Id.* ¶¶ 73, 77. Robinson

and McCreary "were responsible for the supervision of Savoy's investigation" and "both concurred in and approved the formal disciplinary actions" recommended by Aziz. *Id.* ¶ 75. McCreary "presented Savoy's investigation to Defendant Turner for the purpose of initiating the disciplinary proceedings against [ ] Wormuth and Brooke with approval from Defendant Alsobrooks." *Id.* ¶ 76.

Around September 2021, Brooke and Wormuth initiated the show cause proceedings noted above, "to challenge the legality of their proposed terminations." *Id.* ¶ 77. While the show cause hearing was pending, Captain Rogers Massey ("Massey"), at the direction of McCreary, sent an email in September 2021 to select officers informing them that Braveboy "intends to release the names of officers currently placed on the 'Do Not Call' to the public." *Id.* ¶ 78. The email provided that affected officers may "submit impact statements" explaining why their names should not be on the list or, even if on the list, should not be publicly released. *Id.* Wormuth and Brooke do not dispute that Defendants gave officers whose names were on the "Do Not Call" list an opportunity to challenge their inclusion on the list, as well as to challenge specifically their inclusion on the *public* version of the list that the State's Attorney's Office intended to release. But Wormuth and Brooke allege they did not receive Massey's email. *Id.* ¶ 79. On October 29, 2021, Braveboy released the "Do Not Call" list to the public and made appearances on television. *Id.* ¶ 81. During a television appearance, Plaintiffs allege, Braveboy described the officers on the list as "those who have lied" or as "racist, homophobic, and sexist." *Id.*

On November 8, 2021, the show cause hearing was held in the Circuit Court for Prince George's County. *Id.* ¶ 82. Plaintiffs allege that during this hearing Savoy offered "false" testimony about "when she first had access to the contents of D. Wormuth's cell

phone" and other matters. *Id.* ¶ 83. Meanwhile, in Wormuth's criminal prosecution, he moved to suppress all evidence obtained from his personal cell phone. *Id.* ¶ 86. During an April 2022 hearing on that motion, the State reported that they did not intend to use any of the contents of the cell phone in the criminal case. *Id.* The State also "promised the Court to follow-up with federal law enforcement to have the cell phone returned" to Wormuth. *Id.* ¶ 87. Savoy returned the cell phone to the FBI on March 29, 2021, but Wormuth alleges that the FBI did not return his phone to him. *Id.* ¶ 88.

Around January 2023, Elser, acting at the direction of Patterson, during the prosecution of an unrelated criminal case involving Brooke, "conducted a new search of the entire contents of [Wormuth's] cell phone without obtaining a new search warrant." *Id.* ¶ 94. That unrelated case was dismissed later that month. *Id.* ¶ 98. Defendants Patterson, Braveboy, Truxon, and Aziz then reopened an administrative investigation of six officers, one of whom was Brooke, that had previously been opened regarding a use-of-force incident in February 2021. *Id.* ¶ 98. The administrative investigation had been closed on December 20, 2022 without any adverse actions against the six officers. *Id.* Upon reopening the investigation, Brooke was the only one of the six officers charged with misdemeanor conduct in office, a charge that was later dismissed in July 2023. *Id.*

Around August 2023, Braveboy contacted Tracee Wilkins, a News 4 investigative reporter, "and provided her with text messages from [Wormuth's] cell phone that had not previously been referenced in his criminal case and asked Wilkins to run a story on Wormuth and Brooke, which aired on August 8, 2023." *Id.* ¶ 117. Braveboy was interviewed as part of this story and referred to Wormuth and Brooke as "racist individuals on our department that were putting our citizens at risk." *Id.* ¶ 118. On August 4, 2023, Wormuth "was served with three additional administrative charges

related to his criminal case." *Id.* ¶ 119. Aziz recommended termination for all three charges. *Id.* Truxon, at the direction of Alsobrooks and Aziz, set an administrative hearing board date of August 29, 2023 for Wormuth. *Id.*

## II.   PROCEDURAL HISTORY

On January 19, 2023, Plaintiffs provided notice to the Prince George's County Attorney and the Maryland State Treasurer that they intended to file the claims alleged in this case. *Id.* ¶¶ 126, 129. On October 25, 2023, Plaintiffs filed a complaint in this Court that was stricken for failure to comply with Maryland local rules regarding page limits. ECF Nos. 1, 11. On December 11, 2023, Plaintiffs re-filed their complaint, ECF No. 16, and on March 28, 2024, Plaintiffs amended the complaint, ECF No. 30. Plaintiffs assert four principal categories of claims: (1) that insofar as the disciplinary actions taken against them were based on the text messages they had exchanged, the disciplinary actions constituted unlawful retaliation for First Amendment-protected speech; (2) that placing Plaintiffs on the "do not call" list without ensuring that they had received the email about their opportunity to be heard violated their due process liberty interests; (3) that one or more searches of Wormuth's cell phone violated his (and/or his wife's) Fourth Amendment rights; and (4) that State's Attorney Braveboy's comments to the News 4 reporter constitute defamation and/or false light. Plaintiffs also contend that those constitutional or tort claims also support claims under *Monell v. Dep't. of Social Servs. of City of New York*, 436 U.S. 658 (1978), and/or for civil conspiracy.

The State's Attorney Defendants filed a motion to dismiss. ECF No. 36. The County Defendants filed a motion for judgment on the pleadings. ECF No. 37. Plaintiffs responded to both motions. ECF Nos. 42 & 45. The State's Attorney Defendants filed a reply, ECF No. 46; the County Defendants did not.

## III.    STANDARD OF REVIEW

A complaint must contain "a short and plain statement of the claim showing the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). When a complaint fails "to state a claim upon which relief can be granted," even assuming the truth of the alleged facts, the defendant may move to dismiss the complaint. Fed. R. Civ. P. 12(b)(6).

