**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| DARRYL R. WORMUTH, *et al.*,<br>*Plaintiffs*,<br>v.<br>PRINCE GEORGE'S COUNTY, *et al.*,<br>*Defendants*. | Case No. 23-cv-2905-ABA |

**MEMORANDUM OPINION**

Plaintiffs Darryl Wormuth and Anthony Brooke, while police officers in Prince George's County (the "County"), sent each other and fellow officers numerous text messages containing racist and homophobic slurs and stereotypes. Some of the texts appeared to celebrate—or at least condone—violence against the community members they were sworn to protect. Others included complaints that co-workers or police colleagues were receiving favorable treatment due to their race or sexual orientation. Wormuth and Brooke were disciplined by the Prince George's County Police Department ("PGPD"). They were also placed on a list of officers whom the State's Attorney's Office ("SAO") would no longer call to testify in criminal cases. They subsequently sued the County, PGPD, SAO, and several individual employees of these entities, claiming a variety of federal civil rights violations and state law torts.

Earlier in this case, the Court dismissed some of Plaintiffs' claims. ECF No. 48; *Wormuth v. Prince George's Cnty., Md.*, Case No. 23-cv-2905-ABA, 2025 WL 958568 (D. Md. Mar. 31, 2025). Three categories of claims remain. First are Wormuth's federal and state law claims against Defendant Cleo Savoy—a former PGPD detective—for an allegedly unlawful search that led to the initial discovery of the text messages. The

second category is both Plaintiffs' claims against the County, PGPD, and numerous individual employees (the "County Defendants") for retaliation in violation of their rights to free speech under federal and Maryland law. Finally, both Plaintiffs assert claims against Aisha Braveboy ("Braveboy"), who was then the State's Attorney for Prince George's County, for allegedly defaming them during a television interview in which she discussed the text messages.

Both Braveboy and the County Defendants have moved for summary judgment. For the reasons explained below, Defendants are entitled to summary judgment on the federal free speech retaliation claims due to qualified immunity and on the defamation claims as a matter of law. Regarding the unlawful search claims against Savoy, the County Defendants are not entitled to summary judgment as to liability, but there is no evidence from which a reasonable juror could award Wormuth punitive or compensatory damages, leaving only the possibility of nominal damages or equitable relief. Finally, the Court declines to exercise supplemental jurisdiction over the Maryland law retaliation claims and will dismiss these claims without prejudice to permit Plaintiffs to pursue them in state court.

## I. BACKGROUND[1]

### A. Facts relevant to the County Defendants

In October 2020, Wormuth participated in the arrest of a teenage minor. During the arrest, Wormuth assaulted and choked the teenager—who was already in handcuffs—and later photographed the teenager with his personal phone. Several other

[1] When considering a motion for summary judgment, the Court must construe the facts in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Sedar v. Reston Town Ctr. Prop., LLC*, 988 F.3d 756, 761 (4th Cir. 2021).

officers lodged internal complaints against Wormuth based upon this and other conduct. *See Prince George's Cnty. v. Brooke*, Case No. 1730, 2023 WL 5318327, at *1 (App. Ct. Md. Aug. 18, 2023) ("In October 2020, several police officers of the Prince George's County Police Department (PGCPD) filed an internal complaint against a fellow police officer named [Wormuth]. The complaint alleged that [Wormuth] had used excessive force in choking a young man. Surveillance video revealed that [Wormuth] had used his personal cell phone to take pictures of the victim.").[2] These complaints led to an Internal Affairs ("IA") investigation that was conducted largely by Defendant Cleo Savoy, an IA detective. ECF No. 61-2 at 1.

As part of her investigation, Savoy obtained Wormuth's cell phone. Plaintiffs contend that on March 9, 2021 at 1:28 p.m., Savoy accessed the phone despite not yet having a warrant to do so (the record does not indicate how she unlocked it) and recorded its contents. *See* ECF No. 1-1 at 5 (records showing lock status of Wormuth's phone). Savoy did later obtain a search warrant, however, which was issued on March 10, 2021 at 11:13 a.m. by Judge Beverly J. Woodard of the Maryland Circuit Court for Prince George's County. ECF No. 45-1 at 1.[3] Wormuth thus contends that there was a

---

[2] Although Wormuth's name was referred to by just the first initial of his last name in the 2023 opinion—which pertained to Brooke's appeal of disciplinary charges against him—Wormuth's actions are a matter of public record and, as discussed below, he was subsequently convicted of assault. A portion of the arrest, including Wormuth grabbing the minor's throat, was captured on video footage from a police department helicopter that was included in the news broadcast described and cited below. *See infra* p. 11 (citing NBC Washington report at 1:30–1:40).

[3] The County filed the search warrant that was issued for the phone records associated with Wormuth's phone as an exhibit to their motion for summary judgment. ECF No. 58-6. The warrant that allowed access to the phone itself was filed as an attachment to Plaintiffs' opposition to the County's motion for judgment on the pleadings. ECF No. 45-

roughly 22-hour period during which Savoy accessed the contents of his phone without a warrant. Savoy's application for the warrant did not include any reference to material found on the phone, but instead relayed the facts of Wormuth's use of his cell phone to photograph the victim of his assault and to call others following the assault. ECF No. 45-1 at 6. The warrant was broad, allowing Savoy to access "all stored data to include but not limited to: photographs, emails, text messages, video clips, contacts, and call details." *Id.* at 7. Upon accessing the phone, Savoy discovered numerous violent, racist, homophobic text messages sent among Wormuth and other members of the PGPD and his family, several of which discussed PGPD colleagues. *See* ECF No. 61-3. These included racist text messages sent from Brooke to Wormuth, which led to a separate investigation of Brooke. *Brooke*, 2023 WL 5318327, at *1.

Two months after Savoy discovered these messages, Wormuth was charged with nineteen violations of the PGPD General Order Manual based upon the text messages and was terminated pending a disciplinary hearing before the Administrative Hearing Board. *See* ECF No. 61-2 (initial June 2021 disciplinary action recommendation); ECF No. 37-8 (amended August 2021 disciplinary action recommendation). Brooke was charged with sixteen violations of the Manual and the PGPD also issued him a termination recommendation pending a hearing. ECF No. 58-4 at 7.

The precise nature of the texts that Wormuth and Brooke sent is relevant to the analysis below. The original disciplinary recommendation against Wormuth cited the following texts, each of which was the basis for an individual disciplinary charge. The

---

1 at 7; *see also* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

Court also provides below the context for certain messages where the context is apparent from the summary judgment record (the context for other messages is unclear).

1. Wormuth "participated in a text message group with other [PGPD] Officers, during which they discussed not backing up other members of the [PGPD] due to those members reporting police misconduct." ECF No. 61-2 at 1. It is not clear from the summary judgment record precisely which text messages this charge refers to.
2. Wormuth texted family members that another individual had "already dated a phillipino, Asian, Hispanic, Indian n****r . . . so she's almost out of options!" ECF No. 61-2 at 1.[4]
3. Wormuth texted other PGPD officers, "No doubt . . . black people in a white mans job." ECF No. 61-2 at 2. Brooke testified that this was in reference to another officer who was "suspended and charged criminally for aiding a criminal gang enterprise[.]" ECF No. 61-6 (Brooke Deposition) at 5 (88:2–5).
4. Wormuth texted other PGPD officers "God forbid we make a black person look bad, or expose them here for what they are . . . fuckin animals." ECF No. 61-2 at 2; *see also* ECF No. 61-3 at 14.
5. Wormuth texted other PGPD officers "I'm ready for your n****r ass." ECF No. 61-2 at 2.
6. Wormuth texted Brooke "What happen to this animal" in reference to Brooke's message containing a picture of a Black arrestee in bandages at a hospital and

[4] The text message stated the slur in full that is reprinted here (and in the messages below) with asterisks.

the words "This one felt glorious last night." ECF No. 61-2 at 2; ECF No. 61-3 at 12.