To withstand a motion to dismiss, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The pleadings must contain sufficient factual allegations to state a facially plausible claim for relief. *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). As noted above, when considering such a motion, the Court "must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff." *King*, 825 F.3d at 212. "A motion for judgment on the pleadings under Rule 12(c) is assessed under the same standard applicable to motions to dismiss under Rule 12(b)(6)." *Green v. Sw. Credit Sys., L.P.*, 220 F. Supp. 3d 623, 624 (D. Md. 2016) (citing *Walker v. Kelly*, 589 F.3d 127, 139 (4th Cir. 2009)).

## IV.    DISCUSSION

### A.  Counts 1 and 5: First Amendment Unlawful Retaliation

In Count 1, Plaintiffs Anthony Brooke and Darryl Wormuth allege unlawful retaliation under the First Amendment by County Defendants Cleo Savoy, David Robinson, James McCreary, Malik Aziz, Angela Alsobrooks, and Donnell Turner. Am. Compl. ¶¶ 130-136. In Count 5, Plaintiffs Brooke and Wormuth allege unlawful retaliation under Article 40 of the Maryland Declaration of Rights against those same

County Defendants, plus Prince George's County and the Prince George's County Police Department. *Id.* ¶¶ 177-185. Defendants argue those counts do not state claims on which relief can be granted, or should otherwise be dismissed or stayed, for three reasons: (1) lack of standing, (2) qualified immunity, and (3) *Younger* abstention. ECF No. 37-1 at 6-12. For the reasons explained below, the Court agrees that *Younger* abstention applies to Brooke and Wormuth's First Amendment claims, and therefore these claims must be stayed in deference to the Maryland courts' adjudication of whether Brooke and Wormuth's text messages constitute constitutionally protected free speech. The Court need not and does not reach the question of whether the text messages in fact constitute protected free speech, or whether Plaintiffs have otherwise stated a First Amendment unlawful retaliation claim.

The First Amendment generally prohibits government officials from engaging in retaliatory actions against an individual because of the individual's protected speech. *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019). "If an official takes adverse action against someone based on that forbidden motive, and 'non-retaliatory grounds are in fact insufficient to provoke the adverse consequences,' the injured person may generally seek relief by bringing a First Amendment claim." *Id.* (quoting *Hartman v. Moore*, 547 U.S. 250, 256 (2006)). To prevail on a First Amendment unlawful retaliation claim, a governmental employee must show, among other things, that there was a "causal connection" between the government's "retaliatory animus" and the plaintiff's "subsequent injury," *id.* (quoting *Hartman*, 547 U.S. at 259), *i.e.*, that the adverse action would not have been taken against the plaintiff *but for* the retaliatory motive.

Defendants argue that this Court should abstain from adjudicating Brooke's and Wormuth's First Amendment claims because "[p]resently pending before the Circuit

Court for Prince George's County is its consideration of whether the subject text messages, many of which are the same for both Plaintiffs Wormuth and Brooke, are protected free speech or not." ECF No. 37-1 at 12; *see Prince George's County v. Anthony Brooke*, No. CAL-2111244 (Cir. Ct. P.G. Co. 2021). Defendants specifically invoke *Younger* abstention, referring to the doctrine, arising from principles of federalism, that federal courts generally abstain from exercising jurisdiction to consider matters that are being litigated in ongoing state criminal proceedings, *Younger v. Harris*, 401 U.S. 37 (1971), or quasi-criminal proceedings, *Air Evac EMS, Inc. v. McVey*, 37 F.4th 89, 93 (4th Cir. 2022). Plaintiffs argue that *Younger* abstention does not apply because (1) the underlying pending state judicial proceeding pertains only to Brooke, (2) the state's interests are not implicated in the underlying pending state judicial proceeding, and (3) state officials have engaged in "bad faith or harassment" that is responsible for the underlying proceeding. ECF No. 45 at 23-24.

     *Younger* abstention applies to quasi-criminal proceedings if: (1) the state proceeding is ongoing, (2) the ongoing proceeding implicates important state interests, and (3) the proceeding provides an adequate opportunity to raise constitutional challenges. *Air Evac EMS,* 37 F.4th at 93 (citing *Sprint Commcns., Inc. v. Jacobs*, 571 U.S. 69, 81-82 (2013)). "[I]nterference with [such] a state judicial proceeding prevents the state not only from effectuating its substantive policies, but also from continuing to perform the separate function of providing a forum competent to vindicate any constitutional objections interposed against those policies." *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 604 (1975). As explained in *Sprint*:

> Such enforcement actions are characteristically initiated to sanction the federal plaintiff, *i.e.*, the party challenging the state action, for some wrongful act. In cases of this genre, a

> state actor is routinely a party to the state proceeding and
> often initiates the action. Investigations are commonly
> involved, often culminating in the filing of a formal complaint
> or charges.

571 U.S. at 79-80. *Younger* abstention can also apply to "pending 'civil proceedings

involving certain orders . . . uniquely in furtherance of the state courts' ability to perform

their judicial functions." *Id.*

Even when the above elements for *Younger* abstention are satisfied, however, a

federal court should *not* abstain where (1) a showing has been made of "bad faith or

harassment by state officials responsible for the [state] prosecution," (2) a state statute

at issue "is flagrantly and patently violative of express constitutional prohibitions," or

(3) other "extraordinary circumstances" or "unusual situation[s]" exist. *Id.* (cleaned up)

(citing *Younger*, 401 U.S. at 49-54).