7. Wormuth texted other PGPD officers "Fuck snitch ass bitches." ECF No. 61-2 at 2. This text appears to have been in reference to another officer's testimony at a trial. ECF No. 61-3 at 6.
8. Wormuth texted other PGPD officers "Here we go again, another four years of poor fuckin blacks." ECF No. 61-2 at 2.
9. In a text exchange in which an "unknown individual" stated "Lol took that shit out like a cop shooting a n****r," Wormuth responded "I can see that" and "Nice" with "an emoji thumbs up." ECF No. 61-2 at 3.
10. Wormuth texted family members "I said n***a you driving that truck down there." ECF No. 61-2 at 3; *see also* ECF No. 61-4 at 3.
11. In a text exchange with family members, an individual stated "Omg – All day long I thought about her being assassinated by a damn black n***r animal" to which Wormuth responded "She hates these animals." ECF No. 61-2 at 3; *see also* ECF No. 61-3 at 15.
12. In an exchange with Plaintiff Brooke, Brooke texted "FBI did search warrants on two PGPD officers today out of D4 who were doing insurance fraud racket . . . . guess what race they are . . ." to which Wormuth responded "I bet the two were suspended last week" and "Fuckin animals." ECF No. 61-2 at 3–4; *see also* ECF No. 61-3 at 13. D4 appears to be a reference to District 4, which was Brooke's assigned district. *See* ECF No. 58-3 at 5.

13. Wormuth texted other PGPD officers "God forbid we make a black person look bad or expose them here for what they are . . . fuckin animals." ECF No. 61-2 at 5. This appears to be a duplicate of Text #4.
14. Wormuth texted other PGPD officers "The lodge didn't endorse any candidate for president due to the gays and blacks!!!!" ECF No. 61-2 at 5.
15. Wormuth texted other PGPD officers "Nothing because of a black gay lesbian" and "It gets worse and worse by the day." ECF No. 61-2 at 5–6. According to the disciplinary recommendation, this occurred in a conversation concerning "former Hyattsville Police Chief Amal Awad and her selection as the Anne Arundel Police Department Chief." *Id.*
16. Wormuth texted other PGPD officers "Rush's wife's grandpa was murdered by a black guy on bucks co at his store, rush's wife was removed from a supervisors position at work because they wanted a black person in there and rush had to retire early because of reverse racism and constant fake allegations from blacks, yet his wife is still a bleeding liberal, let's go clean the parks in minority neighborhoods . . . (face palm emoji) how about let's burn the parks down." ECF No. 61-2 at 6.
17. In a text exchange with other PGPD officers, Wormuth responded to a picture that another officer sent of "a screenshot that a white Officer posted of an unsolved murder on their social media about a young African American student" by writing "Bull guzzles the koolaid" and "Who fuckin cares" with a "[f]ace palm emoji." ECF No. 61-2 at 6.
18. Wormuth texted other PGPD officers "We're short because they have snitchin bitches." ECF No. 61-2 at 7.

19. Wormuth texted other PGPD officers "'No, shit turd like the rest of them' when referring to African American female police officers." ECF No. 61-2 at 7.

The Appellate Court of Maryland outlined the texts sent by Brooke that formed the basis of his disciplinary charges—all of which were sent to other PGPD officers and some of which were in response to Wormuth's texts listed above—as follows (*Brooke*, 2023 WL 5318327, at *1; *see also* ECF No. 58-4):

1. "FBI did search warrants on two PGPD officers today out of D4 . . . guess what race they are . . ."
2. "Yep," in response to W[ormuth] saying "No doubt . . . black people in a white man['']s job."
3. "We get a paper [cut] and bleed out, these savages get shot in the head and still won't die."
4. "3 Homicides in D4 last night. I LOVE IT."
5. "Hearing about [homicides] like that and just imagining the whole block out there screaming and crying brings true warmth and happiness to my heart."
6. "This one felt glorious last night." This text accompanied a picture of a Black man in a hospital bed with bandages over his forehead and his eye swollen shut.
7. "Heard the call at [W]alker [M]ill, hope they got shot."
8. "Everybody wants to be a social justice warrior. Fuck [']em."
9. "We all deserve nice things. Fuck these animals!!"
10. "Did you see that little fuck got transferred to MRD what a joke"

11. "Yup all they do is bitch and moan about more more more. Want the most shit from doing the least amount of work. Bottom [line] ol whitey is just better at policing than them!"
12. "I just love that it's constantly them getting caught for fraud, theft, all the shit and all they can do is still blame us."
13. "So glad that dude got locked up on [R]ochell. He's such a bitch. Kenney and I [beat] the shit out of him last year when he ran with a gun on Atwood."
14. "I know it doesn't mean much coming from me but I'm seriously not doing shit anymore, fuck this place. Savages . . ."
15. "Can't wait to tell you about all the lazy turd #1s in the class smh."[5]
16. "Helping shift 4 with calls! Why don't they bring the little snitch back from MRD if they are so short! Oh wait they can't it's his reward!"

Wormuth was indicted in Maryland state court for his assault of the minor and, following a bench trial, was convicted of second-degree assault and misconduct in office in May 2023. ECF No. 37-5 at 6–8. He was sentenced to concurrent five-year sentences with all but 45 days suspended, as well as community service and a fine. ECF No. 37-6 at 6. He was separately issued another disciplinary recommendation on August 4, 2023 following his assault conviction, and tendered his resignation from PGPD later that month. ECF No. 37-7; ECF No. 38.

---

[5] According to Brooke, he used "the term '#1'" here to "refer[] to Black people[.]" *Brooke*, 2023 WL 5318327, at *1 n.1.

"Before a disciplinary hearing could take place" regarding the disciplinary charges against Brooke, Brooke "filed a complaint and petition for a show cause order in the Circuit Court for Prince George's County pursuant to the then-existing Law Enforcement Officers' Bill of Rights (LEOBR)." *Brooke*, 2023 WL 5318327, at *2. The Circuit Court concluded that each of Brooke's text messages were protected speech under the federal and Maryland constitutions, and thus he could not be disciplined for them. *Id.* The PGPD appealed this decision. The Appellate Court of Maryland held that the Circuit Court had not applied the correct legal standard, and vacated and remanded for the Circuit Court to reconsider the issue. *Id.* at *5. Upon remand, the Circuit Court reached largely the same conclusion as before, concluding that the messages underlying fourteen of the disciplinary charges constituted constitutionally protected speech. *Brooke v. Prince George's Cnty., Md.*, No. CAL21-11244 (Md. Cir. Ct. July 15, 2025) (provided in the record at ECF No. 58-3). But it concluded that the text messages forming the basis for two of the charges against Brooke (charges #8 and #9) were not protected speech, and remanded those charges for "the County [to] proceed with the administrative hearing and discipline action against Petitioner" with respect to those messages. ECF No. 58-3 at 6.

The County appealed the Circuit Court's decision. ECF No. 58-1 at 2. Before a decision on the appeal, the County and Brooke reached a settlement. The County agreed to dismiss its appeal, and Brooke agreed to accept discipline of five days' suspension without pay, to "dismiss with prejudice" his show-cause petition in the Circuit Court, and to "immediately withdraw any other complaint . . . or other case pending against the County," with the exception of the instant case. ECF No. 73-1 at 2 (PGPD Disciplinary Action Recommendation); ECF No. 73-2 at 1–3 (settlement agreement).

### B. Facts relevant to Defendant Braveboy

Plaintiffs' claims against Defendant Braveboy stem from her comments during an interview that aired as part of an August 8, 2023 television news broadcast. *See Police texts expose racism, retaliation*, NBCWashington (Aug. 8, 2023), https://www.nbcwashington.com/video/investigations/police-texts-expose-racism-retaliation/3400489/ (hereafter, "NBC Broadcast"). Braveboy is now the County Executive of Prince George's County but was at that time the State's Attorney for Prince George's County. The broadcast in question was a report by Tracee Wilkins, a journalist, about Wormuth's conduct and the text messages at issue in this case and featured another officer who had lodged complaints about Wormuth. *Id.* Certain of the text messages between Wormuth and Brooke were displayed during the broadcast, including the exchange in which Wormuth wrote "Fucking animals. Black people in a white man's job" to which Brooke responded "Yep," *id.* at 2:54, and another in which Wormuth had written, "God forbid we make a black person look bad or expose them here for what they are." *Id.* at 3:00. As part of the broadcast, Braveboy made the following two statements that Plaintiffs allege were defamatory: (1) "There were several text messages that were very disturbing" and (2) "I was very concerned that knowing there were racist individuals in our department that we were putting our citizens at risk." *Id.* at 2:28, 3:07.