Defendants here have adequately shown that *Younger* and its progeny require

that this Court abstain from adjudicating Brooke and Wormuth's First Amendment

claims. The underlying case pending before the Circuit Court of Prince George's County

is a "quasi-criminal proceeding" that is ongoing, implicates important state interests,

and provides an adequate opportunity to raise challenges regarding whether the text

messages are protected free speech. In the underlying show-cause proceeding initiated

by Brooke under the Law Enforcement Officer's Bill of Rights (which was repealed in

2021[3]), the Circuit Court of Maryland held that "disciplining Brooke for [the] text

messages would violate his free speech rights." *Prince George's County v. Brooke*, No.

1730 Sept. Term, 2021, 2023 WL 5318327, at *5 (Md. Ct. App. Aug. 18, 2023). The

---

[3] Maryland Police Accountability Act, 2021 Md. Laws, ch. 59,
https://legiscan.com/MD/bill/HB670/2021.

Appellate Court of Maryland vacated the judgment and remanded to the Circuit Court "to review the texts to determine whether the subject matter of the speech involved matters of public concern," and if the texts do "not involve a matter of public concern, the circuit court must deny the show cause petition as to that text and return the matter to [the Prince George's County Police Department] to proceed with disciplining Brooke on that basis." *Id.* The text messages at issue in the show cause proceeding are messages between Wormuth and Brooke, *id.* at *1, that are the exact same text messages at issue in Counts 1 and 5 in this case. *See* ECF No. 37-8.

While the show-cause proceeding was initiated by Brooke, it is a state court proceeding that affects whether the Prince George's County Police Department was permitted to discipline him based, at least in part, on the text messages. A disciplinary hearing can be "akin to a criminal prosecution" because the proceedings are judicial in nature and implicate important state interests in maintaining the integrity of, and public confidence in, its law enforcement officers, and Brooke has had adequate opportunity to raise his First Amendment claims. *See Gonzalez v. Waterfront Com'n of New York Harbor*, 755 F.3d 176, 183 (3d Cir. 2014) (holding that *Younger* abstention applied to a detective's administrative disciplinary hearing). Because the pending state court proceeding constitutes an action to enjoin the Police Department's disciplinary proceeding, it qualifies as a "quasi-criminal" proceeding within the meaning of *Younger*'s progeny discussed above.

And while Wormuth is not directly a party to the underlying state action, that is not a requirement for *Younger* abstention. *Sprint*, 571 U.S. at 79-80. The underlying text message exchanges in Brooke's show-cause proceeding are text messages *between* Brooke and Wormuth, and the text messages sent by Wormuth are sufficiently similar

(and equally outrageous) to the text messages sent by Brooke. *See, e.g.*, ECF No. 37-8 (text messages quoted above). The question pending in the Circuit Court is whether Brooke's text messages are protected free speech. Whichever way the Circuit Court decides that issue will necessarily decide whether Wormuth's text messages are protected by the First Amendment and Article 40 of the Maryland Declaration of Rights.

For these reasons, *Younger* abstention applies as to Counts I and V. And although some abstention doctrines call for a *stay* of federal proceedings, *see, e.g.*, *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 721 (1996) (requiring a stay of proceedings when applying *Colorado River* abstention), normally "*Younger* 'contemplates the outright dismissal of the federal suit, and the presentation of all claims, both state and federal, to the state courts.'" *Nivens v. Gilchrist*, 444 F.3d 237, 244-245 (4th Cir. 2006) (quoting *Gibson v. Berryhill*, 411 U.S. 564, 577 (1973)). However, when the claims seek damages, as is present here, courts should stay rather than dismiss the claims. *Adams Outdoor Advertising Limited P'ship. v. Beaufort Cnty.*, 105 F.4th 554, 559 (4th Cir. 2024) (citing *Nivens*, 444 F.3d at 247-48). Accordingly, the Court need not, and does not, decide whether Plaintiffs have stated cognizable free speech retaliation claims. But those claims (Counts 1 and 5) will be stayed pursuant to *Younger* in deference to the pending state court proceedings.

### B. Counts 3 and 6: Fifth and Fourteenth Amendment "Stigma-Plus" Claims

In Count 3, Plaintiffs Wormuth and Brooks allege, against State's Attorney Defendant Aisha Braveboy and County Defendants Cleo Savoy, James McCreary, Malik Aziz, Angela Alsobrooks, and Donnell Turner, that Plaintiffs' procedural due process rights under the Fifth and Fourteenth Amendment were violated when the State's

Attorney's Office added them to that office's "do not call" list. Am. Compl. ¶¶ 147-160. In Count 6, Plaintiffs Wormuth and Brooks allege the equivalent claim under Article 24 of the Maryland Declaration of Rights and add County Defendants Prince George's County and Prince George's County Police Department. *Id.* ¶¶ 186-189.

Procedural due process requires, among other things, that when a person is being deprived of "liberty" or "property," the person must be given notice and an opportunity to be heard. *Mathews v. Eldridge*, 424 U.S. 319, 348 (1976) ("The essence of due process is the requirement that a person in jeopardy of serious loss be given notice of the case against him and opportunity to meet it.") (cleaned up). Plaintiffs allege that when their names were added to the "do not call" list, they were deprived of "liberty" in the sense of reputational damage, and that they were added to that list "without prior notice and without any opportunity to be heard regarding their placement on the list." *Id.* ¶ 151. Ms. Braveboy argues that the claim against her should be dismissed because (1) it is barred by absolute prosecutorial immunity, and (2) Plaintiffs have not stated a claim in any event. ECF No. 36-1 at 13-14. The remaining County Defendants argue that the claims against them should be dismissed on *Younger* abstention grounds and qualified immunity grounds. ECF No. 37-1 at 17-18.