### C. Procedural history

Plaintiffs filed this case in October 2023. *See* ECF No. 1 (complaint); ECF No. 30 (amended complaint). Following the State Defendants' motion to dismiss and the County Defendants' motion for judgment on the pleadings, the Court dismissed many claims, including all claims against some Defendants. ECF Nos. 48, 49; *see also*

*Wormuth*, 2025 WL 958568. The three categories of claims remaining after that decision are:

1. Wormuth's claim for unlawful search under the Fourth Amendment and Article 26 of the Maryland Declaration of Rights against Savoy only (Counts 4 and 7);
2. Both Plaintiffs' claims for defamation and false light as to Braveboy only for her on-air statements during the August 2023 news broadcast (Counts 8 and 9);
3. Both Plaintiffs' claims for unlawful retaliation under the First Amendment against Savoy, David Robinson, James McCreary, Malik Aziz, Angela Alsobrooks, Donnell Turner and under Article 40 of the Maryland Declaration of Rights against these defendants in addition to PG County and the PGPD (Counts 1 and 5).

*See Wormuth*, 2025 WL 958568, at *15. Regarding the third category, unlawful retaliation for protected speech, the Court stayed adjudication of these claims pursuant to the *Younger* abstention doctrine because of the then-pending case concerning Brooke's challenge to his termination. *Id.* at *6–7. As the parties have settled that case, the Court lifted the stay as to the retaliation claims upon Plaintiffs' motion. ECF No. 70.

The County Defendants and Braveboy moved for summary judgment. ECF Nos. 58–60. Plaintiffs opposed both motions. ECF Nos. 61, 62. Braveboy filed a reply, but the County Defendants did not. ECF No. 65. The Court held a hearing on July 22, 2026.

At that hearing, Plaintiffs contended that they were entitled to partial summary judgment as to the retaliation claims because of the preclusive effect of the Circuit Court's decision that all but two of Brooke's text messages were protected First

Amendment speech. Plaintiffs had made this point in their motion to lift the stay, ECF No. 67, but not in their opposition to the County Defendants' motion for summary judgment. The Court accordingly ordered the parties to file supplemental briefing regarding the effect of the Circuit Court's decision on the analysis pertinent to the summary judgment motions. ECF Nos. 76, 77.

## II. DISCUSSION

### A. Defamation and false light claims against Braveboy (Counts 8 and 9)

"Under Maryland law, to present a prima facie case of defamation, a plaintiff must establish four elements: (1) that the defendant made a defamatory statement to a third person, (2) that the statement was false, (3) that the defendant was legally at fault in making the statement, and (4) that the plaintiff thereby suffered harm." *Offen v. Brenner*, 402 Md. 191, 198 (2007). When the plaintiff is a public figure, the plaintiff must show an additional element: that the defendant acted with actual malice regarding the veracity of the defamatory statement. *See Seley-Radtke v. Hosmane*, 450 Md. 468, 473 (2016) ("[S]tatements pertaining to public officials and to public figures on matters of public concern merit special protection in our society; thus, such statements are subject to a conditional privilege—the First Amendment conditional privilege—that is overcome only by actual malice, i.e., 'knowledge that [the statement] was false or with reckless disregard of whether it was false or not.'") (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964)). The parties spend most of their briefs addressing whether the actual malice standard applies and, if so, whether it can be met on this record. But Plaintiffs' claims fail for a more fundamental reason: Braveboy's

statements were opinions based upon the text messages that were disclosed in the broadcast, and therefore are not defamatory as a matter of law.

Statements are opinions—which generally cannot give rise to a defamation claim—if they are incapable of being proven true or false. *See, e.g.*, *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1093 (4th Cir. 1993) ("'Hefty' is just too subjective a word to be proved false."). "When making the distinction between fact and opinion, Maryland courts have asked: 'Would an ordinary person, reading the matter complained of, be likely to understand it as an expression of the writer's opinion or as a declaration of an existing fact?'" *Connolly v. Lanham*, 685 F. Supp. 3d 312, 336 (D. Md. 2023) (quoting *Peroutka v. Strong*, 116 Md. App. 301, 314 (1997)). The same distinction arises under the First Amendment itself: "[A]s a general matter under the First Amendment, a defamatory statement must also be something susceptible of being proved true or false. Naturally, statements of opinion do not usually meet this definition. But not always. In some cases, an expression of opinion may be defamatory if it clearly implies an assertion of objective fact." *Carey v. Throwe*, 957 F.3d 468, 483–84 (4th Cir. 2020).

Even construing the record in the light most favorable to Plaintiffs, there is no dispute that Braveboy's statements were statements of opinion as opposed to "a declaration of an existing fact." *See Peroutka*, 116 Md. App. at 314. Braveboy makes two assertions that Plaintiffs contend were defamatory: (1) that the text messages "were very disturbing" and (2) that she "was concerned" that the officers who sent them were "racist individuals" who were "putting . . . citizens at risk." NBC Broadcast at 2:30–3:14. Applying the standards described above, Braveboy's statements in the interview were inactionable opinion. Whether messages are "disturbing" or individuals are "racist" are subjective matters of personal belief that cannot be objectively proven or disproven. *See*

*Schifanelli v. Queen Anne's Cnty. Bd. of Comm'rs*, Case No. 20-cv-2906-GLR, 2021 WL 3681157 at *7 (D. Md. Aug. 18, 2021), *aff'd,* Case No. 21-1942, 2023 WL 3918679 (4th Cir. June 9, 2023) ("[O]ne's personal belief that another is a 'racist' or 'liar' who is guilty of 'inciting violence' or engaging in a 'smear campaign' is fairly construed as a statement of opinion that is incapable of being proven true or false."); *McReady v. O'Malley*, 804 F. Supp. 2d 427, 442 (D. Md. 2011) ("How one could objectively be proven to be 'rabid with bitterness' as a matter of *fact* is beyond the Court."). While the statement that the officers could be putting citizens at risk is somewhat more conducive to objective proof, Braveboy's statement clearly indicated that she was speaking of "her concern" that the officers posed a danger, thus clearly couching her statement as an opinion. As Ms. Braveboy testified in her deposition, her opinion that the officers posed a threat to the public was based upon the "bias against residents" of the County that the text messages demonstrated as well as the credibility problems the officers would face if they were called to testify, which generated her concern that the texts would risk significant witness credibility problems. *See* ECF No. 59-3 at 10 (Braveboy Deposition 130:9–22); *see also* ECF No. 59-4 at 3 (Braveboy declaration).

And although a statement of opinion can become actionable if it *implies* a fact that is provably false, Braveboy's statements are not actionable under that aspect of the standard either. "If the facts from which a defendant forms his or her opinion are given or are readily available and those facts cannot be proved false, the defendant is not subject to liability for the opinion." *Peroutka*, 116 Md. App. at 320; *see also* Restatement (Second) of Torts § 566 cmt. c (1977) ("If the defendant bases his expression of a derogatory opinion of the plaintiff on his own statement of facts that are not defamatory, he is not subject to liability for the factual statement—nor for the

expression of opinion, so long as it does not reasonably indicate an assertion of the existence of other, defamatory[] facts that would justify the forming of the opinion.”). Braveboy’s statements during the interview were opinions based upon disclosed facts that were undisputedly true, and therefore her opinion statements are inactionable as a matter of law. In the televised report, Braveboy’s comments are surrounded by the immediate context of Wormuth and Brooke’s text messages, including Wormuth’s text message referring to Black people as “fucking animals” that Brooke affirmed. It was, and is, an undisputed fact that Plaintiffs sent these text messages. It was also known and was part of the news report that Wormuth had physically assaulted a Black minor who was already handcuffed at the time. In that context, Braveboy’s statements that the text messages were “very disturbing” and that Plaintiffs were “racist individuals” who were placing “citizens at risk” were opinion statements based upon the disclosed facts of the text messages and the assault. Braveboy’s statements did not imply knowledge of other undisclosed facts that turned out to be false but instead were presented in connection with the text messages, a sampling of which were provided along with her statements. *Cf. Peroutka*, 116 Md. App. at 319–20 (“When the underlying facts used to form the opinion are not given along with the defamatory statement, the statement itself may be treated as being factual and therefore potentially defamatory.”); *Connolly*, 685 F. Supp. 3d at 338 (“[A]ssuming arguendo that the statements in question are properly considered opinions, they can still be actionable if they are based upon or imply the existence of untrue facts.”). For these reasons, Braveboy is entitled to summary judgment on the defamation claims.

A claim for false light under Maryland law “must meet the same legal standards as an allegation of defamation,” and thus Maryland courts apply the

same analysis. *Hosmane v. Seley-Radtke*, 227 Md. App. 11, 20 n.2 (2016). Accordingly, Braveboy is entitled to summary judgment on Counts 8 and 9.