"The Supreme Court has acknowledged a constitutional liberty interest in one's reputation." *Elhady v. Kable*, 993 F.3d 208, 225 (4th Cir. 2021) (citing *Kerry v. Din*, 576 U.S. 86, 91-92 (2015)). But "reputation alone, apart from some more tangible interests such as employment," is not considered a "liberty" interest within the meaning of the due process clause of the Fifth Amendment. *Id.* (citing *Paul v. Davis*, 424 U.S. 693, 725 (1976)). A plaintiff asserting that his due process rights were violated and that the harm that resulted was solely to his reputation must allege (and later prove) that his

reputational injury was "accompanied by a state action that distinctly altered or extinguished his legal status." *Id.* (quoting *Shirvinski v. Coast Guard*, 673 F.3d 308, 315 (4th Cir. 2012)). Maryland also recognizes this type of claim, which is sometimes referred to as a "stigma plus" claim, under the Maryland Declaration of Rights. *Doe v. Dept. of Public Safety & Correctional Servs.*, 185 Md. App. 625, 641-44 (2009).

To establish a stigma-plus claim, a plaintiff must allege, in addition to the other elements of a procedural due process claim, (1) "a statement 'stigmatizing his good name' and damaging his standing in the community"; (2) "some type of dissemination or publication of the statement"; and (3) "some other government action that 'alter[s] or extinguishe[s] one of his legal rights.'" *Id.* at 225 (quoting *Davis*, 424 U.S. at 706-11). The loss of employment or injury must be due to the stigmatizing statement. *Davis*, 424 U.S. at 706; *Doe*, 185 Md. App. at 645-46. If the information contained in the stigmatizing statement was already in the public domain before the statement at issue was made, a plaintiff cannot prevail in a stigma-plus claim. *Doe*, 185 Md. App. at 645-46. And at least in certain circumstances, courts have held that "[t]here can be no deprivation of liberty unless the stigmatizing [statements] at issue are false." *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 312 (4th Cir. 2006).

Prosecutors "enjoy absolute immunity with respect to claims arising from their role in the judicial process." *State v. Rovin*, 472 Md. 317, 346 (2021) (quoting *Gill v. Ripley*, 352 Md. 754, 770 (1999)). This immunity "extends to acts such as evaluating whether to begin a prosecution by criminal information, presenting evidence to a grand jury to obtain an indictment, filing charges, and preparing and presenting the State's case in court." *Id.* at 350. Absolute immunity does not extend to state prosecutors giving legal advice to police or otherwise advising police in the investigative phase of a criminal

case. *Burns v. Reed*, 500 U.S. 478 (1991). But prosecutors enjoy absolute immunity when they, for example, "inform[] a police officer that the evidence gathered amounted to probable cause and direct[] the officer to file charges." *Nero v. Mosby*, 890 F.3d 106, 119 (4th Cir. 2018). Similarly, the Fourth Circuit has rejected a categorical rule that excludes application of absolute immunity where a prosecutor "participat[ed] in an investigation." *Id.* at 120. "When determining whether a prosecutor is entitled to absolute immunity, we look at the specific act challenged, not the prosecutor's preceding acts." *Id.*

Here, creating and updating the do-not-call list is within the scope of Braveboy's role as a state's attorney. *See Neri v. County of Stanislaus Dist. Attorney's Office*, No. 1:10-cv-823, 2010 WL 3582575, at *5 (E.D. Cal. Sept. 9, 2010); *Walters v. County of Maricopa*, No. 04-cv-1920, 2006 WL 2456173 (D. Ariz. Aug. 22, 2006). "What matter[s] is that the prosecutors' actions involved assessments of witness credibility and judgments about which cases to prosecute, directly connected to the judicial phase of the criminal process and thus protected by absolute immunity." *Savage v. Maryland*, 896 F.3d 260, 271 (4th Cir. 2018). "That a judgment about witness credibility or which cases to try has negative employment consequences," as Wormuth and Brooke allege they were subjected to here, "does not change the underlying nature of that judgment; the immunity analysis focuses on the prosecutorial conduct in question, and 'not on the harm that the conduct may have caused.'" *Id.* at 272 (quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 271 (1993)). Accordingly, well-settled law entitles the State's Attorney Defendants to dismissal of Counts 3 and 6 on absolute immunity grounds.

As to the County Defendants, Plaintiffs have failed to state a stigma-plus claim because they have only alleged that Braveboy was responsible for placing Wormuth and

Brooke on the do-not-call list; merely recommending that Plaintiffs be placed on the list does not give rise to a stigma-plus claim because the recommendation is not a "statement" that has been disseminated or published. Therefore, the Court will dismiss Counts 3 and 6 as to the County Defendants as well.

### C.  Counts 4 and 7: Fourth Amendment Unlawful Search and Seizure

In Counts 4 and 7, Plaintiffs Darryl and Carolina Wormuth contend that when Defendants conducted searches of Wormuth's cell phone, they violated Plaintiffs' rights under the Fourth Amendment, and the Maryland Declaration of Rights, in two ways.[4] First, Plaintiffs argue that when Savoy searched the phone sometime between March 2 and 10, 2021—before the March 10 warrant was issued (and after the December 9, 2020 warrant had expired)—that search constituted a warrantless search as to which no exception to the Fourth Amendment's warrant requirement applied. *Id.* ¶¶ 44, 48. Second, as to searches conducted pursuant to the March 10, 2021, warrant, Plaintiffs challenge the validity of the warrant itself, contending it was "facially invalid" as overbroad because it authorized a search for all "photographs, emails, text messages, video clips, contacts, and call details" on the device without limitation such as date, sender/recipient, or otherwise. Am. Compl ¶ 166; *see also* ECF No. 45-1 at 7 (warrant section describing "the items to be seized").