### B. Unlawful search claims against Savoy (Counts 4 and 7)

At this point, Plaintiffs' unlawful search claims pertain only to Defendant Savoy's search of Wormuth's phone during the roughly 22-hour period that Plaintiffs contend she accessed it before Judge Woodard issued a search warrant for the contents of the device. *See Wormuth*, 2025 WL 958568, at *9–13.[6] Defendants contend that Wormuth has shown no concrete injury stemming from the warrantless search and would only be

---

[6] Plaintiffs contend that this Court committed an error in its prior opinion by failing to "address the second warrantless search alleged in Count IV" that occurred in 2023. ECF No. 61 at 8. Plaintiffs do appear correct in noting that this Court "mistakenly identif[ied]" Defendant Michael Elser as an Assistant State's Attorney, rather than as a PGPD officer, in its earlier opinion. ECF No. 61 at 8–9; *see also Wormuth*, 2025 WL 958568, at *1 n.2 (identifying Elser as one of the State's Attorney Defendants). But that opinion, and the accompanying order, which were issued in March 2025, were clear that the only unlawful search claims that would be proceeding to discovery were the claims against Savoy as to the brief warrantless search. *See id.* at *15 (identifying the only portions of Counts 4 and 7 to "proceed" as to those claims were "as to Defendant Savoy, as to the warrantless search only"); ECF No. 49 at 1–2 (identifying Elser as one of the "State's Attorney Defendants" and stating that "[a]ll counts alleged against the State's Attorney Defendants are dismissed" except for Counts 8 and 9 against Braveboy). Wormuth could have moved for reconsideration, but never did so. He also did not bring the issue to the Court's attention until his opposition to Defendants' motions for summary judgment and never sought to expand the scope of discovery to include any search by Elser. Thus, discovery proceeded—over the course of approximately 5 months—without any such claim as part of discovery. Accordingly, insofar as Wormuth asserted a claim against Elser based on a search of his phone in January 2023, he has forfeited that claim. *See Edd Potter Coal Co. v. Dir., Off. of Workers' Comp. Programs, U.S. Dep't of Lab.*, 39 F.4th 202, 206 (4th Cir. 2022) ("Forfeiture results when a party fails to raise an issue at the appropriate time."); *Puckett v. United States*, 556 U.S. 129, 134 (2009) ("If a litigant believes that an error has occurred (to his detriment) during a federal judicial proceeding, he must object in order to preserve the issue."). The claims as to Elser's search remain dismissed.

entitled to nominal damages, and thus lacks standing for his Fourth Amendment claim. ECF No. 58-1 at 8. Wormuth contends that the Fourth Amendment violation was itself a cognizable injury, and that even if there were no actual damages, he has standing to claim nominal damages as outlined in *Uzuegbunam v. Preczewski*, 592 U.S. 279, 290–93 (2021).

To establish standing under Article III of the U.S. Constitution, "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). "[S]tanding is not dispensed in gross," and thus "plaintiffs do not show standing to press *claims* so much as they show standing, within each claim, to seek each *remedy* they ask for." *Wells v. Johnson*, 150 F.4th 289, 299 (4th Cir. 2025) (quotations omitted).

Regarding the first prong of the standing inquiry, Wormuth's claim that Savoy searched his phone without a warrant—even if her warrantless access lasted less than one day—constitutes a cognizable injury in fact. "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 578 U.S. at 339 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). While "traditional tangible harms, such as physical harms and monetary harms," clearly satisfy this requirement, "[v]arious intangible harms can also be concrete." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021). "Chief among" such intangible harms giving rise to an injury-in-fact "are injuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts." *Id.* Savoy contends that Wormuth never experienced any actual harm stemming from the alleged warrantless

search, as the warrant that issued the following day would have uncovered the same messages. ECF No. 58-1 at 5–6. But a government's intrusion upon a plaintiff's privacy that violates the Fourth Amendment can itself constitute a sufficiently concrete, intangible injury in fact, as the Fourth Amendment is connected to recognized, traditional torts such as common law trespass. *See United States v. Jones*, 565 U.S. 400, 405 (2012) ("Fourth Amendment jurisprudence was tied to common-law trespass, at least until the latter half of the 20th century."); *Smith v. Travelpiece*, 31 F.4th 878, 887 (4th Cir. 2022) ("[T]respass is the most natural common-law analogy for a Fourth Amendment unreasonable-search-and-seizure claim."); *see also TransUnion*, 594 U.S. at 425 ("traditional harms" that meet the injury-in-fact requirement "may . . . include harms specified by the Constitution itself"); *Jonathan R. by ex rel. Dixon v. Morrisey*, 178 F.4th 139, 162 (4th Cir. 2026) ("An injury sufficient for standing may take the form of 'an injury to one's constitutional rights.'") (quoting *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024)). And Savoy does not suggest that an exception to the warrant requirement applied. *See* ECF No. 58-1 at 5–6 (arguing only lack of standing). Based on the evidence showing that the contents of his phone were accessed a day prior to the warrant, Wormuth has developed sufficient evidence from which a reasonable factfinder could conclude that Savoy violated his Fourth Amendment rights by conducting a warrantless search. Accordingly, he has established a cognizable injury in fact.

Regarding the redressability prong, Wormuth's claim for nominal damages can satisfy that requirement. "An injury is redressable if it is 'likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *Doe v. Va. Dep't of State Police*, 713 F.3d 745, 755 (4th Cir. 2013) (quoting *Friends of the Earth, Inc. v.*

*Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 181 (2000)). Savoy contends that Wormuth lacks any evidence of compensable harm and thus lacks standing. *See* ECF No. 58-1 at 4–8. But the Supreme Court has held that "a request for nominal damages satisfies the redressability element of standing where a plaintiff's claim is based on a completed violation of a legal right." *Uzuegbunam*, 592 U.S. at 292.[7] Accordingly, Wormuth has standing to pursue his Fourth Amendment claim.

Though Wormuth has standing to challenge the warrantless search and seek nominal damages, Savoy is entitled to summary judgment on Wormuth's claims for compensatory and punitive damages. At the summary judgment stage, there must be evidence from which a reasonable jury could conclude that a plaintiff is entitled to the damages they seek. *See Dash v. Mayweather*, 731 F.3d 303, 313 (4th Cir. 2013) ("In the summary judgment context, once a defendant has properly supported his claim that there are no actual damages resulting from infringement, the plaintiff must respond with nonspeculative evidence that such damages do, in fact, exist.").

Wormuth has not established any evidence from which a reasonable jury could award compensable or punitive damages for the 22 hours in which Savoy allegedly accessed his phone without a warrant. "It is the plaintiff's burden to prove damages through the use of evidence[.]" *Neal v. United States*, 599 F. Supp. 3d 270, 301 (D. Md. 2022). And "compensatory damages" under § 1983 require "proof of 'actual injury.'" *Bernadou v. Purnell*, 836 F. Supp. 319, 326 (D. Md. 1993) (quoting *Memphis Cmty. Sch.*

---

[7] Though Wormuth also notes the availability of attorneys' fees in the section of his brief on standing, ECF No. 61 at 18, that remedy is irrelevant to the redressability analysis: "A request for attorney's fees or costs cannot establish standing because those awards are merely a byproduct of a suit that already succeeded, not a form of redressability." *Uzuegbunam*, 592 U.S. at 293 (quotations omitted).

*Dist. v. Stachura*, 477 U.S. 299, 308 (1986), *aff'd sub nom. Bernadou v. Rollins*, 8 F.3d 816 (4th Cir. 1993)). Wormuth has identified no evidence in the summary judgment record of economic or non-economic injuries that he suffered as a result of Savoy's alleged pre-warrant search. While he points to the resulting disciplinary action and criminal conviction, ECF No. 61 at 17–18, these events occurred following the issuance of the search warrant. And the warrant itself was obtained in reliance upon facts related to Wormuth's assault that were already available to Savoy prior to March 9, 2021, not from facts learned through a search of the phone. *See* ECF No. 45-1 at 6 (Savoy's affidavit in support of the application for the search warrant relating the facts of Wormuth's assault).