#### i.    The pre-March 10 warrantless search

As to the pre-March 10 warrantless search, Defendants do not appear to defend the constitutionality of the search itself. As noted above, Plaintiffs allege that Defendant Savoy accessed Wormuth's device, using his passcode, at a time when no warrant

---

[4] Plaintiffs name officers Savoy, Truxton and Ross, and ASAs Eubanks, Elser and Patterson, as defendants in these counts.

authorized the search. The record does not reveal how Savoy learned Wormuth's passcode (which was his police badge identification number, *see* Am. Compl. ¶ 50), but there is no suggestion that Wormuth consented to the search. Defendants also do not suggest that an exception to the Fourth Amendment's warrant requirement, such as plain view or exigent circumstances, applied. Instead, Defendants argue that Wormuth's claim alleging a warrantless search should be dismissed (1) on qualified immunity grounds, or (2) because Plaintiffs cannot have been harmed by that warrantless search because anything Defendants saw at that point was subsequently authorized by the March 10 warrant and thus would have inevitably been discovered by Defendants.[5]

Qualified immunity entails a two-part inquiry: first, whether a constitutional violation has occurred, and second, whether that violation was of a "*clearly established constitutional right.*" *E.g.*, *Quinn v. Zerkle*, 111 F.4th 281, 290 (4th Cir. 2024) (emphasis added). Here, there does not appear to be a dispute that the pre-March 10 search violated Wormuth's Fourth Amendment rights. At least at the pleadings stage, where all of Plaintiffs' allegations must be accepted as true—including with respect to the qualified immunity analysis, *see, e.g.*, *Iqbal*, 556 U.S. at 672-73—Plaintiffs are also correct that Defendants are not entitled to qualified immunity. As Plaintiffs explain, "[a]t the time of her warrantless search(es), the Supreme Court had clearly established in *Riley v. California*, 573 U.S. 373 (2014) that every search of a cell phone requires a

---

[5] Plaintiff Carolina Wormuth has not established standing for her claim because she has not shown that any purported injury to her was traceable to the County Defendants, and she had no constitutionally cognizable expectation of privacy as to the contents of Darryl Wormuth's phone. *United States v. Castellanos*, 716 F.3d 828, 832 (4th Cir. 2013); *Casella v. Borders*, 404 Fed. App'x 800, 803-04 (4th Cir. 2010) (holding that the girlfriend of the arrestee whose cell phone was seized lacked a legitimate expectation of privacy in the contents of defendant's cell phone).

warrant, absent exigent circumstances not present in this case." ECF No. 45 at 25. At least at this stage, qualified immunity does not present a basis for dismissal with respect to the pre-March 10 warrantless search of Wormuth's cell phone.

That leaves Defendants' causation argument: that Plaintiffs "allege no facts indicating how any information obtained would not have been obtained inevitably from the court issued warrant on March 10, 2021, or how they were harmed by the premature search." ECF No. 37-1 at 19 n.1. As explained above, Defendants did obtain a warrant to search the phone, which was issued on March 10, and that warrant did authorize a broad search of all "photographs, emails, text messages, video clips, contacts, and call details" on the device. ECF No. 45-1 at 7. Thus, Defendants were authorized by that warrant to obtain the same materials from Wormuth's phone that he contends give rise to his Fourth Amendment claim as to the pre-March 10 warrantless search. Plaintiffs argue that the existence of the March 10 warrant, or the inevitability of discovery of the contents of Wormuth's phone under it, does not present grounds for dismissal of the claim as to the pre-March 10 warrantless searches because (1) the March 10 warrant was not valid, and (2) Defendants' "full access" to the phone, before the March 10 warrant issued, created "irreparable harm" even if the text messages, etc. would have been validly discovered pursuant to the warrant because "a constitutional deprivation of rights always creates irreparable harm." ECF No. 45 at 33-35 (citing, on the last point, *Leaders of a Beautiful Struggle v. Balt. Police Dept.*, 2 F.4th 330, 346 (4th Cir. 2021)).

This causation argument presents a close question. As explained in the next section, Defendants are entitled to qualified immunity with respect to the searches conducted pursuant to the March 10 warrant. Regardless of whether the warrant may have been unconstitutionally overbroad, Defendants have established, even accepting all

of Plaintiffs' allegations as true, that as of March 10, 2021 it was not *clearly established* that a cell phone warrant authorizing a search for all "photographs, emails, text messages, video clips, contacts, and call details" on the device (without limitation such as date, sender/recipient, or otherwise) was unconstitutional. Accordingly, Defendants are entitled to qualified immunity for searches conducted after March 10. The question remaining with respect to the pre-March 10 *warrantless* searches is whether the Court's qualified immunity holding with respect to the later searches *pursuant to the warrant* means that Plaintiffs also cannot state a claim on which relief can be granted with respect to the pre-March 10 warrantless searches.

On one hand, it does appear to be undisputed that the text messages that Plaintiffs allege Savoy accessed without a warrant would inevitably have been obtained, just days later, pursuant to the warrant. On the other hand, Wormuth has clearly alleged, and the Court must take to be true at this stage of the litigation, that Savoy began reviewing the text messages prior to the March 10, 2021 warrant. Am. Compl. ¶ 164. And Wormuth alleges that he suffered independent, cognizable harm during those days. The Court is skeptical that Wormuth will be able to establish any cognizable harm, caused by the pre-March 10 warrantless searches, that would not have inevitably flowed from Defendants' access to the contents of the device pursuant to the warrant. But at this stage, where Plaintiffs' allegations and any reasonable inferences from them must be accepted as true, the Court will deny the motion to dismiss Counts 4 and 7 with respect to the pre-March 10 warrantless searches, as to Savoy only (the only defendant Plaintiffs allege conducted a warrantless search during that time period, *see* Am. Compl. ¶ 164).

### ii.    Searches pursuant to the March 10 warrant

As indicated above, the pleadings require a different result with respect to Counts 4 and 7 insofar as they allege that Defendants violated the Fourth Amendment (and the Maryland Declaration of Rights) when Defendants executed the March 10 warrant. Regardless of the warrant's actual constitutionality, Defendants have shown that they were entitled to rely on the warrant as authorizing them to search Wormuth's phone, and are entitled to qualified immunity on that basis.

Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity protects government officials "performing discretionary functions" by "shielding them from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638-39 (1987).

As an initial matter, the Court notes that none of the information providing a factual basis for the warrant came from the pre-March 10 warrantless search. Instead, the factual basis for the warrant related entirely to evidence of Wormuth's allegedly unlawful use of force during an arrest on October 20, 2020:

> On Tuesday, October 20, 2020, at approximately 2125 hours, the Prince George's County Police Internal Affairs/Special Investigative Response Team received a call for a Use of Force complaint. Multiple Officers alleged that Cpl. Darryn Wormuth #3342 placed his hands around a juvenile's neck and chocked him while escorting him to his patrol car in handcuffs. Further investigation revealed the juvenile Victim, whose identity is known to this investigator, was visiting a

friend at 4525 Davis Avenue, Suitland, Prince Georges County, Maryland, when Cpl. Darryl Wormuth #3342 engaged in conversation with the Juvenile about trespassing at the location. Cpl. Wormuth #3342 exited his marked police cruiser, and the Juvenile took off running. Cpl. Wormuth #3342 broadcasted the lookout for the Juvenile, and apprehension was made a short distance away by P/O Lester #4117 and POFC Brown #3968 without incident.

Cpl. Wormuth #3342 arrived at the apprehension scene at the 4600 block of Davis Avenue, Suitland, Prince George's County, Maryland. Cpl. Wormuth #3342 approached P/O Lester #4117, escorting the Juvenile prisoner to the cruiser, grabbed the Juvenile by the neck, and then choked him while in handcuffs. P/O Lester #4117 and POFC Brown #3968 immediately reported this unnecessary use of force to their Sergeant. The Incident was captured by Police aerial video.

Cpl. Wormuth #3342 transported the Juvenile to the District 8 station for processing. Once at the District 8 station Cpl. Wormuth #3342 was observed on video using his cellular phone to take photographs of the Juvenile. The station video also captures audio and Cpl. Wormuth #3342 was seen and heard using his cell phone to call several people to discuss the arrest. This investigator is attempting to identify additional witnesses and again to recover photographs of the Victim's injuries.

Cpl. Wormuth #3342 provided his cellular number as (215) 852-7654; a check through police databases show this number belonging to Darryl Wormuth, and the carrier is Sprint.

ECF No. 45-1 at 5-6. The warrant application went on to explain the following:

On March 2, 2021, a court ordered search warrant was executed on the Defendant at 8801 Presidential Parkway, Prince George's County, Maryland. A Black Apple cell phone with telephone number (215) 852-7654 was recovered from the Defendant's person. During the course of the investigation it has been determined that the Defendant photographed the Victim with his cell phone and spoke with multiple people after the assault to discuss what had just occurred.

*Id*. at 6.

Based on that showing of probable cause, Circuit Judge Beverly J. Woodard issued a warrant authorizing a search for "all stored data to include but not limited to: photographs, emails, text messages, video clips, contacts, and call details." *Id*. at 7.

The warrant may not have satisfied the particularity standard articulated a year and a half later in *Richardson v. State*, where the Supreme Court of Maryland held that, "given the privacy interests at stake, it is not reasonable for an issuing judge to approve a warrant that simply authorizes police officers to search everything on a cell phone." 481 Md. 423, 468 (2022). But this Court need not and does not decide whether the March 10, 2021, warrant *in fact* satisfied the Fourth Amendment's particularity requirement. That is because as of March 2021, the law was not "clearly established" that a warrant as broad as the March 10 warrant was unconstitutional.

To be sure, in the years since the U.S. Supreme Court decided *Riley* in 2014, various courts have aligned with the *Richardson* approach in holding that when law enforcement seeks to search an electronic device such as a computer or cell phone, the scope of the search must be tailored to the probable cause supporting the search or seizure. *See, e.g.*, *Macasaet v. State*, No. A-13574, 2025 WL 499893, at *9 (Alaska Ct. App. Feb. 14, 2025); *People v. Carson*, No. 355925, 2024 WL 647964 (Mich. Ct. App. Feb. 15, 2024), *appeal granted,* 11 N.W.3d 269 (Mich. 2024); *Burns v. United States*, 235 A.3d 758, 773 (D.C. 2020); *People v. Coke*, 461 P.3d 508, 516 (Colo. 2020); *State v. Mansor*, 421 P.3d 323, 326 (2018); *Wheeler v. State*, 135 A.3d 282, 299-301 (Del. 2016); *Matter of Black iPhone 4*, 27 F. Supp. 3d 74 (D.D.C. 2014); *In re Nextel Cellular Tel.*, No. 14-MJ-8005-DJW, 2014 WL 2898262 (D. Kan. June 26, 2014). Various commentators also have argued that such scope limitations or other restrictions on

searches of electronic devices are required by the Fourth Amendment. *See, e.g.*, Sara J. Dennis, *Regulating Search Warrant Execution Procedure For Stored Electronic Communications*, 86 Fordham L. Rev. 2993 (2018); Michael Mestitz, *Unpacking Digital Containers: Extending* Riley's *Reasoning to Digital Files and Subfolders*, 69 Stanford L. Rev. 321 (2017); Adam M. Gershowitz, *The Post-*Riley *Search Warrant: Search Protocols and Particularity in Cell Phone Searches*, 69 Vanderbilt L. Rev. 585 (2016); Andrew D. Huynht, *What Comes After "Get A Warrant": Balancing Particularity and Practicality in Mobile Device Search Warrants Post-*Riley, 101 Cornell L. Rev. 187 (2015); Paul Ohm, *Massive Hard Drives, General Warrants, and the Power of Magistrate Judges*, 97 Va. L. Rev. 1 (2011); James Saylor, *Computers As Castles: Preventing The Plain View Doctrine From Becoming A Vehicle For Overbroad Digital Searches*, 79 Fordham L. Rev. 2809 (2011);

But other courts and commentators see the issue differently, concluding (at least prior to *Riley*) that broad warrants to search electronic devices, even without temporal or other limitations, can be justified and do not become unlawful "general" warrants. *See, e.g.*, *United States v. Richards*, 659 F.3d 527, 541-42 (6th Cir. 2011); Orin Kerr, *Ex Ante Regulation of Computer Search & Seizure*, 96 Va. L. Rev. 1241 (2010).