At the hearing, when pressed to identify any evidence or theory of injuries from the *warrantless* search that he claims he would not have suffered as a result of the constitutional search the next day, Wormuth's response was to state that, at his state court sentencing on his assault and abuse of office charges, the prosecution showed a version of racist text messages that Savoy took using her phone prior to obtaining the warrant (*i.e.*, a photo from her phone showing the screen of Wormuth's phone), rather than a screenshot directly from Wormuth's phone. ECF No. 74 (Q. "Explain to me what evidence in the record exists that . . . Wormuth suffered compensable injury because of the search during that one day? A. Yeah. The only response I would have and it may be a thin reed, Your Honor, is that the product of that warrantless search was then used against my client in a criminal case. . . . [T]hey were not shown to the jury during the criminal case. . . . They were however used for sentencing."). But Wormuth did not dispute that the same text messages were available from the search pursuant to the warrant. And there is no evidence that the format of the text messages that were

displayed at sentencing had any effect on Wormuth's sentence. Accordingly, Savoy is entitled to summary judgment as to Wormuth's claim to compensatory damages for the alleged warrantless search of his device on March 9, 2021.

There is also no evidence that would permit a reasonable juror to award punitive damages. "Punitive damages for violations of § 1983 are available only when the defendant's conduct is shown to be motivated by 'evil motive or intent' or when it involves 'reckless or callous indifference to the federally protected rights of others.'" *Does 1-22 v. Bd. of Educ. of Prince George's Cnty.*, 644 F. Supp. 3d 149, 162 (D. Md. 2022) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)); *see also Henderson v. Motley*, Case No. 13-cv-55, 2014 WL 3661107, at *11 (W.D. Va. July 22, 2014) ("The award of punitive damages is an extraordinary remedy and is designed to punish and deter particularly egregious conduct."). There is no evidence that Savoy acted with "evil motive or intent" or "reckless or callous indifference to the federally protected rights of others" prior to obtaining the warrant. A deposition of Savoy is not in the record in this case. Instead, Wormuth filed a supplemental exhibit consisting of Savoy's trial testimony in an unrelated case. *See* ECF No. 66 (providing an excerpt of the jury trial transcript from *Magassouba v. Prince George's Cnty.*, Case No. 23-cv-767-TJS (D. Md.)). But Savoy does not discuss Wormuth or the search at issue in this case during that testimony. And there is no testimony or documentary evidence in the record of this case concerning why Savoy would have accessed the phone one day before obtaining a warrant or the circumstances behind her doing so. Even construing the record in the light most favorable to Wormuth, Savoy is entitled to summary judgment regarding punitive damages with respect to the alleged warrantless, unconstitutional search.

Though Savoy is entitled to summary judgment on Wormuth's compensatory and punitive damages claims, that still leaves nominal damages (as discussed above) and equitable relief. Regarding equitable relief, Wormuth also requested in his amended complaint a declaratory judgment stating that "the government has no further right to possess data obtained from [his] personal cellular phone seized on March 2, 2021 by Defendant Savoy," and an injunction that "[o]rder[s] the government forthwith to return to Plaintiffs all data copies obtained from the cellular phone and otherwise enjoin[s] the government from any further use of the cellular phone data." ECF No. 30 at 59–60.

As PGPD eventually obtained a warrant for the phone, Wormuth has not identified any legal basis at this juncture to explain why copies of his data should be returned and/or why the government should be unable to access his phone in the future if they properly apply for another warrant. But the parties did not brief this issue, and since Wormuth's unlawful search claim is continuing on his nominal damages request, the Court will delay resolution of the issue of equitable relief until the pre- or post-trial briefing stage.

As Maryland courts analyze state and federal unlawful search claims identically, the Court's analysis above applies equally to Wormuth's claim in Count 7 that Savoy violated his rights under Article 26 of the Maryland Declaration of Rights. *See Washington v. State*, 482 Md. 395, 408 (2022) (explaining Maryland's "longstanding practice of interpreting Article 26 *in pari materia* with the Fourth Amendment"); ECF No. 30 ¶ 191 ("Article 26 of the Maryland Declaration of Rights provides . . . protections coextensive with the Fourth Amendment[.]"); *see also Hollingsworth v. Perry*, 570 U.S.

693, 714–15 (2013) ("Standing in federal court is a question of federal law, not state law.").

In summary, Savoy is not entitled to summary judgment as to Wormuth's Fourth Amendment or Article 26 claims for lack of standing. But Savoy is entitled to summary judgment as to Wormuth's claims for compensatory and punitive damages because there is no evidence from which a reasonable factfinder could impose either, even construing the record in the light most favorable to Wormuth. Accordingly, the unlawful search claims will proceed to trial, at which the relief available will be limited to nominal damages and/or equitable relief.

### C. Retaliation claims against the County Defendants (Counts 1 and 5)

Next are Plaintiffs' claims that the County Defendants retaliated against them in violation of their rights under the First Amendment of the U.S. Constitution.

The First Amendment generally prohibits government officials from engaging in retaliatory actions against an individual because of the individual's protected speech. *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019). "This remains true when speech concerns information related to public employment." *Hunter v. Town of Mocksville*, 789 F.3d 389, 396 (4th Cir. 2015). But "[g]overnment employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). Thus, courts faced with a First Amendment retaliation claim asserted by a government employee must balance the First Amendment interest of the employee against "the government's countervailing interest in controlling the operation of its workplaces." *Lane v. Franks*, 573 U.S. 228, 236 (2014).

This analysis entails a three-part test. First, a court "determin[es] whether the employee spoke as a citizen on a matter of public concern." *Garcetti*, 547 U.S. at 418. "If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." *Id.* Second, a court asks whether the employee's "interest in First Amendment expression outweighed the [government's] interest in the efficient provision of public services." *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 317 (4th Cir. 2006). This step is commonly referred to as "*Pickering* balancing," after *Pickering v. Board of Education,* 391 U.S. 563 (1968). Third, "if the employee's claim satisfies both of these legal criteria, the court turns to the factual question of 'whether the employee's speech was a substantial factor in the employee's termination [or other adverse] decision.'" *Brooks v. Arthur*, 685 F.3d 367, 371 (4th Cir. 2012) (quoting *McVey v. Stacy*, 157 F.3d 271, 277–78 (4th Cir. 1998)). "The first two prongs of this test are questions of law, while the third is a factual inquiry." *Crouse v. Town of Moncks Corner*, 848 F.3d 576, 583 (4th Cir. 2017).

The County Defendants have asserted a defense of qualified immunity as to Plaintiffs' retaliation claims.[8] Under the doctrine of qualified immunity, government

---

[8] The County Defendants did not raise a qualified immunity defense in their motion for summary judgment, though both sides addressed it in the supplemental briefing. *See* ECF Nos. 76, 77. Generally, a failure to raise such an argument results in forfeiture. *See DePaola v. Clarke*, 884 F.3d 481, 488 (4th Cir. 2018) ("Defendants . . . did not raise the defense of qualified immunity in their motions to dismiss in the district court and, therefore, have waived that argument on appeal."). Here, however, the County Defendants did raise qualified immunity as a defense to the retaliation claims in their answer and their motion for judgment on the pleadings. *See* ECF No. 22 at 16; ECF No. 37-1 at 10–12. And the Court reserved ruling on that issue, because it stayed consideration of the retaliation claims under *Younger* abstention. *Wormuth*, 2025 WL 958568, at *7 ("*Younger* abstention applies as to Counts I and V. . . . Accordingly, the Court need not, and does not, decide whether Plaintiffs have stated cognizable free

officials are shielded "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). "There is a two-prong test for resolving qualified immunity claims." *Walker v. Prince George's Cnty.*, 575 F.3d 426, 429 (4th Cir. 2009). "To defeat a qualified immunity defense, a plaintiff must show (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Crouse*, 848 F.3d at 583 (quotations omitted). Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236.

#### i. Wormuth

The Court need not address whether the County Defendants violated Wormuth's rights under the First Amendment because, even assuming that they did, he has not come forward with evidence showing that Defendants violated a clearly established right. *See West v. Murphy*, 771 F.3d 209, 214 (4th Cir. 2014) (courts "may address either prong of the qualified immunity analysis first").

"A right is clearly established only if its contours are sufficiently clear that 'a reasonable official would understand that what he is doing violates that right.'" *Carroll v. Carman*, 574 U.S. 13, 16 (2014) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640 (1987)). "In order to hold that a right is clearly established, a court does not need to find

---

speech retaliation claims."). Given that the stay pursuant to *Younger* abstention was only lifted on May 15, 2026, the County Defendants' qualified immunity defense was properly preserved and is squarely before the Court at this stage.