And of particular significance to the qualified immunity analysis, in March 2021, when Officer Savoy applied for the warrant and Judge Woodard issued it, *Richardson* had not been decided. And even in *Richardson*, the Maryland Supreme Court held that the good faith exception applied to the warrant at issue there:

> Until today, this Court has not analyzed whether a cell phone search warrant that allows officers to search an entire phone for evidence of a particular crime satisfies the particularity requirement. Courts around the country have answered this

> question differently. . . . In this opinion, we have stated that, in this case and with respect to the vast majority of Maryland cell phone search warrants, the answer to that question is "no." But we cannot fault the officers who executed this search warrant for thinking that the answer was "yes."

481 Md. at 471.

Moreover, the original panel of the Appellate Court of Maryland in *Richardson* itself held that the warrant at issue there *was* sufficiently particularized. *Richardson v. State*, No. 2386, Sept. term 2019, 2021 WL 3261215, at *11 (Md. Ct. Spec. App. July 30, 2021), *supplanted, published at* 252 Md. App. 363, 259 A.3d 156 (2021), *aff'd,* 481 Md. 423, 282 A.3d 98 (2022). And that intermediate appellate decision was issued in July 2021, *after* the March 2021 warrant in this case.

For these reasons, regardless of whether the March 10 warrant in fact violated the Fourth Amendment in the scope of the search that it authorized, Wormuth's allegations, even accepted as true and with all reasonable inferences drawn in his favor, do not render the alleged unconstitutionality of the warrant to have been "clearly established" at the time Savoy sought the warrant and the court issued it. Defendants are entitled to qualified immunity as to their searches pursuant to the warrant as "their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson*, 483 U.S. at 638-39.

### D. Count 2: First and Fourth Amendment *Monell* Claims

In Count 2, Plaintiffs Darryl Wormuth, Carolina Wormuth, and Anthony Brooke allege claims against County Defendants Prince George's County and the Prince George's County Police Department, arguing that, under *Monell*, the policies of the Prince George's County Police Department and Prince George's County amounted to

unlawful retaliation under the First Amendment and unlawful search warrants under the Fourth Amendment. Am. Compl. ¶¶ 137-146. Defendants argue that Plaintiffs have failed to state a *Monell* claim on which relief can be granted. ECF No. 37-1 at 13-17.

In *Monell v. Dep't. of Social Servs. of City of New York*, the Supreme Court held that "[m]unicipalities and other local government units [are] to be included among those persons to whom § 1983 applies." 436 U.S. 658, 690 (1978). "Local governing bodies" can be sued under § 1983 when an "action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Id.* "A plaintiff may demonstrate the existence of an official policy in three ways: (1) a written ordinance or regulation; (2) certain affirmative decisions of policymaking officials; or (3) in certain omissions made by policymaking officials that 'manifest deliberate indifference to the rights of citizens.'" *Johnson v. Balt. Police Dept.*, No. 19-cv-698-ELH, 2022 WL 9976525, at *66 (D. Md. Oct. 14, 2022) (citing *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999)).

"An official policy often refers to 'formal rules or understandings . . . that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time,' and must be contrasted with 'episodic exercises of discretion in the operational details of government.'" *Semple v. City of Moundsville*, 195 F.3d 708, 712 (4th Cir. 1999) (citations omitted). And a "governmental unit may create an official policy by making a single decision regarding a course of action in response to particular circumstances." *Id.* A policy or custom "may arise if a practice is so 'persistent and widespread' and 'so permanent and well settled' as to constitute a 'custom or usage' with the force of law." *Carter*, 164 F.3d at 218 (quoting *Monell*, 436 U.S. at 691).

In Count 2, Plaintiffs assert two *Monell* claims. Neither is cognizable, at least at this time.

First, Plaintiffs allege that Chief's Special Order #21-003, which prohibited employees from "using culturally insensitive language," facially violates the free speech clause of the First Amendment. *See supra* IV.A. But as discussed above, this Court must abstain and stay the First Amendment-based claims as to Plaintiffs Brooke and Wormuth in light of the pendency of the essentially identical issues before the Circuit Court for Prince George's County. *See supra* IV.A. Because this Court will not be adjudicating Plaintiffs' First Amendment claims, at least at this time, the *Monell* claims based on the same theory must be stayed as well. *See, e.g.*, *Grayson v. Peed*, 195 F.3d 692, 697 (4th Cir. 1999) (holding that where there is "no underlying constitutional violations by any individual, there can be no municipal liability"); *Dawson v. Prince George's Cnty.*, 896 F. Supp. 537, 540 (D. Md. 1995) ("If Dawson fails in his efforts to show that an active defendant violated his constitutional rights, his claims against the County likewise fail."). The difference from cases like *Grayson* and *Dawson*, however, is that here the Court has not decided one way or the other whether Plaintiffs' First Amendment rights have been violated. Here, Plaintiffs' own First Amendment claims are being stayed on abstention grounds. For that reason, the Court will stay Count 2 with respect to Chief's Special Order #21-003.

Second, Plaintiffs allege that the police department's practice (at the time) of obtaining broad cell phone warrants constitutes a policy that violates the Fourth Amendment. *See supra* IV.C. But as explained above, Defendants are entitled to qualified immunity on Wormuth's individual claim, because it was not clearly established in March 2021 that a warrant as broad as the one at issue here was

unconstitutional. Accordingly, Plaintiffs do not state a cognizable *Monell* claim with respect to the alleged policy of seeking broad cell phone warrants.