'a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.'" *Crouse*, 848 F.3d at 583 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments[.]" *Spencer v. Glaser*, --- F.4th ---, 2026 WL 2235303, at *4 (4th Cir. Aug. 4, 2026) (quotations omitted).

Because steps one and two of the First Amendment retaliation inquiry are questions of law, "an employer is entitled to qualified immunity if either [step] cannot be resolved under clearly established law." *Crouse*, 848 F.3d at 583. Here, the County Defendants are entitled to qualified immunity as to both steps.

At the first step of the First Amendment retaliation inquiry, the Court "determin[es] whether the employee spoke as a citizen on a matter of public concern." *Garcetti*, 547 U.S. at 418. "This [step] can in turn be divided into two inquiries: whether the speech was made as a citizen or pursuant to the employee's duties, *Garcetti*, 547 U.S. at 421, and whether the content of the speech addressed 'a matter of interest to the community' rather than 'complaints over internal office affairs[,]' *Connick* [*v. Myers*, 461 U.S. 138, 149 (1983)]." *Crouse*, 848 F.3d at 583. In other words, a First Amendment retaliation claim by a public employee plaintiff requires that (a) the plaintiff spoke "as a citizen" rather than as an employee; and (b) the speech "addressed a matter of public concern" rather than private topics. *Id.* A failure to satisfy either requirement means "the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." *Id.*

"Speech involves a matter of public concern when it involves an issue of social, political, or other interest to a community." *Grutzmacher v. Howard Cnty.*, 851 F.3d 332, 343 (4th Cir. 2017) (quoting *Urofsky v. Gilmore*, 216 F.3d 401, 406 (4th Cir.

2000)). The public concern inquiry "centers on whether the public or the community is likely to be truly concerned with or interested in the particular expression." *Id.* (quotations omitted). Not everything that a public employee says pertains to a matter of public concern, even if the speech is about the employee's job or expresses criticism about other government officials. *See Brooks*, 685 F.3d at 373 ("The Supreme Court has warned us to guard against 'attempt[s] to constitutionalize the employee grievance.'") (quoting *Connick v. Myers*, 461 U.S. 138, 154 (1983)). "[M]atters of internal policy, including mere allegations of favoritism, employment rumors, and other complaints of interpersonal discord, are not treated as matters of public policy." *Goldstein v. Chestnut Ridge Volunteer Fire Co.*, 218 F.3d 337, 352 (4th Cir. 2000). "Deciding whether speech is of public or private concern requires [courts] to examine the 'content, form, and context' of that speech, 'as revealed by the whole record.'" *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (ultimately quoting *Connick*, 461 U.S. at 147–48).

The County Defendants are entitled to qualified immunity as to step one because it is not "beyond debate" that Wormuth's text messages were about matters of public concern. *al-Kidd*, 563 U.S. at 741.[9] Some of the texts reflect Mr. Wormuth expressing racist sentiments and using slurs in conversations with his family about seemingly private topics. *See, e.g.*, ECF No. 61-2 at 1 (Charge #2, related to text message discussing the race and ethnicity of an individual's prior romantic partners). While several of the texts do discuss PGPD business and police affairs, many can be reasonably described as "complaints of interpersonal discord," *Goldstein*, 218 F.3d at 352, that are not protected.

[9] The County Defendants do not contend that the texts were made in Wormuth's capacity as an employee, so the Court need not address this aspect of the step-one analysis.

Text #15, for example, criticized a former officer from Hyattsville—a municipality within Prince George's County—who had been elevated to department chief in another county. Text #7 criticizes a fellow officer as a "snitch" for giving trial testimony. ECF No. 61-2 at 3. Text #19 refers to Black female officers as "shit turd like the rest of them." *Id.* at 7. Even if such critical sentiments regarding a police officer are ultimately matters of public concern for purposes of the First Amendment retaliation inquiry, Wormuth's expression of these sentiments about colleagues also reflected his expression of internal grievance regarding what he viewed as unwarranted favorable treatment of Black co-workers. Plaintiffs have not shown that it was clearly established that Wormuth's racist comments about his fellow officers fell on the protected side of the First Amendment retaliation line. *Carroll*, 574 U.S. at 17.

Plaintiffs contend that Fourth Circuit precedent clearly establishes that speech critical of Police Department policies and "racial discrimination within a law enforcement agency" are matters of public concern. *See* ECF No. 76 at 17–18 (citing *Liverman v. City of Petersburg*, 844 F.3d 400 (4th Cir. 2016), *Cromer v. Brown*, 88 F.3d 1315 (4th Cir. 1996), and *Hunter v. Town of Mocksville*, 789 F.3d 389 (4th Cir. 2015)). But all of these cases are distinguishable; none "clearly establish" that Wormuth's texts were on matters of public concern. In *Liverman*, the police department defendant enacted a social media policy that functioned as a "virtual blanket prohibition on all speech critical of the government employer" and "prevent[ed] plaintiffs and any other officer from making unfavorable comments on the operations and policies of the Department." 844 F.3d at 407–08. PGPD's actions here do not aim with such "astonishing breadth," *id.* at 408, to target all negative comments, but instead pertained to text messages that frequently mixed violent rhetoric with race-related workplace

complaints. In *Hunter*, the plaintiff officers had contacted the NAACP and the North Carolina Attorney General's Office and Governor's Office to discuss concerns about corruption and racial discrimination in their police department. 789 F.3d at 399. Such speech is easily distinguishable from the texts here. Though Wormuth's texts did involve complaints about racial discrimination, they were also shot through with personal insults, slurs, and name-calling that were unrelated to the police department's public affairs, a far cry from the political advocacy in *Hunter*. And regardless, *Hunter* cannot be relied upon to "clearly establish" Wormuth's rights here because there was no dispute in *Hunter* that the speech was on a matter of public concern, and thus the Fourth Circuit did not rule on the issue. *Id.* at 400 n.2. Finally, regarding *Cromer*, the speech at issue in that case was a group letter from nearly all of the Black sheriff's deputies in a sheriff's department concerning racial discrimination. 88 F.3d at 1326. As with *Hunter*, such speech that clearly takes the form of concerted advocacy is categorically different than the personal venting that Wormuth engaged in here. The *Cromer* court itself recognized this difference, noting that "the letter was not the expression of a single disgruntled employee about a personal employment dispute" and thus more clearly was protected speech. *Id.* Even assuming that Wormuth's texts did speak on matters of public concern, it was not unreasonable for PGPD to conclude that they did not under this precedent.

Finally, as Plaintiffs correctly note, "[a] statement's arguably inappropriate or controversial character . . . is irrelevant to the question whether it deals with a matter of public concern." *Snyder*, 562 U.S. at 453 (internal quotations omitted); *see* ECF No. 76 at 18–19. But while it may be clearly established that "inappropriate" speech can still be protected, Wormuth's speech here was not merely offensive. The relevant distinction for First Amendment purposes is that it primarily took the form of workplace grievance,

which the Fourth Circuit has admonished courts not to "constitutionalize." *Brooks*, 685 F.3d at 373. Accordingly, it was not clearly established that Wormuth's texts were on matters of public concern.

Additionally, even if the conclusion that Wormuth's texts involved matters of public concern was clearly established, the County Defendants would be entitled to immunity regardless because it was not unreasonable for them to conclude that government interests outweighed Wormuth's free speech interest under *Pickering* balancing.

In the *Pickering* inquiry, the government bears the burden to show that its decision to fire the employee was justified to maintain the provision of government services. *Lawson v. Union Cnty. Clerk of Ct.*, 828 F.3d 239, 252 (4th Cir. 2016). To show this, "the government need not prove that the employee's speech actually disrupted efficiency; rather, its burden is to show that an adverse effect was reasonably to be apprehended." *Id.* (quotations omitted); *see also Fenico v. City of Philadelphia*, 755 F. Supp. 3d 602, 620 (E.D. Pa. 2024) ("[I]t is axiomatic that an employer need not 'allow events to unfold to the extent that the disruption of the office and destruction of working relationships is manifest before taking action' against disruptive employee speech—a reasonable belief that the speech could cause disruption is enough.") (quoting *Connick*, 461 U.S. at 152). "Factors relevant to this inquiry include whether a public employee's speech (1) impaired the maintenance of discipline by supervisors; (2) impaired harmony among coworkers; (3) damaged close personal relationships; (4) impeded the performance of the public employee's duties; (5) interfered with the operation of the institution; (6) undermined the mission of the institution; (7) was communicated to the public or to coworkers in private; (8) conflicted with the

responsibilities of the employee within the institution; and (9) abused the authority and public accountability that the employee's role entailed." *Ridpath*, 447 F.3d at 317.