### E.  Counts 8 and 9: Defamation *Per Se* and False Light

In Counts 8 and 9, Plaintiffs Wormuth and Brooke allege that Defendant Braveboy defamed them when, after contacting the News 4 reporter Tracee Wilkins, she gave Wilkins copies of text messages from Wormuth's phone and told Wilkins during an interview on August 8, 2023 that "racist individuals on our department . . . were putting our citizens at risk." Am. Compl. ¶ 195. A prosecutor's "statements to the media are not entitled to absolute immunity." *Buckley*, 509 U.S. at 277. Thus, Ms. Braveboy does not invoke immunity with respect to these counts. Instead, she argues Counts 8 and 9 should be dismissed because Plaintiffs "have failed to allege that any defamatory statement made by Ms. Braveboy in the August 2023 news story was *false*." ECF No. 36-1 at 18.

"Under Maryland law, to present a prima facie case of defamation, a plaintiff must establish four elements: (1) that the defendant made a defamatory statement to a third person, (2) that the statement was false, (3) that the defendant was legally at fault in making the statement, and (4) that the plaintiff thereby suffered harm." *Offen v. Brenner*, 402 Md. 191, 198 (2007). Fault can be established based on negligence or actual malice. *Samuels v. Tschechtelin*, 135 Md. App. 483, 544 (2000).

"In the case of words or conduct actionable *per se*, their injurious character is a self-evident fact of common knowledge of which the court takes judicial notice and need not be pleaded or proved." *Id.* (quoting *M & S Furniture Sales Co. v. Edward J. DeBartolo Corp.*, 249 Md. 540 (1968)). Whether an alleged defamatory statement is defamatory *per se* is a question of law. *Id.* And with respect to Plaintiffs' false light claim

(count IX), Maryland has adopted Restatement section 652E, which provides that "[o]ne who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if (a) the false light in which the other person was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." *Bagwell v. Peninsula Reg'l Med. Ctr.*, 106 Md. App. 470, 514-15 (1995) (quoting Restatement (Second) of Torts § 652E (1977)). "An allegation of false light must meet the same legal standards as an allegation of defamation." *Piscatelli v. Van Smith*, 424 Md. 294, 306 (2012).

The Court agrees with Defendant Braveboy that Plaintiffs have failed to establish that her statement was false to the extent that she did provide Wormuth's and Brooke's text messages and purported to provide Ms. Wilkins with text messages from Wormuth's cell phone search. Am. Compl. ¶ 194. The Court also agrees with Defendant Braveboy that not requiring the officers to have an opportunity to respond to the news story is not a required element of defamation. ECF No. 36-1 at 18. However, Defendant Braveboy has not refuted the core of Plaintiffs' allegation that Braveboy defamed them by describing them as "racist individuals on our department that were putting our citizens at risk," and as officers "who have lied" or are "racist, homophobic and sexist." Am. Compl. ¶ 195. At this stage of the litigation, Plaintiffs have adequately alleged that these statements are defamatory. Therefore, they have satisfied the standards for their defamation and false light claims with respect to Braveboy's statements made to the reporter during the interview (but not with respect to providing the text messages to the reporter).

31

### F.  Count 10: Common Law Conspiracy

Under Maryland law, "[c]onspiracy is not a separate tort capable of independently sustaining an award of damages in the absence of other tortious injury to the plaintiff." *Alleco Inc. v. The Harry & Jeanetter Weinberg Foundation, Inc.*, 340 Md. 176, 189 (1995). Plaintiffs Wormuth and Brooke allege that Defendants Cleo Savoy, David Robinson, James McCreary, Malik Aziz, Corey Truxon, Jeff Ross, Aisha Braveboy, Musa Eubanks, Donnell Turner, and Angela Alsobrooks entered into a conspiracy and "had an agreement or understanding" to "engage in unlawful discrimination and retaliation" against Plaintiffs. Am. Compl. ¶ 210. The State's Attorney Defendants named in this count (Braveboy and Eubanks) invoke statutory immunity and further argue that Plaintiffs have failed to state a claim for conspiracy. ECF No. 36-1 at 22. The remaining County Defendants argue that Plaintiffs have failed to state a claim for conspiracy because "the actions of the County Defendants in obtaining Wormuth's text messages and using them as a basis for proposed discipline was legal." ECF No. 37-1.

In light of the Court's conclusions reached above, Plaintiffs have failed to state a claim of the existence of a conspiracy among the named parties to "engage in unlawful discrimination and retaliation" against Plaintiffs. *See Hill v. Brush Engineered Materials, Inc.*, 383 F. Supp. 2d 814, 821 (D. Md. 2005) ("Conspiracy is not a tort on its own, but is dependent on some underlying tort that caused injury to the plaintiff."); *Estate of White ex rel. White v. R.J. Reynolds Tobacco Co.*, 109 F. Supp. 2d 424, 428 (D. Md. 2000) (same).

### CONCLUSION

For the foregoing reasons, Plaintiffs have stated the following claims that may proceed: (1) Counts 4 and 7 as to Defendant Savoy, as to the warrantless search only,

and (2) defamation and false light claims in Counts 8 and 9 as to Defendant Braveboy, limited to the oral assertions of fact made during the August 2023 interview. The Court will abstain as to Plaintiffs' First Amendment claims and thus stay those claims pursuant to *Younger*. The remaining counts of Plaintiffs' complaint will be dismissed on qualified immunity and/or failure-to-state-a-claim grounds as explained above. A separate order follows.


Date:  March 31, 2025                    _____/s/_____
                                         Adam B. Abelson
                                         United States District Judge