In *Crouse*, two ex-police detective plaintiffs sued their former department and its police chief who had "forced" them to resign, claiming First Amendment retaliation. 848 F.3d at 580. The plaintiffs had gone to the home of an individual who had been assaulted by another police officer (with whom they had an interpersonal conflict) to encourage the assault victim to sue the department for excessive force. *Id.* at 581. When the department discovered this visit, the *Crouse* plaintiffs were told they could either resign or their employment would be terminated. *Id.* at 582. The Fourth Circuit held that the police chief was entitled to qualified immunity both because he reasonably concluded that the detectives had spoken in their official capacities and because "based on the clearly established law at the time of [the chief's] decision and the facts he knew at that time, the outcome of the *Pickering* balancing test is not 'beyond debate.'" *Id.* at 585 (quoting *al-Kidd*, 563 U.S. at 741). The *Crouse* court emphasized the fact that the detectives had not made public statements, and thus the chief "could reasonably have surmised that the lessened public interest in the speech meant that his freedom of action was correspondingly broader." *Id.* at 586. Further, the chief's actions were more reasonable because he "was entitled to regard [the detectives'] speech as an outgrowth of their private dissatisfactions" with the officer who had committed the assault. *Id.* But "[m]ost critically," the chief was entitled to qualified immunity because he viewed the detectives' speech "as a threat to his ability to manage the police department." *Id.* The court noted that "greater latitude is afforded to police department officials in dealing with dissension in their ranks" and the detectives' speech could reasonably have been expected to "undermine the hierarchical structure that even the most admirably

collaborative institutions maintain." *Id.* at 586–87. The court concluded by noting that "no court has managed to sketch out completely clear criteria governing claims of retaliation against employees for the exercise of First Amendment rights," and thus "[i]n the absence of clear rules, there must remain room for the judgment of those officials to whom responsibility has been entrusted and accompanying accountability has been required." *Id.* at 587.

There is little daylight between this case and *Crouse* regarding qualified immunity as to *Pickering* balancing. Wormuth's texts here, in addition to expressing hateful slurs and stereotypes, could reasonably have been expected to "undermine the hierarchical structure" of the PGPD. The texts are rife with prejudiced criticism of co-workers and superiors. *See* ECF No. 61-2 at 2 (Text #3: "No doubt . . . black people in a white mans job"); *id.* (Text #4: "God forbid we make a black person look bad, or expose them here for what they are . . . fuckin animals"); *id.* at 5 (Text #14: "The lodge didn't endorse any candidate for president due to the gays and blacks!!!!"). As in *Crouse*, it was reasonable for the PGPD to conclude that these messages—which were sent to other PGPD officers—indicated that Wormuth posed a threat to police operations and affairs. Further, as in *Crouse*, the facts that Wormuth's texts were not made as public statements and were expressions of workplace grievance weigh for the reasonableness of PGPD's termination decision. Additionally, as Braveboy explained in her testimony, the PGPD would likely have difficulty deploying Wormuth effectively as a law enforcement witness: his prejudiced texts would likely have to be disclosed to the defense in criminal trials, creating severe credibility problems if he were to testify and thus undermining the County's ability to effectively enforce the law. *See* ECF No. 59-3 at 10 (Braveboy Dep. 130:9–22). Finally, the fact that Wormuth's texts indicated a disdain for—and desire for

violence against—those he sees as different from him could reasonably have led to the conclusion that his continued service as a police officer would be ineffective or dangerous, especially in the diverse county that he served. *See Munroe v. Cent. Bucks Sch. Dist.*, 805 F.3d 454, 474 (3d Cir. 2015) ("[I]nvective directed against the very persons that the governmental agency is meant to serve could be expected to have serious consequences for the performance of the speaker's duties and the agency's regular operations."); *Locurto v. Giuliani*, 447 F.3d 159, 183 (2d Cir. 2006) ("The First Amendment does not require a Government employer to sit idly by while its employees insult those they are hired to serve and protect.").

For these reasons, the County Defendants are entitled to summary judgment on Wormuth's First Amendment retaliation claims under the doctrine of qualified immunity.

**ii. Brooke**

The issue of First Amendment retaliation as to Plaintiff Brooke is more complicated. Brooke contends that the Circuit Court's July 15, 2025 order entitles him to prevail on his retaliation claim under the doctrine of issue preclusion. *See* ECF No. 76 at 8–10. Defendants contend that the Circuit Court's order was not a final judgment on the merits, and also argue that the Circuit Court's holding that two of the offending text messages were unprotected renders Brooke's claims moot. ECF No. 77 at 6–7; ECF No. 58-1 at 8–9. The Court need not decide whether Brooke is correct regarding the preclusive effect of the Circuit Court's ruling on Brooke as to the First Amendment claim, however, because regardless, Defendants are entitled to qualified immunity. Even if the Circuit Court's order has preclusive effect regarding the first prong of the qualified immunity analysis—whether Brooke's constitutional rights were violated—it does not

resolve the second prong: whether Defendants violated "clearly established" rights by issuing the discipline based upon the text messages. *See Est. of Zimmerman v. Blatter*, 458 Md. 698, 742 (2018) ("[W]hen collateral estoppel applies, facts or issues that were decided in the previous action are conclusive only if they are identical to facts or issues that are presented in the subsequent proceeding.") (quotations and alterations omitted). And on the "clearly established" prong for Brooke, as outlined above with regard to Wormuth, Defendants prevail.[10]

First, it is not "beyond debate" that Brooke's texts were about matters of public concern. As detailed above, several courts have concluded that complaints about co-workers and comments on office politics are not necessarily matters of public concern, even when the plaintiff is a government employee. Brooke's texts, like Wormuth's, involve several instances of workplace complaints. *See* ECF No. 61-2 at 4 (Text #10: "Did you see that little fuck got transferred to MRD what a joke"); *id.* at 5 (Text #15: "Can't wait to tell you about all the lazy turd #1s in the class smh"). In fact, Brooke described the text messages as "just two officers venting about, you know, stuff on the department and the current climate." *Brooke*, 2023 WL 5318327, at *5 n.8.[11] The

[10] Plaintiffs also contend that the Circuit Court ruling should have preclusive effect as to Wormuth's retaliation claim as well, since they involve similar messages and, in some instances, texts between the two. ECF No. 76 at 19. But Wormuth's texts are different than Brooke's, including, for example, texts among his family members. And for preclusion to apply, the two cases must involve the same parties or those in privity with the original parties. *Zimmerman*, 458 Md. at 741. Wormuth is not Brooke and has no relevant contract or legal right of succession with him, so there is no privity. Issue preclusion does not apply to Wormuth's retaliation claim.

[11] The Appellate Court described this statement as "Brooke's summation" of the texts. *Brooke*, 2023 WL 5318327, at *5 n.8. This statement does not appear to have been

ambiguity regarding Brooke's texts is underlined by the procedural history of his petition for an order to show cause. The Circuit Court initially found that all of the texts involved matters of public concern, and the Appellate Court subsequently disagreed and remanded for the Circuit Court to apply the proper legal test. When the Circuit Court did so, its analysis yielded a mixed result—two texts were unprotected, and the others were protected. If there was ambiguity for both a trial and appellate court regarding whether Brooke's texts addressed matters of public concern, it was not beyond debate that his text messages *were* protected.

And regardless, the County Defendants are entitled to qualified immunity with respect to the *Pickering* aspect of the analysis. As with Wormuth, Brooke's texts contain numerous race-based grievances about fellow officers and derogatory comments about the communities he was policing. *See* ECF No. 61-2 at 2 (Text #5: "Hearing about [homicides] like that and just imagining the whole block out there screaming and crying brings true warmth and happiness to my heart"); *id.* (Text #3: "We get a paper [cut] and bleed out, these savages get shot in the head and still won't die"). In Text #6, Brooke sent Wormuth a picture of a Black individual in a hospital bed with a swollen eye and a bandage on his forehead, accompanied by the words "This one felt glorious last night." ECF No. 61-3 at 12. At his deposition, Brooke testified that the individual was a "suspect" who had been the target of a "subject stop." ECF No. 61-6 at 5 (Brooke Dep. 88:15–22). As explained above, it is not unreasonable for a police department to terminate an officer's employment based on text messages that reflect a celebration of

included in any of the documents contained in the summary judgment record before this Court.

harm to members of the public (including those members of the public who are suspected of committing crimes). The County Defendants are entitled to qualified immunity as to the complex balancing of the efficient provision of government services against Brooke's First Amendment interest in his text messages, especially in light of the potential for internal conflict, the demonstration of prejudice towards community members, and the likely issues with witness credibility explained above.

Accordingly, even if issue preclusion applies regarding the question of whether the County Defendants violated Brooke's First Amendment right against retaliation, they are entitled to qualified immunity under the "clearly established" prong.

**iii. Article 40 retaliation**

The foregoing analysis applies only to Plaintiffs' federal-law claims of retaliation under the First Amendment. "Marylanders' free speech rights are also guaranteed by Article 40 of the Maryland Declaration of Rights, which provides 'that every citizen of the State ought to be allowed to speak, write and publish [their] sentiments on all subjects, being responsible for the abuse of that privilege.'" *Brooke*, 2023 WL 5318327, at *3 n.4 (quoting Md. Const., Decl. of Rts., art. 40). "Although the two constitutional provisions are worded differently and this Court has sometimes held out the possibility that Article 40 could be construed differently from the First Amendment in some circumstances, [Maryland courts have] generally regarded the protections afforded by Article 40 as 'coextensive' with those under the First Amendment." *Clear Channel Outdoor, Inc. v. Dir., Dep't of Fin. of Balt. City*, 472 Md. 444, 457 (2021) (quoting *Newell v. Runnels*, 407 Md. 578, 608 (2009)).

One major difference between Plaintiffs' Article 40 and First Amendment claims is qualified immunity. "[N]o qualified immunity defense is allowed for claims under

Maryland's Constitution." *Crystal v. Batts*, Case No. 14-cv-3989-JKB, 2015 WL 5698534, at *9 (D. Md. Sept. 25, 2015). Thus, the Court's conclusion above that the County Defendants are entitled to qualified immunity irrespective of the preclusive effect of the Circuit Court's order does *not* apply to the Article 40 claims.

Under 28 U.S.C. § 1367(a), "district courts . . . have supplemental jurisdiction over all other claims that are so related to claims in the action within [their] original jurisdiction that they form part of the same case or controversy[.]" "Claims are part of the same case or controversy if they stem from a 'common nucleus of operative facts.'" *Potomac Conf. Corp. of Seventh-day Adventists v. Takoma Acad. Alumni Ass'n, Inc.*, 2 F. Supp. 3d 758, 766 (D. Md. 2014) (quoting *Rosmer v. Pfizer Inc.*, 263 F.3d 110, 116 (4th Cir. 2001)). The exercise of supplemental jurisdiction "is a doctrine of discretion, not of plaintiff's right." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966). In particular, "district courts may decline to exercise supplemental jurisdiction" if "(1) the claim raises a novel or complex issue of State law"; "(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction"; "(3) the district court has dismissed all claims over which it has original jurisdiction"; or "(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction." 28 U.S.C. § 1367(c).

The Court will decline to exercise supplemental jurisdiction over Plaintiffs' Article 40 claims for two reasons.

First, adjudication of the claims involves resolving a complex issue of state law, namely whether the Circuit Court's order as to Brooke's text messages is a final judgment on the merits that is entitled to preclusive effect. As Plaintiffs themselves recognized in their supplemental brief, the Supreme Court of Maryland has not ruled on

whether an appealed judgment has preclusive effect, and there is a split among other jurisdictions. ECF No. 76 at 9–10; *see also Campbell v. Lake Hallowell Homeowners Ass'n*, 157 Md. App. 504, 521 (2004) ("The finality of a judgment on appeal for purposes of res judicata and collateral estoppel remains, as of today, an open question in Maryland."). And at the time of the supplemental briefing, the appeal of Brooke's case remained pending. *See* Md. Rule 8-606(a) ("Any disposition of an appeal, including a voluntary dismissal, shall be evidenced by the mandate of the Court, which shall be certified by the Clerk under the seal of the Court and shall constitute the judgment of the Court."). Further complicating matters, the settlement agreement between Brooke and the PGPD was contingent upon Brooke withdrawing his case in the Circuit Court with prejudice. *See* ECF No. 73-2 at 2. The parties have not cited any Maryland case involving the unusual circumstances of a plaintiff who settles following an order that was appealed and then attempts to use the order for offensive preclusion purposes in a subsequent case. The Court has likewise been unable to find any such precedent. The Court would also have to resolve whether the Circuit Court's remand of two of the text messages constituted an order on only part of Brooke's claim, which would not be a final judgment under Maryland law. *Gertz v. Anne Arundel Cnty.*, 339 Md. 261, 272–73 (1995) ("Maryland Rule 2–602(a) makes clear that an order that does not adjudicate all of the claims in an action, or that adjudicates less than an entire claim . . . is not a final judgment[.]"). Additionally, the Court would have to determine whether the Circuit Court's order that the texts were protected under the First Amendment or Article 40 for purposes of the show cause petition involved identical issues to a retaliation claim under Article 40. Determining the preclusive effect of the Circuit Court's judgment involves deciding complex questions of Maryland constitutional and procedural law.

Second, if the Court were to allow the Article 40 claims to proceed in this Court, these claims would predominate over the only remaining federal law claim (Wormuth's unlawful search claim against Savoy). "Federal courts have not hesitated to dismiss or remand state causes of action where the state claims would require elements of proof that are distinct and foreign to the federal claim, and which would therefore cause a substantial expansion of the action beyond that necessary and relevant to the federal claim." *Green v. Zendrian*, 916 F. Supp. 493, 498 (D. Md. 1996) (quotations and alterations omitted). State law claims may predominate "in terms of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought[.]" *Gibbs*, 383 U.S. at 726. Here, the factual question involving the unlawful search issue is singular and straightforward: did Savoy search Wormuth's phone prior to obtaining a warrant? And as explained above, Wormuth is entitled only to nominal damages on that claim. If the Article 40 claims were to continue to trial in this forum, the state law claims would predominate in terms of the factual issues as to liability and damages. *See Green*, 916 F. Supp. at 500 (dismissing "state law claims that were substantially more expansive and complex than the federal claims over which this Court had original jurisdiction."). They would entail an entirely different set of events involving an additional Plaintiff (Brooke) and numerous additional Defendants (all County Defendants besides Savoy) who are not implicated in the unlawful search claims.

The Court acknowledges that its decision has the unusual effect of declining jurisdiction over certain state law claims and retaining it over others, as it has elected to exercise supplemental jurisdiction over the state law unlawful search as well as the defamation and false light state law claims against Braveboy. "[A]lthough it is unusual, it is permissible for the federal court to decide one supplemental claim on the merits

while declining to hear another supplemental claim." 13D *Wright & Miller's Federal Practice & Procedure* § 3567.3 (3d ed.) (citing *Southerland v. Hardaway Mgmt. Co.*, 41 F.3d 250, 256 (6th Cir. 1994)). Here, this path is the prudent one. Maryland's constitutional provision concerning unlawful search—Article 26—is coextensive with the Fourth Amendment, as Plaintiffs recognize. *See* ECF No. 30 ¶ 191 (citing *King v. State*, 434 Md. 472, 482 (2013) ("[T]his Court has interpreted historically Article 26 *in pari materia* with the Fourth Amendment of the U.S. Constitution.")). So the retention of jurisdiction over Wormuth's Article 26 claim (Count 7) will not lead to the adjudication of any novel areas of state law or entail a broadening of the issues at trial.

Accordingly, in consideration of issues of judicial economy, fairness, federalism, and the deference owed to state courts for the interpretation of state law issues, the Court will decline to exercise supplemental jurisdiction over Plaintiffs' state law speech retaliation claims and dismiss those claims without prejudice.

## III. CONCLUSION

For the reasons explained above, the Court will grant Defendants summary judgment on Counts 1, 8, and 9 as well as summary judgment as to compensatory and punitive damages for Counts 4 and 7. The Court will dismiss Count 5 without prejudice. The only remaining claims are Wormuth's unlawful search claims under Counts 4 and 7 against Defendant Savoy for nominal damages and equitable relief. A separate order follows.

Date: September 29, 2026

*/s/*
Adam B. Abelson
United States District Judge